**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CRIMINAL CASE NO. 1:11-cr-00010-MR-DLH**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF**</u> |
| | ) | <u>**DECISION AND ORDER**</u> |
| | ) | |
| **JAMES W. "BILL" BAILEY, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the ancillary petitions filed by former clients of the Defendant James W. "Bill" Bailey, Jr., a financial advisor who has admitted to engaging in a massive Ponzi scheme to defraud investors of millions of dollars over the course of a decade. The Petitioners whose matters are addressed by this Order forwarded funds from their individual retirement accounts (IRAs) to the Defendant for the purpose of purchasing real estate, or funding real estate purchases by others, with their IRA funds. Unlike so many of the Defendant's other clients, whose funds were stolen and never invested as promised, the present Petitioners each received the real estate asset they had instructed

the Defendant to purchase within the time promised.  The Government now seeks the forfeiture of these properties from the Petitioners on the theory that these assets constitute the proceeds of the Defendant's fraud.  For the reasons that follow, the Court rejects the Government's position and therefore orders that these properties should be removed from the preliminary order of forfeiture.

## I.  PROCEDURAL BACKGROUND

On February 1, 2011, the Defendant James W. "Bill" Bailey was charged in a Bill of Information with filing false tax returns, in violation of 26 U.S.C. § 7206(l); committing mail fraud, in violation of 18 U.S.C. § 1341; and committing securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  [Doc. 1].  The Bill of Information contained a Notice of Forfeiture, which stated the Government's intent to pursue the forfeiture of the Defendant's interest in various properties pursuant to 18 U.S.C. § 982 and 28 U.S.C. § 2461(c), including "any and all assets titled in the name of LLCs established by Defendant and/or

Southern Financial Services for the purpose of managing and/or purchasing assets . . . ." [Id. at 3].[1]

The Defendant entered a plea of guilty to the Bill of Information on February 16, 2011. [Doc. 15]. Following the Defendant's plea of guilty, the Government and the Defendant presented the Court with a proposed Consent Order and Judgment of Forfeiture ("Consent Order"), pursuant to which the Defendant agreed to forfeit, among other things, his interest in the properties identified in the Notice of Forfeiture in the Bill of Information. [Doc. 16 at 8]. Beyond the Defendant's consent to the proposed forfeiture and his stipulation as set forth in the Plea Agreement that he "has or had a possessory interest or other legal interest in each item or property" identified in the Bill of Information [Doc. 3 at ¶8(b)], the Government presented no evidence supporting the forfeiture of these properties. The Consent Order was entered by the Magistrate Judge on February 16, 2011.

_____

[1] As originally entered, the Consent Order additionally authorized the preliminary forfeiture of "[a]ny and all interest in any LLCs, including LLCs in the name of Southern Financial Services clients, established by Defendant and/or Southern Financial Services for the purpose of managing and/or purchasing assets . . . ." [Doc. 16 at 3 (emphasis added)]. The reference to "any and all interest in any LLCs" was subsequently removed upon motion of the Government. [See Doc. 229]. Thus, to the extent that any of the Petitioners' petitioners and/or summary judgment motions address the forfeiture of any membership interest in any LLCs, such petitions and motions have now been rendered moot.

On March 11, 2011, several petitioners (collectively "the Sage Petitioners") filed Verified Claims, seeking to adjudicate the validity of their interest in the certificated securities of Sage Automotive Interiors, Inc. ("Sage Certificates" or "Certificates") that were identified in the Consent Order. [Docs. 23-38]. Other claims asserting interests in various properties identified in the Consent Order quickly followed. [See Docs. 40, 41, 42, 43, 46, 47, 62, 71, 72, 73, 74, 76, 79, 80, 82, 83, 85, 86, 87, 88, 89, 92, 93, 94, 96, 97, 98, 99, 100, 101, 103, 104, 110, 111, 113, 114, 115, 119, 120, 121, 122, 131, 168, 171, 174, 183, 186, 187, 200, 292].

On March 22, 2011, the Sage Petitioners moved for an expedited hearing on their claims. [Doc. 48]. The Court granted the Sage Petitioners' motion and held an expedited hearing on April 5, 2011. Following the expedited hearing, on April 8, 2011, the Court entered an Order ("the First Sage Order"), directing the return of the Certificates to the Sage Petitioners subject to certain requirements. [Doc. 164]. Particularly, the Court concluded that because the Defendant had obtained money from the Sage Petitioners through fraudulent means, a constructive trust arose in those funds at the time that they were conveyed to the Defendant. [Id. at 7]. Having determined that the Sage Petitioners had a valid legal interest in the

funds under state law and that such interest was superior to any interest the Defendant may have had, the Court then conducted a tracing analysis. Using the bank record summaries that were prepared by the Government and introduced at the hearing without objection by the Sage Petitioners ("the Bank Summaries"), the Court applied the lowest intermediate balance rule ("LIBR") to trace the Sage Petitioners' funds and determine the amount of the Certificates' value that should be returned to them. The Court recognized a constructive trust on the entirety of the Certificates issued on behalf of some of the Sage Petitioners. [Id. at 8-9]. With respect to other Sage Petitioners, for whom Certificates were purchased in whole or in part with commingled funds, the Court awarded only a percentage of the Certificates' value. [Id. at 9-10].

Several of those Sage Petitioners who received only a percentage of the Certificates' value filed a Motion to Clarify the Order on June 7, 2011, seeking reconsideration of the Court's Order regarding the calculation of their percentage ownership of the Certificates. [Doc. 226]. While that motion was pending, the Court granted the motions of various other Petitioners to conduct discovery for a period of sixty (60) days. [Doc. 230].

In July 2011, the Court referred the remaining claims to the Magistrate Judge for the purpose of conducting such ancillary proceedings as may be required to adjudicate these claims [Doc. 239]. The Magistrate Judge proceeded to schedule hearings on the Petitioners' claims for the end of September 2011. [Doc. 241].

On September 7, 2011, this Court entered an Order staying all proceedings pending resolution of the Sage Petitioners' Motion to Clarify. [Doc. 286]. In ordering the stay, the Court noted that reconsideration of the First Sage Order "may have a significant impact on the manner in which the other pending ancillary claims are addressed by the parties and resolved by this Court." [Id.]. Subsequently, on November 10, 2011, the Court granted the Sage Petitioners' Motion to Clarify and vacated the First Sage Order with respect to these Petitioners ("the Second Sage Order"). A hearing was set to hear these Petitioners' ancillary claims on December 12, 2011. [Doc. 306].

In the Second Sage Order, the Court stated that the filings in the ancillary proceedings had caused it to question the basis for the preliminary order of forfeiture obtained by the Government:

> The Court determines that rehearing of this matter
> is necessary for another, more fundamental reason

as well. Review of the Motion for Reconsideration, as well as the myriad of filing[s] by other claimants since the original Sage Hearing, has led the Court to question whether the Government satisfied its initial burden of proving the requisite nexus between the Defendant's crimes and the property sought to be seized pursuant to the preliminary order of forfeiture.

[Doc. 306 at 12]. Accordingly, the Court determined that the Government would be required to show the requisite nexus between each property subject to forfeiture pursuant to the Consent Order and the offenses to which the Defendant pled guilty before the Petitioners would be required to go forward with their claims. [Id.].

The hearing regarding the Sage Petitioners' Motion to Clarify was held on December 12, 2011. During the hearing, the Government presented the testimony of five witnesses and offered into evidence voluminous documents as exhibits. Included among these witnesses were former clients of the Defendant, who had established Investment Management or Asset Management Accounts with Southern Financial. These witnesses testified that the Defendant never purchased any of the stocks, bonds, or securities that he had been instructed to purchase, and that he had provided them false account statements to hide his fraud. At the conclusion of the Government's nexus presentation, the Sage

Petitioners submitted nine exhibits of documents concerning their interests in the Sage Certificates. [Doc. 318]. The parties were given the opportunity to file post-hearing briefs, as well as proposed findings of fact and conclusions of law for the Court's consideration. [Docs. 319, 320, 321, 322, 323, 324].

On February 22, 2012, the Court entered an Order granting the Petitions of those Sage Petitioners who challenged the First Sage Order, and the Consent Order and Judgment of Forfeiture was amended to reflect their superior rights in the Sage Certificates. [Doc. 331].

In light of the Court's Order, a status conference was held with counsel on March 8, 2012 to address the remaining ancillary claims. At that time, the Government advised the Court that it did not intend to offer any additional evidence regarding the nexus between the Petitioners' property that had been seized and the Defendant's crimes. As a consequence of this status conference, the Court ordered motions to dismiss and/or summary judgment to be filed by April 23, 2012. [See Text-Only Order entered March 8, 2012]. With respect to Petitioner Mark Fox, the parties were given until May 14, 2012 to file such motions. [Id.].

Pursuant to the Court's Order, the remaining Petitioners filed the following motions:

(1)    The Motion for Summary Judgment filed by William Stephen Aldridge regarding the forfeiture of the real property at 130 NW 5th Street, Oak Island, North Carolina, more particularly described in Deed Book 2810, Page 393 in the Brunswick County Register of Deeds (as described in Paragraph (1)(VI)(a) of the Consent Order and Judgment of Forfeiture) [Doc. 441];

(2)    The Motion for Summary Judgment filed by James F. Combest, the James F. Combest Self Directed IRA, LLC, and the James F. Combest Individual Retirement Account (collectively, "Combest Petitioners") regarding the forfeiture of the membership interest in Griffin Stafford Lodging One, LLC (as described in Paragraph 1(VI)(zz) of the Consent Order and Judgment of Forfeiture) [Doc. 435];

(3)    The Motion for Summary Judgment filed by Peter L. Contrastano, the Peter L. Contrastano self-directed Real Estate Individual Retirement Account, and the Peter L. Contrastano Real Estate IRA, LLC (collectively, "Contrastano Petitioners") regarding the forfeiture of the

real property at 1525 NW 57th St, Unit 626, Seattle, Washington, more particularly described as Parcel Number 20080917000400 in the King County Register of Deeds (as described in Paragraph 1(VI)(c) of the Consent Order and Judgment of Forfeiture)[2] [Doc. 413];

(4)     The Motion for Summary Judgment filed by Beverly J. Daggett, the Beverly J. Daggett self-directed Real Estate Individual Retirement Account, and the Beverly J. Daggett Real Estate IRA, LLC (collectively, "Beverly Daggett Petitioners") regarding the forfeiture of one or more promissory notes secured by deeds of trust on the real property known as the "Louise B Buckner Property" and more particularly described in Buncombe County Register of Deeds Book 4613, Page 1947 (as described in Paragraph 1(VI)(d) of the Consent Order and Judgment of Forfeiture) [Doc. 418];

(5)     The Motion for Summary Judgment filed by Russell L. Daggett, the Russell L. Daggett self-directed Real Estate Individual Retirement

_____

[2]  The description of this property as set forth in the Consent Order and Judgment of Forfeiture is incorrect.  The correct description is "The real property at 1525 NW 57th St, Unit 626, Seattle, Washington, more particularly described as King County Parcel Number 0451901580 associated with Warranty Deed Instrument Number 20080917000400 in the King County Records Office."  The Government, acknowledging this error, has moved to correct this property description.  [See Doc. 285].

Account, and the Russell L. Daggett Real Estate IRA, LLC (collectively, "Russell Daggett Petitioners") regarding the forfeiture of one or more promissory notes secured by deeds of trust on the real property known as the "Louise B Buckner Property" and more particularly described in Buncombe County Register of Deeds Book 4613, Page 1947 (as described in Paragraph 1(VI)(d) of the Consent Order and Judgment of Forfeiture) [Doc. 422];

(6)    The Motion for Summary Judgment filed by James R. Eddy and the James R. Eddy Real Estate IRA, LLC ("James Eddy Petitioners"), and Susann M. Eddy and The Susann M. Eddy Revocable Living Trust ("Susann Eddy Petitioners") (collectively, "Eddy Petitioners") regarding the forfeiture of the real property known as 156 Allegra Lane, Silverstone, CO 80498, more particularly described in Summit County records as "Unit 156 BLDG N-6 PONDS AT BLUE RIVER CONDO SEVENTH AMENDMENT" (as described in Paragraph 1(VI)(e) of the Consent Order and Judgment of Forfeiture) [Doc. 367][3];

_____

[3]  Subsequent to the filing of this Motion, the Government agreed to the granting of the Eddys' Petition insofar as it pertained to the 40% interest held by The Susann M. Eddy Revocable Living Trust. [Consent Order, Doc. 572]. Accordingly, that portion of the

(7)     The Motion for Summary Judgment filed by Jeffrey E. Efird and Melissa P. Efird (collectively, "Efird Petitioners") regarding the forfeiture of: the real property at 23 Sequoia Drive, Greenville, South Carolina, more particularly described in Deed Book 2367, Page 5518 in the Greenville County Register of Deeds (as described in Paragraph 1(VI)(f) of the Consent Order and Judgment of Forfeiture); the real property at 1608 E. North Street, Greenville, South Carolina, more particularly described in Deed Book 2374, Page 4994 in the Greenville County Register of Deeds (as described in Paragraph 1(VI)(g) of the Consent Order and Judgment of Forfeiture); the real property at 409 Morris Street, Greenville, South Carolina, more particularly described in Deed Book 2364, Page 3399 in the Greenville County Register of Deeds (as described in Paragraph 1(VI)(h) of the Consent Order and Judgment of Forfeiture); and the real property at 121 Henderson Avenue, Greenville, South Carolina, more particularly described in Deed Book 2366, Page 698 in the

---

Eddy Petitioners' Motion shall be denied as moot.

Greenville County Register of Deeds (as described in Paragraph 1(VI)(i) of the Consent Order and Judgment of Forfeiture) [Doc. 371][4];

(8)   The Motion for Summary Judgment by James R. Fatland Real Estate IRA, LLC regarding the forfeiture of the real property at 602 Highlands Mountain Club, Highlands, North Carolina, more particularly described in Deed Book A-33, Page 1328 in the Macon County Register of Deeds (as described in Paragraph 1(VI)(j) of the Consent Order and Judgment of Forfeiture) [Doc. 365];

(9)   The Motion for Summary Judgment filed by Mark A. Fox and Mark A. Fox Real Estate IRA, LLC (collectively, "Fox Petitioners") regarding the forfeiture of Lot S-8 as shown on a Plat in Plat Book 5 at Page 881 in Madison County Register of Deeds, North Carolina (as described in Paragraph 1(VI)(l) of the Consent Order and Judgment of Forfeiture) [Doc. 520].

(10)  The Motion for Summary Judgment filed by William R. Ghormley, the William R. Ghormley Individual Retirement Account, and the William R. Ghormley Real Estate IRA, LLC ("Ghormley Petitioners") regarding the forfeiture of the real property known as "100 acres more or less

_____

[4]  The Efird Petitioners also move for a hearing on their petition.  [Doc. 46].

Big Hickory Bear Pen Branch," more particularly described in Deed Book 336, Page 554 in the Madison County, North Carolina Register of Deeds (as described in Paragraph 1(VI)(m) of the Consent Order and Judgment of Forfeiture) [Doc. 424];

(11) The Motion for Summary Judgment filed by Julia Kathleen Harold, individually and on behalf of the Julia Kathleen McCarthy Real Estate IRA, LLC (collectively, "Harold Petitioners"), regarding the forfeiture of the real property at 13 Old Candler Town Road, Candler, North Carolina, more particularly described in Deed Book 4688, Page 792 in the Buncombe County Register of Deeds (as described in Paragraph 1(VI)(bb) in the Consent Order and Judgment of Forfeiture) [Doc. 404];

(12) The Motion for Summary Judgment filed by Victor D. Howard, the Victor D. Howard Real Estate Individual Retirement Account, and the Victor D. Howard Real Estate IRA, LLC (collectively, "Howard Petitioners") regarding the forfeiture of the real property at 2622 Dayton Street, Knoxville, Tennessee, more particularly described in Instrument No. 200810270027933 in the Knox County Registry of

Deeds (as described in Paragraph 1(VI)(r) of the Consent Order and Judgment of Forfeiture) [Doc. 402];

(13) The Motion for Summary Judgment filed by Joan T. Johnstone, individually and on behalf of the Joan T. Johnstone Real Estate IRA, LLC (collectively, "Johnstone Petitioners") regarding the forfeiture of the real property at Flowery Branch Road, Buford, Georgia, more particularly described in Deed Book 49644, Page 1 in the Gwinnett County Register of Deeds (as described in Paragraph 1(VI)(s) of the Consent Order and Judgment of Forfeiture) [Doc. 436];

(14) The Motion for Summary Judgment filed by Harold K. Ledford IRA, LLC regarding the forfeiture of the real property known as Parcel 1-1 Township, Parcel B, Plat Book 6 at page 29, Madison County, North Carolina, more particularly described in Deed Book 415, Page 475 in the Madison County Register of Deeds (as described in Paragraph 1(VI)(u) of the Consent Order and Judgment of Forfeiture) [Doc. 369];

(15) The Motion for Summary Judgment filed by the Richard J. Lessow Real Estate IRA and Richard J. Lessow, M.D., both individually and in his capacity as owner/beneficial owner of the Lessow IRA and the fictitious Richard J. Lessow Real Estate IRA, LLC (collectively,

"Lessow Petitioners") regarding the forfeiture of the interests secured by a Mortgage Security Agreement on file at the New York City Department of Finance, Office of the City Register, Document 2009061601107002, in regard to real property at Manhattan Borough Block 1497, Lot 1001, also known as 1049 5th Avenue (as described in Paragraph 1(VI)(t) of the Consent Order and Judgment of Forfeiture)[5] [Doc. 453];

(16) The Motion for Summary Judgment filed by James H. Lucas, Jr., the James H. Lucas, Jr. self-directed Real Estate Individual Retirement Account, and the James H. Lucas, Jr. Real Estate IRA, LLC (collectively, "Lucas Petitioners") regarding the forfeiture of: the real property at 22 Harris Lane, Maylene, Alabama, more particularly described as Instrument No. 20080530000219090 in the Shelby County Register of Deeds (as described in Paragraph 1(VI)(w) of the Consent Order and Judgment of Forfeiture); the real property at 78 Harris Lane, Maylene, Alabama, more particularly described as

---

[5]  The subject mortgage security agreement is titled in the name of the Richard J. Lessow IRA.  The Consent Order and Judgment of Forfeiture, however, describes this asset as belonging to an LLC.  By its Motion to Correct Clerical Errors [Doc. 285], the Government seeks to correct the description of this asset in the Consent Order and Judgment of Forfeiture.

Instrument No. 20080530000219080 in the Shelby County Register of Deeds (as described in Paragraph 1(VI)(x) of the Consent Order and Judgment of Forfeiture); and the real property at 122 Harris Lane, Maylene, Alabama, more particularly described as Instrument No. 20080530000219100 (as described in Paragraph 1(VI)(y) of the Consent Order and Judgment of Forfeiture) [Doc. 427];

(17) The Motion for Summary Judgment filed by David R. McCartney, David R. McCartney Individual Retirement Account, and the David R. McCartney Real Estate IRA, LLC (collectively, "McCartney Petitioners") regarding the forfeiture of the membership interest in David R. McCartney Real Estate, IRC., LLC, a North Carolina limited Liability Company and the real property at 2896 Treadwell Street, Mt. Pleasant, South Carolina, more particularly described in Deed Book 651, Page 45 in the Charleston County Register of Deeds (as described in Paragraph 1(VI)(aa) of the Consent Order and Judgment of Forfeiture) [Doc. 448];

(18) The Motion for Summary Judgment filed by Michael James Mehaffey, Michael James Mehaffey Real Estate IRA, LLC, and The Michael James Mehaffey Individual Retirement Account (collectively,

"Mehaffey Petitioners") regarding the forfeiture of the real property at Richland Creek Road, Clyde, North Carolina, more particularly described in Deed Book RB713, page 1363 in the Haywood County Register of Deeds (as described in Paragraph 1(VI)(cc) of the Consent Order and Judgment of Forfeiture) [Doc. 433];

(19)  The Motion for Summary Judgment filed by Paul L. Miller and Paul L. Miller Real Estate IRA, LLC (collectively, "Miller Petitioners") regarding the forfeiture of the real property at 420 Hells Hollow Lane, Blue Ridge, Georgia, more particularly described in Deed Book 829, Page 312 in the Fannin County Real Estate Index (as described in Paragraph 1(VI)(gg) of the Consent Order and Judgment of Forfeiture) [Doc. 439];

(20)  The Motion for Summary Judgment filed by John C. Myers, The John C. Myers Individual Retirement Account, and John C. Myers Real Estate IRA, LLC (collectively, "Myers Petitioners") regarding the forfeiture of the real property at Lot 2 at Sweetwater Hills, Ridgeview, Henderson County, North Carolina, more particularly described in Deed book 1411, Page 113 in the Henderson County Register of

Deeds (as described in Paragraph 1(VI)(ii) of the Consent Order and Judgment of Forfeiture) [Doc. 275];

(21) The Motion for Summary Judgment filed by William Ellis Peacock, William Ellis Peacock Real Estate IRA, LLC, and The William Ellis Peacock Individual Retirement Account (collectively, "Peacock Petitioners") regarding the forfeiture of the real property at 261 3rd Street, Key Colony Beach, Florida, more particularly described as Parcel Number 010072750-000000 in the Monroe County Register of Deeds (as described in Paragraph 1(VI)(jj) of the Consent Order and Judgment of Forfeiture) [Doc. 407];

(22) The Joint Motions for Summary Judgment filed by Becky B. Pope ("Becky Pope") and Keith Pope, the Keith Pope Individual Retirement Account, and Keith Pope Real Estate IRA, LLC (collectively, "Keith Pope Petitioners") regarding the forfeiture of the real property at Lot 1, The Gorges at Lake Toxaway, more particularly described in Deed Book 484, Page 811 in the Transylvania County Register of Deeds (as described in Paragraph 1(VI)(ll) of the Consent Order and Judgment of Forfeiture) and the real property at Bayside Lot #58, Grainger County, Tennessee, more particularly described in Deed

Book IN289, Page 1211, in the Grainger County Register of Deeds (as described in Paragraph 1(VI)(kk) of the Consent Order and Judgment of Forfeiture) [Docs. 416, 420];

(23) The Motion for Summary Judgment filed by Terry L. Price and Terry L. Price Real Estate IRA, LLC (collectively, "Price Petitioners") regarding the forfeiture of the real property at Bayside Lot #57, Grainger County, Tennessee, more particularly described in Deed Book IN289, Page 1208 in the Grainger County Register of Deeds (as described in Paragraph 1(VI)(mm) of the Consent Order and Judgment of Forfeiture) [Doc. 452];

(24) The Motion for Summary Judgment filed by Terry R. Sloan, Terry R. Sloan Individual Retirement Account, and the Terry R. Sloan Real Estate IRA, LLC (collectively, "Sloan Petitioners") regarding the forfeiture of: the membership interest in Terry R. Sloan Real Estate IRA, LLC a North Carolina Limited Liability Company; the real property at 141 Wexford Drive, Condominium 200, County of Anderson, Anderson, South Carolina 29621, more particularly described in Deed Book 8550, Page 218 in the Anderson County Register of Deeds (as described in Paragraph 1(VI)(pp) of the

Consent Order and Judgment of Forfeiture); and the real property at 107 and 108 Highfield Court, Anderson, South Carolina, more particularly described in Deed Book 8716, Page 176 in the Anderson County Register of Deeds (as described in Paragraph 1(VI)(qq) of the Consent Order and Judgment of Forfeiture) [Doc. 450];

(25) The Motion for Summary Judgment filed by Kenneth L. Talley, the Kenneth L. Talley self-directed Real Estate Individual Retirement Account, and the Kenneth L. Talley Real Estate IRA, LLC ("Talley Petitioners") regarding the forfeiture of the forfeiture of the real property at 301-305 West Oaklane Avenue, Johnson City, Tennessee, more particularly described at Roll 587, Image 2028 in the Washington County Register of Deeds (as described in Paragraph 1(VI)(vv) of the Consent Order and Judgment of Forfeiture) [Doc. 401]; and

(26) The Motion for Summary Judgment filed by Glenn A. Warren, the Glenn A. Warren self-directed Real Estate Individual Retirement Account, and the Glenn A. Warren Real Estate IRA, LLC (collectively, "Warren Petitioners") regarding the forfeiture of the real property at Rich Square Township, Northampton County, North Carolina, more

particularly described as Parcel Number 06-01907 in the Northampton County property records (as described in Paragraph 1(VI)(xx) of the Consent Order and Judgment of Forfeiture) [Doc. 409].[6]

Also pending before the Court are the Government's Motions to Dismiss, or in the Alternative, for Summary Judgment with respect to the above-referenced Petitioners' claims [Docs. 373, 375, 376, 377, 378, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 432] and its Motion to Correct Clerical Errors [Doc. 286]. These motions have been fully briefed and are ripe for adjudication.

## II.    STANDARD OF REVIEW

### A.    Standard of Review Applicable to Motions to Dismiss

The Government moves to dismiss each of the remaining ancillary claims on the grounds that the Petitioners lack standing to assert their claims. A motion to dismiss a third-party petition for lack of standing in a forfeiture proceeding is analyzed under the same standards as a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b).

---

[6]    Also pending is the Warren Petitioners' Preliminary Motion to Determine the Existence of Any Interest of the Defendant in the Subject Property and Request for Expedited Hearing [Doc. 60].

Pacheco v. Serendensky, 393 F.3d 348, 352 (2d Cir. 2004). Thus, in order to survive a motion to dismiss, an ancillary petition "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The petition's factual allegations must be taken as true and construed in favor of the petitioner. See United States v. Salti, 579 F.3d 656, 667 n.11 (6th Cir. 2009); Fed. R. Crim. P. 32.2(c)(1)(A) (stating that for purposes of considering a motion to dismiss a third-party petition for lack of standing in an ancillary proceeding, "the facts set forth in the petition are assumed to be true").

**B.    Standard of Review Applicable to Motions for Summary Judgment**

While these ancillary proceedings arise in the context of criminal forfeiture, the Federal Rules of Criminal Procedure allow for a party to move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Fed. R. Crim. P. 32.2(c)(1)(B). Accordingly, in reviewing the parties' summary judgment motions, the Court applies the same standard of review that would be applied in a civil case. United States v. Corpus, 491 F.3d 205, 208-09 (5th Cir. 2007).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Pub. Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported speculation, nor evidence that is

24

> merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate shall be entered.

Id. (internal quotation marks and citations omitted).

In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011). Where both parties seek summary judgment, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

III.    FACTUAL BACKGROUND

At the outset, the Court notes that the vast majority of the Government's summary judgment motions do not present a summary of the undisputed facts in support of each particular motion. Rather than presenting a forecast of evidence in support of these motions, the

Government relies on purely legal arguments to argue in favor of denying the Petitioners' claims. Accordingly, the following summary of the forecast of evidence is derived primarily from the Petitioners' verified petitions, as well as the affidavits, depositions, and other filings presented in support of the Petitioners' motions for summary judgment; the depositions of Defendant Bailey, taken July 18, 2011 and August 23, 2011; the Memorandum of Interview prepared by Department of Treasury Special Agent Eric Veater; and the testimony of the Government's witnesses at the November 12, 2011 hearing regarding the Sage Petitioners. As the Government has offered no forecast of evidence to the contrary of that presented by the Petitioners, the following forecast of evidence as presented by the Petitioners is undisputed.

From approximately January 2000 and continuing through December 2010, Defendant Bailey operated a number of companies, including Southern Financial Services Inc. ("Southern Financial"), 1031 Exchange Services, LLC ("1031 Exchange"), and AVL Properties, LLC ("AVL Properties") in Asheville, North Carolina. Bailey originally started Southern Financial as an estate planning and insurance business. He later expanded the scope of Southern Financial's services to include various

investment vehicles, which will be described in greater detail *infra*. Bailey

founded AVL Properties as a real estate holding company. In 2004, Bailey

created 1031 Exchange to act as a qualified intermediary for 1031

exchanges.[7]

———————————————

[7] The Fourth Circuit recently explained the concept of the 1031 exchange as well as the role of the qualified intermediary in 1031 exchanges as follows:

> Section 1031 of the Internal Revenue Code permits individuals (exchangers) to defer the payment of capital gains tax on the sale of certain assets when such assets are properly exchanged in a "like kind" exchange. 26 U.S.C. 1031. In general, a like kind exchange occurs when one piece of property is sold and, within a given period of time, a similar piece of property is purchased. The like kind exchange allows the exchanger to delay recognizing a gain on the sold property, as the tax basis of the sold property carries forward to the newly acquired property. Thus, the recognition of a gain and the payment of capital gains tax are delayed. Id. § 1031(d). For the newly acquired property to qualify as "like kind," it must be identified within forty five days and be purchased within one hundred and eighty days of the sale of the sold property. Id. § 1031(a)(3). In addition, the exchanger must not receive the proceeds from the sale of the sold property, either actually or constructively, during the prescribed period. 26 C.F.R. § 1.1031(k)–1(a). A [qualified intermediary] company can be used to hold the sale proceeds in the interim, preventing the exchanger's receipt of the funds. Id. § 1.1031(k)–1(g)(4). The Internal Revenue Code and regulations contain no requirement as to how the [qualified intermediary] company is to hold the proceeds and, so far as the Internal Revenue Code is concerned, the [qualified intermediary] company may invest the proceeds. Such investment typically is governed by the agreement between the exchanger and the [qualified intermediary] company.

United States v. Okun, 453 F. App'x 364, 367 n.1 (4th Cir. 2011).

Throughout the relevant time period, the Defendant's Companies purported to operate as separate entities with separate bank accounts. If one of the Companies had a shortage of money, however, Bailey would transfer funds from the other businesses to the business that was short. For example, Bailey occasionally funded real estate purchases by AVL Properties with funds provided by Southern Financial clients. Further, Bailey occasionally used funds from the 1031 Exchange bank accounts to fund purchases on behalf of Southern Financial clients.

Through Southern Financial, Defendant Bailey offered four basic types of services to clients: (1) trust and estate administration[8]; (2) asset management accounts ("AMAs"); (3) investment management accounts ("IMAs"); and (4) self-directed real estate individual retirement accounts ("self-directed IRAs"). Clients who established AMAs with Southern Financial either instructed Bailey to purchase specific assets, such as bonds, foreign currencies or gold, or simply deposited funds with Southern Financial and entrusted Bailey to manage the money. Unbeknownst to these clients, however, when their funds were forwarded to Southern

_____

[8] It is not alleged that Bailey engaged in any type of fraud with respect to his trust and estate clients.

Financial, either for the purchase of a specific asset or for the management of an investment fund, Bailey did not utilize the funds as directed but rather deposited these funds in Southern Financial's bank accounts for use as he saw fit. The AMA clients were then provided fictitious account statements falsely stating that their money was invested.

Similarly, clients who established IMAs with Bailey would deposit funds with Southern Financial for investment. Essentially, an IMA was supposed to function like a private certificate of deposit with a guaranteed rate of return for a specific period of time. Like the AMA clients, IMA clients received fictitious account statements purporting to show their investments growing at the promised rate of return when in fact Bailey had deposited the clients' funds in Southern Financial accounts for general use by himself and his Companies. In short, Bailey's treatment of the funds from his AMA and IMA clients was a Madoff-type Ponzi scheme.

The final type of service Bailey purportedly offered to provide through Southern Financial was related to the establishment and operation of self-directed IRAs. In order to maintain the protected status of these IRA funds under Section 408 of the Internal Revenue Code, 26 U.S.C. § 408, real estate IRAs require a qualified custodian who can provide custodial

services similar to those services provided for traditional IRA accounts by financial institutions. A qualified custodian's primary responsibility is to manage the account so that it does not engage in prohibited transactions as defined by § 408. Such prohibited transactions may result in a loss of tax-deferred status, as the assets may be deemed "distributed" by virtue of the prohibited transaction. Any distribution of IRA funds to a third party who is not a qualified custodian under § 408 also results in a loss of tax-deferred status, and the owner of those funds incurs substantial taxes and penalties for this distribution. The real estate IRA investment vehicle offered by Bailey and Southern Financial purportedly allowed clients to use their existing IRA funds to purchase real estate while protecting the tax-deferred status of such funds.

The Petitioners addressed by the present Order were clients of Bailey who sought the establishment of self-directed IRAs with Southern Financial for the purpose of purchasing real estate or other assets[9] with their IRA

_____

[9] In most cases, these Petitioners sought to purchase real estate with their IRA funds. The Combest Petitioners sought to acquire a membership interest in a limited liability company, while the Beverly Daggett Petitioners, Russell Daggett Petitioners, and Lessow Petitioners sought to facilitate the purchase of real estate by others by lending their IRA funds to the purchasers, thereby creating a mortgage interest in favor of their respective IRA LLCs.

funds. These Petitioners -- William Stephen Aldridge, the Combest Petitioners, the Contrastano Petitioners, the Beverly Daggett Petitioners, the Russell Daggett Petitioners, the Eddy Petitioners, the Efird Petitioners, the James R. Fatland Real Estate IRA, LLC, the Fox Petitioners, the Ghormley Petitioners, the Harold Petitioners, the Howard Petitioners, the Johnstone Petitioners, the Harold K. Ledford IRA, LLC, the Lessow Petitioners, the Lucas Petitioners, the McCartney Petitioners, the Mehaffey Petitioners, the Miller Petitioners, the Myers Petitioners, the Peacock Petitioners, Becky B. Pope, the Keith Pope Petitioners, the Price Petitioners, the Sloan Petitioners, the Talley Petitioners, and the Warren Petitioners -- shall be hereinafter referred to collectively as "the IRA Petitioners."

For each of the IRA Petitioners, unless otherwise noted below, Southern Financial provided the following services. Southern Financial, through Bailey, entered into a standard management agreement with each client for the establishment of a self-directed real estate IRA. Pursuant to that agreement, Bailey established a North Carolina limited liability company (LLC) for the client's real estate IRA, usually using the client's name within the name of the LLC (i.e., "the John Q. Smith Real Estate IRA,

LLC").[10]  Bailey utilized a standard form operating agreement, pursuant to which the LLC was designated as a manager-managed LLC, with Southern Financial or Bailey designated as the manager and the client (or the client's IRA) designated as the sole member of the LLC.  It is therefore undisputed that Defendant Bailey had no membership interest in any of the LLCs created on behalf of the IRA Petitioners.

These Petitioners understood that they held 100% membership in their respective LLCs, with Southern Financial or Bailey designated as the manager.  All of the LLCs that were organized by Bailey were in fact organized in precisely this manner, even though only some of the Petitioners actually received copies of this written operating agreement.

The standard operating agreement utilized by Defendant Bailey with regard to all of the LLCs that were established describes the control reserved by the client and the limitations which applied to the Defendant. Pursuant to this agreement, the client could replace Defendant Bailey as manager and could dissolve the LLC at the client's option.  The language of the Operating Agreement executed by Petitioner William Ellis Peacock is

---

[10]  Bailey never created a limited liability company on behalf of Petitioner Richard J. Lessow.  The mortgage created on Petitioner Lessow's behalf was instead titled in the name of the Richard J. Lessow IRA.

typical of the standard agreement utilized to establish an LLC for a Southern Financial client:

> This Operating Agreement of William Ellis Peacock Real Estate IRA, LLC, a limited liability company organized pursuant to the Act, is entered into and shall be effective as of the Effective Date, by and between the Company and William Ellis Peacock, its sole member.
>
> ...
>
> ARTICLE II.  DEFINITIONS
>
> For purposes of this operating agreement, unless the context clearly indicates otherwise, the following terms shall have the following meanings:
>
> 1.1.  Organization. The Member has organized the Company as a North Carolina Limited Liability Company pursuant to the provisions of Article 57C, the North Carolina Limited Liability Company Act, of the North Carolina General Statutes. The Member hereby confirms that it has appointed Southern Financial Services of North Carolina, Inc. as Manager of the Company.
>
> …
>
> 2.4.  Company. William Ellis Peacock Real Estate IRA, LLC, a limited liability company formed under the laws of the State, and any successor limited liability company.
>
> …
>
> 2.6.  Company Property. Any Property owned by the Company.
>
> …
>
> 2.10.  Manager shall mean one or more managers. Specifically, Manager shall mean Southern Financial Services of North Carolina, Inc. or any

Entity, Company, Person or Persons who succeeds it in that capacity....

…

## ARTICLE VI.  MANAGEMENT

6.1.   Management Rights.   Subject to subsection 6.2 of this Article, the business of the Company shall be conducted by the Manager and all management of the Company shall be vested in the Manager....

...

6.2.   Certain Powers of Managers and Restrictions on Authority of the Managers.   Notwithstanding subsection 6.1 of this Article, only the Member may take the following actions or may direct the Manager to take the following actions:

6.2.1. The Appointment of another or additional Manager;

…

6.2.8. The sale, exchange or other Disposition of all, or substantially all, of the Company Property other than in the ordinary course of the Company's business.

...

## ARTICLE XI.  DISSOLUTION AND WINDING UP

11.1. Dissolution. The Company shall be dissolved and its affairs wound up, upon the will of the Member. Notwithstanding any provision of the Act to the contrary, the Company shall continue and not dissolve as a result of the death, retirement, resignation, expulsion, bankruptcy or dissolution of any Member or any other event that terminates the continued membership of the Member....

[Peacock Operating Agreement, Doc. 276-8].

In both the articles of organization filed for each LLC and in subsequent filings with the Secretary of State, Bailey or Southern Financial was identified as a manager, custodian, or registered agent of the Petitioners' LLCs, as opposed to a member or owner of it.  As set forth in the standard operating agreement, Bailey acted as an agent of the Petitioners, with fiduciary obligations and with the authorization to perform only administrative tasks to accomplish the purchase and maintenance of assets funded by the IRAs.

Neither Bailey nor Southern Financial participated in any way in selecting the assets to be purchased with the IRA Petitioners' funds.  The IRA Petitioners performed all of the due diligence in identifying and purchasing their investments.  The only service performed by Bailey and Southern Financial with respect to the purchase of the real properties was to accept the IRA proceeds, set up the IRA LLCs, and transfer the IRA funds to complete the purchases of the properties for the benefit of the IRA LLCs.  When the purchase of the property selected by the client closed, the

title to the property was held by the client's self-directed IRA LLC.[11]  At all times since the closing, the properties have been held and titled in the name of the Petitioners, or their respective LLCs.

Following these purchases, each IRA Petitioner received quarterly statements which listed the purchased property as an asset of the Petitioner's self-directed IRA LLC.  Some Petitioners directed Defendant Bailey to expend funds they had deposited with Southern Financial to pay certain expenses, such as property taxes and association fees, and Defendant Bailey performed those tasks as instructed.  These expenditures never exceeded the amount that the IRA Petitioners initially deposited.  In the case of those Petitioners who funded mortgages or engaged in the leasing of their properties, Southern Financial collected payments and retained such funds on behalf of the LLCs.[12]  The Petitioners paid Southern

---

[11]  In two instances, property was not titled in the name of the Petitioners' LLCs.  The first instance was in the case of Petitioner William Ghormley, whose property was titled in the name of "Southern Financial Services, Inc. as Trustee FBO William R. Ghormley IRA."  [Doc. 426-17].  The Government does not appear to contend, however, that Southern Financial acquired any ownership interest in the real property by virtue of its designation as trustee for Ghormley's IRA.  The second instance was in the case of Petitioner Richard J. Lessow.  The mortgage security agreement which secures the loan of Lessow's IRA funds is in the name of the Lessow IRA.  As noted previously, Bailey never created an LLC on Lessow's behalf.

[12]  Those funds have not been recovered and are presumably lost.  In such instances, the Petitioners seek only the return of the underlying property or asset (and the future

Financial annual custodial fees, and Southern Financial paid the necessary property taxes and filed the required annual reports with the North Carolina Secretary of State for each LLC that was created.

Unbeknownst to the Petitioners, Defendant Bailey was not in fact a qualified custodian under § 408. Bailey failed to manage the self-directed IRAs appropriately, thus in many cases causing his clients to engage (unknowingly) in prohibited transactions and thereby compromise the tax-deferred status of their funds. When Southern Financial received a wire transfer of funds from a client's IRA, the money was wired into Southern Financial bank accounts and not into an account designated solely for the client. As a result, the Petitioners' IRA funds were, at least for a brief time, held in the same account as funds provided by other clients of Southern Financial.

Despite the fact that Bailey failed to manage the self-directed IRAs appropriately, he did properly establish LLCs for all of the IRA Petitioners except one.[13] While operating agreements were not identified for every LLC that Bailey established, each Petitioner asserts -- and the Government

income stream therefrom) and not the funds previously paid to Southern Financial.

[13] As previously noted, Bailey never created an LLC on behalf of Petitioner Lessow.

does not contest -- that for each LLC that was created, the specific Petitioner (or the Petitioner's IRA) was designated as the sole member and owner with Defendant Bailey designated only as the organizer and manager. It is undisputed that Bailey was not, and never had been, a member of any of the Petitioners' LLCs. Thus, while the procedures Bailey followed were insufficient to preserve certain tax benefits for the Petitioners, the LLCs themselves that were created were at all times valid, properly organized, and existing under North Carolina law. Further, while the Petitioners' funds may have been temporarily co-mingled with the funds of other Southern Financial clients, all of the transactions for which the Petitioners forwarded funds to Bailey were completed as directed.

Common to all of the Petitioners is the fact that when the Petitioners forwarded their funds to Defendant Bailey and their respective investments were made, they had no notice of any irregularities concerning the operations of Southern Financial or the criminal conduct of Defendant Bailey. Until learning of Defendant Bailey's guilty plea and the entry of the Preliminary Order of Forfeiture in February 2011, none of the Petitioners had any notice or reason to believe that Defendant Bailey had engaged in any criminal wrongdoing or that the assets they had purchased could be

subject to forfeiture. It is undisputed that none of the Petitioners ever authorized or intended either Defendant Bailey or Southern Financial to have any right, title or membership interest in their respective LLCs, or in any of the assets purchased on their behalf.

## IV.    DISCUSSION

### A.    Criminal Forfeiture Procedure

The Defendant is subject to mandatory forfeiture due to his convictions for securities fraud and mail fraud.  The criminal forfeiture statute, 18 U.S.C. § 982(a)(2), requires the forfeiture of "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" certain enumerated offenses, including mail fraud affecting a financial institution.  Another forfeiture statute, 18 U.S.C. § 981(a)(1)(C), authorizes the civil forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" certain enumerated offenses, such as mail fraud or securities fraud.  The provisions of § 981(a)(1)(C) are applicable to this case pursuant to 28 U.S.C. § 2461(c) (allowing criminal forfeiture where civil forfeiture is authorized).  These statutory provisions require that the district court "shall order" forfeiture.  See 18 U.S.C. § 982(a)(2); 28 U.S.C. § 2461(c).  "The

mandatory nature of that phrase is clear: When the government has met the requirements for criminal forfeiture, the district court *must* impose criminal forfeiture, subject only to statutory and constitutional limits." United States v. Newman, 659 F.3d 1235, 1240 (9th Cir. 2011), cert. denied, 132 S.Ct. 1817, 182 L.Ed.2d 635 (2012) (emphasis added).

Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b), dictate the procedures applicable to a criminal forfeiture proceeding. Rule 32.2(b)(1) provides for entry of a preliminary order of forfeiture upon the entry of a guilty verdict or a plea of guilty if the Court determines by a preponderance of the evidence that there is a nexus between the identified property and the offense. See Libretti v. United States, 516 U.S. 29, 38-40, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995). Following the entry of a preliminary forfeiture order, a third party "asserting a legal interest in property which has been ordered forfeited to the United States ... may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). The Court must amend the order of forfeiture if the third party demonstrates by a preponderance of the evidence that:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders

the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section . . . .

21 U.S.C. § 853(n)(6).  Section 853 provides that its provisions "shall be liberally construed to effectuate [the section's] remedial purposes."  21 U.S.C. § 853(o).

Although forfeiture is an issue of federal law, courts generally refer to the law of the state that created the property right to determine what interests, if any, the claimant has in the forfeited property.  United States v. Oregon, 671 F.3d 484, 490 (4th Cir. 2012); United States v. Schecter, 251 F.3d 490, 494 (4th Cir. 2001).  Once the legal interests have been defined under state law, federal law determines whether such interests are sufficient for the claimants to prevail under § 853(n)(6).  Oregon, 671 F.3d at 491-92; United States v. Buk, 314 F. App'x 565, 568-69 (4th Cir. 2009).

B.    Standing

As a preliminary matter, the Government moves to dismiss all of the Petitioners' claims for a lack of standing. As noted above, when reviewing a motion to dismiss for lack of standing, the Court must construe all of the well-pled allegations in the third party's petition as true.

To contest a government forfeiture action, a claimant must establish both Article III standing and statutory standing. "In order to establish Article III standing, a claimant must have a colorable ownership, possessory or security interest in at least a portion of the [seized] property." United States v. Munson, 477 F. App'x 57, 62-63 (4th Cir.) (citing United States v. 16510 Ashton, 47 F.3d 1465, 1470 (6th Cir.1995); United States v. $321,470.00 in United States Currency, 874 F.2d 298, 302 (5th Cir.1989); United States v. $122,043.00 in United States Currency, 792 F.2d 1470, 1473 (9th Cir.1986)), cert. denied, 133 S.Ct. 315, 81 U.S.L.W. 3168 (2012). To establish statutory standing in a forfeiture case, a claimant must satisfy the standing requirements of 21 U.S.C. § 853(n). Specifically, § 853(n)(2) "allows any person, other than the defendant, asserting a 'legal interest' in the property to petition the district court for a hearing to adjudicate its asserted interest." Oregon, 671 F.3d at 490. Thus, the possession of a

"legal interest" in the forfeited property is "the touchstone for standing" of a third party to challenge a preliminary order of forfeiture.  Id.

The Government makes two arguments to support its contention that the Petitioners lack standing to pursue their claims.  First, the Government contends that once the Petitioners transferred funds to Defendant Bailey, those funds became proceeds of the Defendant's "fraudulent scheme," and thus, under the relation-back doctrine, the Petitioners cannot assert any legal interest in the forfeited properties that were subsequently purchased with the proceeds of the Defendant's fraud.  As the Court explained, however, in one of its prior Orders addressing the Sage Petitions [Doc. 331 at 35-41], and as is discussed in greater detail below, the relation-back doctrine does not preclude the Petitioners from asserting a legal interest in the forfeited properties, and to find otherwise would produce an absurd result.[14]  Thus, the Court finds the Government's first standing argument to be without merit.

---

[14] Indeed, if one follows the Government's argument on this point to its logical conclusion, the owner of a firearm which was stolen would not have standing to seek the return of his property because the stolen firearm would be forfeitable as the proceeds of the defendant's crime (i.e., the possession of a stolen firearm).  This, obviously, cannot be the law, and the Government presents no authority to support this absurd proposition.

43

Second, the Government argues that the individual Petitioners lack standing to bring petitions to challenge the forfeiture of the subject properties because it is the LLCs, not the individual clients, who are the titled owners of these forfeited properties.  This argument fails for many reasons.  First, the Government ignores the fact that many of the present Petitions were brought on behalf of not only individual clients, but also the IRAs and the LLCs established for the benefit of those clients.  Even for those Petitions that were brought only on behalf of individual clients, however, the Government's argument is specious.  Where the subject properties are owned by, and titled in the name of, LLCs created by Defendant Bailey, such LLCs were formed for the benefit of the individual Petitioners.   The individual Petitioners and/or their respective IRAs are the sole members of the LLCs created by Bailey.   In light of these circumstances, if the individual Petitioners do not have standing, the Court is hard-pressed to identify anyone who *would* have standing to challenge the Government's forfeiture of these properties.

The Government also moves to dismiss the Petitioners' claims on the ground that Petitioners have not "stated a claim upon which relief can be granted."  [Government's Motion at 9].  The Government does not provide

any support or explanation for this conclusory argument, and on this basis alone, the Government's motion to dismiss should be denied. Nevertheless, a review of the verified petitions in this case demonstrates that the Petitioners have made plausible allegations entitling them to relief under 21 U.S.C. § 853. The Government's motion to dismiss the Petitioners' claims is therefore denied.

### C. Nexus

Before a preliminary order of forfeiture is entered, a judicial determination must be made as to whether the "requisite nexus" exists between the property to be seized and the offenses of conviction. See Fed. R. Crim. P. 32.2(b)(1)(A). As noted previously, the Government bears the burden of proving nexus by a preponderance of the evidence. United States v. Cherry, 330 F.3d 658, 669-70 (4th Cir. 2003).

The preliminary determination of nexus is made independently of any interests alleged by third parties. United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009). Any third party interests are instead appropriate for adjudication only in ancillary proceedings pursuant to Federal Rule of Criminal Procedure 32.2(c). Id.; United States v. Ivanchukov, 405 F.Supp.2d 708, 714 n.12 (E.D. Va. 2005) (citing Fed. R. Crim. P. 32.2(b)(2)

("Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).")).

At the Rule 11 hearing before the Magistrate Judge, the Government obtained a preliminary order of forfeiture on a number of properties and other assets, including the properties and assets at issue here. The issue of forfeiture was dealt with summarily, as evidenced by the following exchange between the Magistrate Judge and counsel for the parties:

> THE COURT: Based upon the representations and answers given by the defendant and his attorney in the foregoing Rule 11 proceeding, I find that the defendant's plea is knowingly and voluntarily made; and that the defendant understands the charges, the potential penalties, and the consequences of his plea; and his plea of guilty is hereby accepted.
>
> *  *  *
>
> Anything further from the government in regard to Mr. Bailey's matter?
>
> MR. ELLIS: Your Honor, Mr. Bailey has executed a Consent Order and Judgment of Forfeiture in regard to any of his interest in certain properties that are set forth in this consent order that's been executed by the government. I'd like to approach with that, if I might.

THE COURT: All right. Mr. Parker, has that been signed by Mr. Bailey and either by yourself or Judge Payne?

MR. PARKER: Yes, sir, Your Honor.

THE COURT: I take it the parties are requesting that I execute that document?

MR. ELLIS: We are, Your Honor.

MR. PARKER: Yes, sir. That would be fine.

THE COURT: All right. I've now executed the Consent Order and Judgment of Forfeiture in this matter. Anything further, Mr. Ellis?

MR. ELLIS: No, Your Honor, not from me.

                    *       *       *

THE COURT: Mr. Parker, anything further?

MR. PARKER: No, sir, Your Honor. We thank you.

[Doc. 257 at 35-36]. The Consent Order and Judgment of Forfeiture entered by the Magistrate Judge summarily recites a finding "that there is a substantial nexus between the property listed below and the offenses to which the defendant has pled guilty...." [Doc. 16 at 1].

In its prior Orders regarding the Sage petitions, the Court questioned whether the Government had actually shown the nexus required to support such a finding and therefore directed the Government to present further

evidence to demonstrate nexus.[15]  [Doc. 306 at 12].  While objecting to the Court's decision to re-examine the nexus issue, at the December 12, 2011 hearing on the Sage petitions, the Government presented evidence to support its nexus theory.  Specifically, the Government presented the testimony of some of the individuals who were victims of the Defendant's Ponzi scheme, i.e., individuals who forwarded funds to the Defendant for the purpose of opening AMA or IMA accounts, and who in return received false accounting statements representing that their money had been invested in certain funds and was earning certain rates of return when in fact no such investments had been made.  [Transcript of Dec. 12, 2011 Hearing, Doc. 318 at 12-45].  The Government further presented the testimony of an employee of Home Trust Bank and the case agent to establish that the Defendant was engaged in a check kiting scheme using Southern Financial's account with HomeTrust Bank at the time that the Sage Certificates were purchased with funds deposited in the same Account.  [Id. at 54-112].  The Government also relied upon the Defendant's Affidavit, which had previously been submitted to the Court, as

_____

[15]  As previously noted, the Court also afforded the Petitioners an opportunity to present evidence challenging the validity of the nexus determination at the December 12, 2011 hearing.  [See Doc. 306 at 18-19].

well as the Petitions of record, as further proof of nexus. [Id. at 113]. Most of this evidence, however, pertained to investors other than the Sage Petitioners, to assets other than the Sage Certificates, and to transactions that were of an entirely different nature from those at issue in the Sage hearing. The Court thus concluded that this evidence "did little, if anything, to show any specific connection between the Defendant's criminal activity and the [Sage] Certificates." [Doc. 331 at 26].

Since the December 2011 Sage Hearing, the Government has declined to present any further evidence of nexus, even though it has been afforded the opportunity to do so, apparently taking the position that it has satisfied its burden on this issue. The Government further contends that the Petitioners are precluded from challenging the Magistrate Judge's nexus determination and therefore it is improper for the Court to re-examine the issue of nexus in the context of the present ancillary proceedings.

In arguing that the Court is precluded from revisiting the nexus issue, the Government cites Courts of Appeals cases which have held that third parties are generally barred from relitigating the forfeitability of the property. See, e.g., United States v. White, 675 F.3d 1073, 1077-78 (8th

Cir. 2012); United States v. Davenport, 668 F.3d 1316, 1321 (11th Cir.),

cert. denied, 132 S.Ct. 2731, 183 L.Ed.2d 70 (2012); United States v.

Andrews, 530 F.3d 1232, 1236-37 (10th Cir. 2008). The reasoning of these

courts was summarized succinctly by the Eighth Circuit Court of Appeals as

follows: "if the forfeited property really belongs to the third party, she can

prevail and recover her property during the ancillary proceeding 'whether

there were defects in the criminal trial or the forfeiture process or not; and if

the property does not belong to the third party, such defects in the finding

of forfeitability are no concern of hers.'" Davenport, 668 F.3d at 1321

(quoting in part Andrews, 530 F.3d at 1237).

The Fourth Circuit, however, has recognized the right of third party

claimants to challenge the validity of a preliminary forfeiture order in a

subsequent ancillary proceeding:

> Nothing in § 853(n) explicitly acknowledges the right
> of third parties to attack the validity of the forfeiture
> order by proving that a particular asset was not
> forfeitable under the terms of the statute. Serious
> due process questions would be raised, however, if
> third parties asserting an interest in forfeited assets
> were barred from challenging the validity of the
> forfeiture. The determination made at the
> defendant's criminal trial that the property was
> subject to forfeiture cannot be considered binding
> on persons who were not only not parties to the
> criminal action but were specifically barred from

intervening.  See 21 U.S.C. § 853(k) (barring third parties from intervening in the criminal trial); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.7, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979) (citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971)) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard.").

United States v. Reckmeyer, 836 F.2d 200, 206 (4th Cir. 1987).  Thus, while other courts have concluded that third party claimants cannot challenge the underlying determination of forfeitability, the Fourth Circuit in Reckmeyer clearly has held to the contrary.  Reckmeyer remains binding precedent in this Circuit.  See United States v. McHan, 345 F.3d 262, 270 (4th Cir. 2003) (noting that "§853(n) is a means by which third persons who raise challenges to the *validity of the forfeiture order* [can] have their claims adjudicated") (citing Reckmeyer with approval) (emphasis added).  In light of binding Fourth Circuit authority, the Court therefore rejects the Government's contention that the issue of nexus cannot be revisited at this stage in the proceedings.

Even if the Government were correct, and third parties such as the present Petitioners were precluded from re-litigating nexus, the

Government has offered no authority to suggest that once a preliminary order of forfeiture is entered, a court is prohibited from revisiting the determination of nexus *sua sponte*.  The finding of a nexus in the present case -- to the extent that such determination was even made -- was set forth in an interlocutory consent order entered by the Magistrate Judge. The Government's argument that this nexus finding somehow binds this Court in perpetuity and precludes any reconsideration of that determination is simply without any legal support.  Like any other interlocutory order, the preliminary order of forfeiture is subject to revision prior to entry of a final judgment in this case.  The Government's contention, then, that the Court cannot revisit this determination in light of the evidence now before it is without merit.

Having determined that the issue of nexus can be revisited, the Court now turns to the issue of whether the Government has satisfied its burden of proving a nexus between the Defendant's offenses of conviction and the specific properties and other assets at issue in these ancillary proceedings.

To establish nexus with respect to the real properties and other assets identified in the Consent Order and Judgment of Forfeiture, the Government relies upon a theory that the purchases of real estate

completed on the Petitioners' behalf constitute the proceeds of the Defendant's fraud. In making this argument, the Government cites cases that stand for the general proposition that criminal forfeiture is not restricted to property owned by the defendant but may extend to assets held in the names of third parties. The Court has no quarrel with this general statement of law. It is well-settled that criminal forfeiture may extend to assets owned by third parties where, for example, such assets were "involved in the offense." DeAlmeida v. United States, 459 F.3d 377, 381 (2d Cir. 2006). Further, it has long been established that the proceeds of a crime are always forfeitable, and it is not necessary to prove that money ever legally belonged to the Defendant in order for such money to be forfeited. See United States v. Evanson, No. 2:05CR00805 TC, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008) (citing United States v. Grossman, 501 F.3d 846, 849 (7th Cir. 2007)). These statements are entirely consistent with the primary remedial purposes underlying criminal forfeiture, which is to punish the defendant and to disgorge him of his ill-gotten gains. See Libretti, 516 U.S. at 39, 116 S.Ct. 356 ("Congress conceived of forfeiture as *punishment* for the commission of various . . . crimes.") (emphasis added); United States v. Martin, 662 F.3d 301, 309

(4th Cir. 2011) ("[T]he substantive purpose of criminal forfeiture is . . . to deprive criminals of the fruits of their illegal acts and deter future crimes."), cert. denied, 132 S.Ct. 1953, 182 L.Ed.2d 805 (2012); Newman, 659 F.3d at 1243 (stating that criminal forfeiture is a means of disgorging a criminal defendant of his "ill-gotten gains"); United States v. Venturella, 585 F.3d 1013, 1019 (7th Cir. 2009) ("forfeiture seeks to punish a defendant for his ill-gotten gains by transferring those gains to the United States Department of Justice") (citation omitted), cert. denied, 130 S.Ct. 1547, 176 L.Ed.2d 139 (2010); United States v. Hoover-Hankerson, 511 F.3d 164, 171 (D.C. Cir. 2007) ("Forfeiture is a means of forcing a criminal defendant to disgorge ill-gotten profits."). Section 853(o) expressly states that the statute should be construed liberally to effectuate the purpose of the statute. Because that purpose is the punishment of the wrong-doer, it therefore follows that the statute should be construed *narrowly* when it is being interpreted in any manner that does not serve to punish the Defendant.

Unlike a civil forfeiture action, which is an *in rem* proceeding brought against the property sought to be forfeited, criminal forfeiture is an *in personam* proceeding. Cherry, 330 F.3d at 669 n.16. "[C]riminal forfeiture

is a sanction against the individual defendant rather than a judgment against the property itself." United States v. McGinty, 610 F.3d 1242, 1246 (10th Cir. 2010) (citation omitted); Martin, 662 F.3d at 306 ("Criminal forfeiture is part of a defendant's sentence."). Thus, in a criminal forfeiture proceeding, the Government acquires only "the *defendant's* interest in the property . . . ." United States v. Pease, 331 F.3d 809, 810 (11th Cir. 2003). Because criminal forfeiture follows the defendant as part of his penalty, the Government may seize any of the *defendant's property* that is traceable to the proceeds of criminal conduct. See Hoover-Hankerson, 511 F.3d at 171 & n.4 ("The theoretical limit of forfeiture is the value of the proceeds the defendant possesses from the illegal activity . . ."; thus, "if a defendant purchased a house with his share of the loot from a bank robbery, the house would be considered proceeds subject to forfeiture"); United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003) ("A change in form from the proceeds immediately obtained from crime -- for example, use of criminal lucre to buy a house -- does not prevent forfeiture of the resulting property."); Evanson, 2008 WL 3107332, at *3 (noting that "[i]f the proceeds of the offense were not cash, the money judgment should be based upon the value of the benefit *the defendant received*") (emphasis added).

Here, however, the Government has failed to demonstrate that the Defendant received any benefit by acquiring these assets, beyond briefly possessing the funds used to purchase them. The assets were purchased at the direction of the Petitioners and for their benefit. There is no suggestion, much less any evidence, that these were sham transactions designed to defeat forfeiture or to hide assets for the Defendant. While the Government may have established that the Petitioners were induced to part with their money as a result of the Defendant's misrepresentations regarding his status as a qualified intermediary, the Government has not shown that the Defendant actually obtained or retained any *beneficial interest* in the funds as a result of such fraudulent conduct. The money he received from the Petitioners was given to him with the explicit instruction to purchase specific assets with their IRA funds. Unlike so many of the Defendant's IMA and AMA clients, who gave the Defendant funds with explicit directives for their investment but whose directives were ignored, the present Petitioners, like the Sage Petitioners, ultimately received precisely the assets for which they had bargained. The purchase transactions were completed and the assets were acquired and titled in the name of the Petitioners, their IRAs, and/or their LLCs, in accordance with

the Petitioners' expectations and explicit instructions.[16]   To the extent that any fraud was committed with respect to these Petitioners, such fraud is limited to the Defendant's misrepresentations regarding his status as an intermediary qualified to hold their IRA funds and the manner in which he managed the funds retained by Southern Financial.   Such misrepresentations, however, are not specifically related to the offenses for which he was convicted (mail fraud, securities fraud and filing false tax returns), or even to the general Ponzi scheme described in the Bill of Information.

The Government nevertheless contends that the requisite nexus is established by the fact that the Defendant's business would not have existed at the time the subject properties and assets was obtained "but for" his fraud.  [Government's Motion to Dismiss at 6].  Where the Government seeks forfeiture of property that it contends constitutes proceeds of the defendant's crimes, several courts, including the Fourth Circuit, have

---

[16] The Government suggests that because the IRA Petitioners' funds were not segregated in any manner from other funds held by the Defendant, these properties *must* have been purchased with funds provided by Bailey's other victims.  Beyond relying upon the mere fact of the co-mingling of these funds, however, the Government has presented no evidence to support this suggestion, nor has it made any effort to trace such funds through the purchases.  As such, the Court is constrained to find that the Government has failed to show by the preponderance of the evidence that any of these properties were purchased with funds other than those deposited precisely for that purpose.

applied the "but for" test first articulated by the Seventh Circuit in United States v. Horak, 833 F.2d 1235, 1242-43 (7th Cir. 1987). See United States v. Farkas, 474 F. App'x 349 (4th Cir. 2012); United States v. DeFries, 129 F.3d 1293, 1313 (D.C. Cir. 1997); United States v. Nicolo, 597 F.Supp.2d 342, 346 (W.D.N.Y. 2009), aff'd, 421 F. App'x 57 (2d Cir. 2011); Ivanchukov, 405 F.Supp.2d at 712; United States v. Benyo, 384 F.Supp.2d 909, 914 (E.D. Va. 2005).

The Fourth Circuit recently approved of the "but for" test in Farkas, supra. In that case, the defendant and his co-conspirators engaged in a multi-stage fraud scheme while the defendant was chairman and principal owner of a mortgage lending company called TBW. United States v. Farkas, No. 1:10cr200 (LMB), 2011 WL 5101752, at *1 (E.D. Va. Oct. 26, 2011). Specifically, the defendant and his co-conspirators engaged in a scheme to disguise overdrafts of TBW's master advance account by "sweeping" funds into that account from TBW's investor funding account. Id. The defendant also sold sham mortgage loans and pools of loans to banks. Id. Following his conviction, the defendant was ordered to forfeit more than $35,000,000 in funds which the district court determined were proceeds acquired directly or indirectly through his fraud. Included in these

funds were monies paid to or for the benefit of the defendant from his shareholder account and monies transferred from TBW for the benefit of the defendant's general partnership.  Id. at *5.  The district court reasoned that the nexus requirement for these funds was satisfied because such funds "would not have been available to him but for his fraud, because TBW would not have remained in business in the absence of the bank and wire fraud scheme."  Id.  The district court therefore concluded that such funds constituted indirect proceeds of the defendant's fraud.  Id. at *6.  The Fourth Circuit affirmed the district court's reasoning in all respects, finding that the court did not clearly err in finding that TBW would have been insolvent during the fraud period "but for" Farkas's fraud schemes.  Farkas, 474 F. App'x at 360.

In the present case, the Government particularly emphasizes one passage in the opinion of the district court in Farkas:

> Defendant places great significance on the argument that TBW generated revenue from legitimate business operations after the fraud commenced and until the company's demise. However, whether the specific funds resulted from legitimate or illegal activities at TBW is irrelevant because any funds held by TBW would have been unavailable to defendant but for his fraud.

Farkas, 2011 WL 5101752, at *6.  The Government cites this language in support of its position that, regardless of whether the purchases made on behalf of the IRA Petitioners were legitimately made, they nevertheless should be considered the proceeds of the Defendant's fraud and thus subject to forfeiture.

The Government's reliance on Farkas is entirely misplaced.  The facts of Farkas are clearly distinguishable from the present case.  In Farkas, the funds that were forfeited were corporately held funds that were *available to the defendant*, i.e., the company's earnings.  Here, the properties purchased on behalf of the IRA Petitioners were not held by the Defendant or any of his corporate alter egos; the properties were entirely in the control of the Petitioners.  Thus, unlike in Farkas, where the defendant had access to and control of the forfeited funds, the properties in the instant case were not "available" for the Defendant's use.  The Court declines to extend the reasoning of Farkas to encompass the type of legitimate business transactions which occurred here within the meaning of "indirect proceeds."

If the Government is correct in its nexus argument, then *any* funds which Defendant Bailey ever received from clients over the course of a

decade and legitimately expended for such clients' benefit constitute the indirect proceeds of the Defendant's crimes and would therefore be forfeitable. Taking the Government's argument to its logical conclusion, any expenditure by the Defendant -- for salaries of employees who were oblivious to his fraud, for mortgage or rental payments for office space, even for payment of the electric bill – would constitute funds which would now be subject to forfeiture from the innocent third parties who received them. Such a result is nonsensical and is completely contrary to the underlying remedial purposes of the criminal forfeiture laws.[17]

The Government boldly asserts that the subject properties were purchased with the funds of others, including the funds of Defendant's Ponzi scheme victims. The Government has been steadfast in its position, however, that it is not required to trace funds in order to show that the

_____

[17] The Court notes that there is a glaring inconsistency in the Government's position. In order to try to show a nexus the Government argues that the Defendant procured the Petitioner's funds by his fraud/misrepresentation. If that is true, then the Petitioners are the *victims* of the Defendant's crime. Thus, a *necessary* component of the Government's argument regarding nexus is that they are seeking to forfeit these properties *from the victims of the Defendant*. That completely thwarts the purpose of forfeiture. Forfeiture is to punish the Defendant: to take away from him his wrongful gain, or to take it away from those whom he wanted to benefit by his crime. Presumably, the perpetrator of any crime is willing to harm his victims – for his own gain. Here, the Petitioners are not harmed – except to the extent that the Government seeks to take from them what the Defendant did not.

subject assets are proceeds of the Defendant's crimes. [See Government's Motion to Dismiss at 5]. Without tracing, however, the Government cannot show by a preponderance of the evidence that funds of the Defendant's other victims were in fact used to purchase the properties in question. The Government thus has presented no forecast of evidence to support its assertion that other victims' funds were used to purchase the subject properties. The Government's reliance on the Defendant's co-mingling of his clients' funds is simply insufficient to carry this burden.

Based on the evidence presented, the Court finds that the Petitioners paid their IRA funds to Bailey who then purchased the subject properties in the names of the appropriate IRA LLCs. Accordingly, the Court concludes that the Government has failed to establish that the requisite nexus exists between the Defendant's crimes and the real properties and other assets identified in the Consent Order and Judgment of Forfeiture which are claimed by the IRA Petitioners.

### D.    Interests of the IRA Petitioners

Even if the Court were to conclude that the Government had carried its burden of demonstrating a nexus between the properties identified in the Consent Order and Judgment of Forfeiture and the Defendant's offenses of

conviction, the IRA Petitioners would nevertheless prevail in their contest of the Government's forfeiture of the properties in this case because they can demonstrate both that they hold a valid, superior legal interest in the properties and that they are bona fide purchasers for value.

### 1. Superior Legal Interests under § 853(n)(6)(A)

Section 853(n)(6)(A) provides that the Court shall amend the order of forfeiture if the petitioner can establish by a preponderance of the evidence that:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section....

21 U.S.C. § 853(n)(6)(A). In determining the superiority of the IRA Petitioners' interests, the Court is mindful that such an inquiry "is not a precise one, but instead involves equitable considerations and is necessarily fact-bound and value laden." Oregon, 671 F.3d at 492.

Here, the IRA Petitioners have presented undisputed forecasts of evidence that establish that they have a vested or superior interest in the

assets that they purchased. First, the Petitioners have established that they each hold legal title to the properties. The Government has presented no forecast of evidence that Defendant Bailey has any type of ownership interest in the properties. Indeed, the Government does not contend that title to these properties ever vested in Bailey or Southern Financial; rather, the Government contends that some type of interest arose in favor of Bailey at the time the funds were transferred from the IRA Petitioners' IRA accounts to Southern Financial. By focusing its analysis on this single moment, however, the Government chooses to ignore the transactions that subsequently took place as directed by the Petitioners which resulted in the properties being purchased on the Petitioners' behalf.

As to this issue, the Court finds the Fourth Circuit's decision in Oregon to be instructive. In that case, a preliminary order of forfeiture was issued authorizing the Government to seize funds that the defendant, a cigarette manufacturer, had deposited into an escrow account for the benefit of states in which the defendant sold its products. Two of these states petitioned to exclude their sub-accounts from the forfeiture. In evaluating the comparative strengths of the parties' claims of interest in the funds, the Fourth Circuit gave great weight to the fact that the defendant's

interest was vested at the time of the acts giving rise to forfeiture, while the claimants' interest, which was subject to a number of unfulfilled contingencies, was not. Id. at 492. The Court noted the fact that the vested nature of the defendant's interest placed the Government "in a strong position" with respect to forfeiture. Id. at 493. The Court, however, did not end its inquiry there. Rather, the Court went on to examine the relative equities of the parties, noting that the funds were held in escrow by the defendant for the contingent benefit of the claimants, and that if the claimants had been able to demonstrate that the contingencies were imminent or otherwise likely to be met, this may have tilted the calculus in their favor. Id. Finding that there was no evidence that the claimants were even contemplating actions that would have fulfilled these conditions, however, the Court ultimately concluded that the claimants had failed to carry their burden of proving that their legal interest in the escrow funds was superior to the defendant's. Id.

In the present case, the Defendant had possession of the Petitioners' funds for that short period immediately before the funds were used to purchase the subject properties as the Petitioners had instructed. The Government contends that it was the Defendant's holding of those funds

that give rise to any potential forfeiture. At that time, however, all of the conditions had been fulfilled for the Petitioners to have those funds converted into an interest in the real properties at issue. The only item left to be completed was the Defendant's imminent transfer of the funds to the closing attorney for the completion of the transaction. In every case, the transactions were in fact completed: Defendant Bailey transferred the funds required to complete the closing of the transaction. As such, at the time that any forfeitable interest in the funds may have arisen, the IRA Petitioners' interests were fully vested and the contingencies that yet needed to be met were imminent and likely to occur. The Petitioners' interest in the funds therefore was, and remained at all relevant times, superior to any interest briefly held by the Defendant, regardless of the operation of the relation back doctrine.[18]

The Government takes the position that because any funds transferred to Defendant Bailey became the proceeds of his fraud, any purchases subsequently made by Bailey on behalf of the IRA Petitioners

---

[18] Indeed, the Court notes that the Petitioners' interest in their Properties is even more substantial than the superior interest found to have been held by the Sage Petitioners in the Sage Certificates, as the present Petitioners hold legal, beneficial and possessory interest in their assets, whereas Defendant Bailey had at least a possessory interest in the Sage Certificates. [See Doc. 331].

also constitute the proceeds of his fraud. In so arguing, the Government relies on cases such as United States v. Allmendinger, No. 3:10CR248-01, 2012 WL 966615 (E.D. Va. Mar. 21, 2012). In Allmendinger, the Government sought forfeiture of a truck that the defendant had given as a gift to his mother. Allmendinger's mother contested the forfeiture, arguing that the truck had been given to her as a gift and that she did not have knowledge that the truck had been "derived from criminal activity." Id. at *1. The district court concluded that the mother could not prevail under § 853(n)(6)(A), reasoning that because the truck had been purchased with fraud proceeds, the mother "could not have acquired her interest in the [t]ruck before the commission of the offense." Id. at *2.[19]

The facts of Allmendinger are entirely distinguishable from the present case. In Allmendinger, the defendant obtained money from his fraud, bought a truck with the proceeds of his fraud, and gave the truck to his mother. Clearly, the proceeds used to purchase the truck continued to constitute the proceeds of the defendant's crime. Unlike the defendant's mother in Allmendinger, the IRA Petitioners in the present case had a

_____

[19] The court further concluded that the mother did not qualify as a bona fide purchaser for value as the mother was admittedly a donee. Id.

cognizable legal interest in their IRA funds *prior to* the commission of the Defendant's fraudulent conduct.  Such funds were given to the Defendant with the expectation that he would forward those funds for the purchase of assets selected by the Petitioners – which the Defendant did.  Thus, the "proceeds" of the Defendant's fraud, at least as with respect to the IRA Petitioners, were in essence returned to them: they suffered no loss.  For the Government to argue that the real estate assets at issue do not belong to the IRA Petitioners because they are proceeds of the Defendant's crimes completely ignores the position of the Petitioners as the holders of a superior legal interest in the funds to begin with.[20]

The undisputed forecast of evidence demonstrates that in order to comply with IRS requirements for self-directed IRAs, the Petitioners transferred funds from their IRA accounts to Southern Financial for the express and limited purpose of Southern Financial providing *custodial* services for the Petitioners' self-directed real estate IRAs.[21]  Southern

---

[20] This argument also places the Government in the curious position of arguing that a thief has an interest in stolen property that is superior to the interest of the very persons from whom he stole.

[21] Indeed, the only time that Bailey and/or Southern Financial held anything for the Petitioners, they held it as a custodian performing a "custodial service."  By definition, a custodian of funds is holding the funds *for* someone, i.e., the *beneficial owner* of the funds.  Clearly, a beneficial owner has a legal interest that is superior to the mere

Financial subsequently established LLCs to hold title to the real estate and other assets purchased by the Petitioners. Defendant Bailey set up LLCs for the Petitioners, designating each as a single member LLC, meaning that Southern Financial as the manager had no ownership interest and that 100 percent of the membership interest belonged to the respective Petitioners and/or their self-directed real estate IRAs.

Southern Financial then transferred the funds needed to purchase the properties directly to the closing attorney designated for the particular transaction. Deeds for the real properties were duly recorded in the name of each Petitioner's LLC (or the individual Petitioner, as the case may be) as the grantee. The Petitioners selected these properties without any input from Bailey or Southern Financial. The only services performed by Bailey with respect to the purchase of these assets were to accept the Petitioners' IRA funds and to forward these funds to complete the purchases.

Defendant Bailey never represented himself to be a member of any of the Petitioners' LLCs or as owner of any of the subject assets in any documents pertaining to their purchase. The only forecast of evidence that the Government has presented to demonstrate any purported ownership

_____

possessory interest of a custodian.

interest by the Defendant in the subject assets is Defendant Bailey's unsupported statement in his Plea Agreement that he "has or had a possessory or legal interest" in the assets identified in the Consent Order and Judgment of Forfeiture. "The mere fact" that Defendant Bailey agreed in his plea agreement that the assets are forfeitable, however, "does not make it so...." Libretti, 516 U.S. at 55, 116 S. Ct. 356 (Stevens, J., dissenting) (quoting United States v. Roberts, 749 F.2d 404, 409 (7th Cir. 1984)); accord United States v. Nava, 404 F.3d 1119, 1133 (9th Cir. 2005) (noting that a defendant's assertion of ownership in a plea agreement did not establish legal or equitable title); United States v. Schwimmer, 968 F.2d 1570, 1580-81 (2d Cir. 1992) ("a defendant's consent to forfeit property does not expand the Court's power over that property, if the property is not the defendant's own"). Moreover, as the Court previously noted in the Sage Order, "the Defendant's credibility is called into doubt by the fact that the Defendant has entered into a Plea Agreement with the Government and is currently awaiting sentencing. As such, the Defendant has a powerful incentive to agree to forfeit as many assets as he possibly can, regardless of whether he actually has any interest therein, and to provide testimony that is helpful to the Government in these forfeiture proceedings."

[Doc. 331 at 8 n.4]. Thus, the Defendant's self-serving and conclusory statements alone are insufficient to contradict the public records and the basic tenets of state real property law which establish that the Petitioners are the titled record owners of the subject properties.

The IRA Petitioners' cases stand in stark contrast to other criminal forfeiture cases in which the Government has taken the position that ownership was by a "straw man" to hide a defendant's assets. In such instances, the relation back provision of § 853(c) properly allows the Government to reach forfeitable assets held by third parties at the time of conviction. See Reckmeyer, 836 F.2d at 203 (noting that the relation back provision "was designed to prevent defendants from escaping the impact of forfeiture by transferring assets to third parties"); see also United States v. Wilson, 659 F.3d 947, 953 (9th Cir. 2011) ("the Government's interest attaches at the time of the crime, in order to prevent criminals from distributing the proceeds of crime to friends, relatives, and straw persons."). "Congress's primary concern in adopting the relation-back provision was to make it possible for courts to *avoid sham or fraudulent transfers* that were aimed at avoiding the consequences of forfeiture. *Congress did not intend to permit courts to void 'arms'-length' transactions*." Reckmeyer, 836 F.2d

at 208 (citations omitted) (emphasis added); <u>United States v. Morgan</u>, 224 F.3d 339, 343 (4th Cir. 2000) (noting Congress's intent that § 853(n)(6) "be construed to deny relief to third parties acting as nominees of the defendant or who knowingly engage in sham or fraudulent transactions").  Thus, while the Government may pursue forfeiture of a third party's assets, such forfeiture is still limited only to property in which the *defendant* truly retains an interest.

The IRA Petitioners transferred their IRA funds to Southern Financial for the purpose of creating self-directed IRAs. Defendant Bailey complied with the Petitioners' directives to apply their IRA funds towards the purchase of certain assets; these purchases were completed, and the assets were titled in the names of the Petitioners or their LLCs.  The Government has presented no forecast of evidence to suggest that these purchases were "sham transactions" effected by Defendant Bailey to hide his assets.  Rather, they were legitimate purchases on behalf of the Petitioners.  In fact, they were precisely the legitimate purchases that the Petitioners retained Bailey to effectuate.  To the extent that Defendant Bailey acquired any interest in the Petitioners' funds, such interest was,

and remained at all times, inferior to the interests vested in and retained by the Petitioners.

For all of these reasons, the Court concludes that pursuant to § 853(n)(6)(A), the Petitioners have a vested and superior legal interest in the properties identified in the Consent Order.

## 2.     Bona Fide Purchasers for Value under § 853(n)(6)(B)

Section 853(n)(6)(B) provides that the Court must amend an order of forfeiture if the claimant can show by a preponderance of the evidence that

> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section . . .

21 U.S.C. § 853(n)(6)(B).

Under §  853(n)(6)(B), if the Court determines that the petitioner acquired its interest subsequent to the defendant's misconduct, the petitioner will prevail upon showing that the petitioner (1) was a purchaser for value of the interest in the property; (2) was, at the time of that purchase, reasonably without cause to believe that the property was subject to forfeiture; and (3) acquired the interest in an arms'-length transaction with the expectation that he or she would receive the equivalent

value in return.  <u>United States v. McClung</u>, 6 F.Supp.2d 548, 551 (W.D. Va. 1998).  Consistent with the underlying purposes of the criminal forfeiture statute, the term "bona fide purchaser for value" is to be "construed liberally to include all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return."  <u>Reckmeyer</u>, 836 F.2d at 208.

All of the requirements for a bona fide purchaser are satisfied here. The IRA Petitioners transferred their IRA funds to Southern Financial for the sole purpose of using Bailey's custodial services to purchase assets with those funds.  The funds required to purchase the assets were wired directly from Southern Financial to the closing attorney.  The IRA Petitioners had no intention of creating an ongoing investment account with Bailey or Southern Financial.  Rather, the funds were transferred through the Defendant's accounts solely in an attempt to comply with rulings of the Internal Revenue Service regarding self-directed IRAs.  The incidental use of the Defendant's account to facilitate a transaction required under the Internal Revenue Code does not constitute grounds for criminal forfeiture of the real properties and other assets acquired on the Petitioners' behalf.

The Petitioners engaged in arms'-length transactions with Southern Financial. It is undisputed that none of the Petitioners were aware of any of Defendant Bailey's illegal activities. Further, the nature and form of these transactions demonstrate that Defendant Bailey was not an active participant in the purchases of these assets. The assets were identified and selected by the Petitioners, all due diligence prior to purchase was conducted by the Petitioners, and the closings were orchestrated by the Petitioners. Defendant Bailey and his business played a minimal role in these transactions. Moreover, what limited role Defendant Bailey did play was completed exactly as directed by the Petitioners. The evidence is clear that the Petitioners acquired their property interests in arms'-length transactions, all with the expectation that the equivalent value would be received in return.

While not disputing the lack of wrongdoing by any of the Petitioners, the Government nevertheless contends that they cannot prevail under § 853(n)(6)(B) because whatever interest they had in the funds was extinguished when the Defendant procured the funds through his fraud. And because the funds were transferred to the Defendant, the argument goes, the Petitioners cannot claim to be bona fide purchasers for value, as

they had no interest in the funds that the Defendant used to complete the purchases. As the Court has already explained, however, the Petitioners maintained an equitable and beneficial interest in the funds they had deposited with the Defendant. Upon the closing of the transactions, the Petitioners exchanged this equitable and beneficial interest in the funds for the legal title held by the Petitioners through their respective LLCs. That was by definition -- and in reality -- an exchange of equivalent value.

Accordingly, the Court concludes that the undisputed forecast of evidence establishes that each of the IRA Petitioners satisfies the requirements of a bona-fide purchaser under Section 853(n)(6)(B).

### 3. Inadequacy of Remission Procedure

Throughout these ancillary proceedings, the Government has urged the Court to allow the forfeiture of all the property identified in the Consent Order and thus allow the Attorney General to address the interests of the Petitioners through the remission process provided in 21 U.S.C. § 853(i). This argument is without merit for several reasons. First, distribution pursuant to remission is a "non-judicial remedy that is left entirely to the Attorney General's discretion." Willis Mgmt. (Vt.), Ltd. v. United States, 652 F.3d 236, 243 (2d Cir. 2011) (citation and internal quotation marks omitted);

see also 21 U.S.C. § 853(i) (granting Attorney General authority to grant petitions, restore forfeited property or "take any other action to protect the rights of innocent person which is in the interest of justice and which is not inconsistent with the provisions of this section"). Since the law is clear that any remission procedure is a discretionary matter within the purview of the Attorney General, the Court does not have jurisdiction to order the Attorney General to make any such distribution. More importantly, however, before the remission process under section 853(i) can even be implemented, the Court is required to make the legal determination that the property is forfeitable. See id. at 245 ("[I]f the property is not forfeited in the first instance, § 853(i) simply would not apply to the property."); United States v. Lacoff, 446 F. App'x 311, 314 (2d Cir. 2011) ("[F]ederal remission procedures do not apply until property interests based on innocent ownership are resolved and forfeiture ordered by a court. Thus, remission procedures cannot resolve the competing claims of innocent ownership here at issue.").

The Government's proposal also raises serious separation of powers concerns. To require the Petitioners to undergo the remission process without first determining the extent of their legal interest in the forfeited

property would be an improper delegation of the Court's judicial authority to an executive agency, as well as an improper shirking of the obligation conferred on this Court by Congress to adjudicate issues of ownership in an ancillary proceeding.

Issues of due process are implicated as well. Due process requires that third party claimants are entitled to notice and a hearing when a preliminary order of forfeiture is entered with respect to property in which they claim a cognizable interest. See McHan, 345 F.3d at 270. The ancillary forfeiture proceeding is the only opportunity that third parties have to be heard before being deprived of property in which they claim a legitimate interest. Allowing the Government to use the remission process in lieu of adjudicating the third-party petitions filed in this matter on their merits would therefore deprive the claimants of due process. After all, the determination of their property rights would then be at the sole discretion of the Attorney General. While the Court recognizes that the Government articulates a legitimate objective in seeking to provide restitution to those clients of the Defendant who lost everything, this objective cannot be achieved by confiscating retirement funds from other clients of the

Defendant who were not so victimized just to redistribute the hardship more "fairly."

The Government's argument that the Court should order forfeiture of these properties so that these assets can be liquidated and the proceeds distributed equally to all "similarly situated victims" through the remission process also ignores the principal distinction between forfeiture and restitution. Criminal forfeiture and restitution each serve a different remedial purpose. The primary objective of criminal forfeiture is to punish the defendant, whereas the purpose of restitution is "not to punish the defendant, but to make the victim whole again by restoring to him or her the value of the losses suffered as a result of the defendant's crime." Newman, 659 F.3d at 1241 (quoting United States v. Hunter, 618 F.3d 1062, 1064 (9th Cir. 2010); see also United States v. Boring, 557 F.3d 707, 714 (6th Cir. 2009) ("Given their distinct nature and goals, restitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain."). The Court, therefore, cannot order forfeiture merely so that the Attorney General may create a larger restitution pool for the other victims of the Defendant's crimes. Doing so would not serve the remedial purposes

of the criminal forfeiture statute. As such, the statute simply does not support the Government's legal argument.[22]

In summary, the Court finds that the Government has failed to demonstrate the requisite nexus between the real properties and other assets titled in the name of the IRA Petitioners and the offenses committed by the Defendant. Even assuming such nexus could be established, the IRA Petitioners have demonstrated that they possessed a superior legal interest in the assets at the time of the acts which gave rise to the claims of forfeiture and that they are bona fide purchasers for value.[23] Having established their right to recovery pursuant to 21 U.S.C. § 853(n)(6)(A) and § 853(n)(6)(B), the IRA Petitioners are entitled to the removal of their claimed properties from the Consent Order and Judgment of Forfeiture.[24]

---

[22] The Government's reliance on the remission procedure is also extremely short-sighted. If the real property and other assets identified in the Consent Order were seized and liquidated so that the sale proceeds could be distributed to the Defendant's victims *pro rata*, the Government could not possibly obtain fair market value for such assets, given the present economic climate. In its effort to be "fair" to the Defendant's victims, the Government would end up multiplying the aggregate losses of all of the Defendant's clients. This makes no sense at all.

[23] In light of this ruling, the Court need not conduct a tracing analysis of the Petitioners' funds or determine whether the IRA Petitioners are entitled to recover under a constructive trust theory.

[24] Petitioner Terry R. Sloan filed a second Petition challenging the forfeiture of $375,301.48 in 401(k) rollover funds that he alleges was retained by Southern Financial

## V.     CONCLUSION

In its arguments, the Government has completely lost sight of the purpose of this proceeding and the purpose of the forfeiture statute. Section 853(o) expressly states that the statute should be construed liberally to effectuate the purpose of the statute.  That purpose is the punishment of the wrong-doer, the Defendant.  Therefore, 21 U.S.C. § 853 should be construed *narrowly* when it is being interpreted in any manner that does not serve to punish the Defendant.  Forfeiting the properties at issue herein does absolutely nothing to punish the Defendant.  Put simply, he has "no dog in that fight," which is likely why he was so willing to consent to the forfeiture of those assets in the first place: it affected him not in the least.  The ones who are being punished by the Government's actions are the Petitioners, who are completely innocent in every regard. The Government seeks to deprive them of their hard-earned retirement

_____

and which were not used to fund the purchase of his real property.  [Doc. 120].  The Government moves to dismiss this Petition, arguing *inter alia* that the Petitioner has no standing to assert an interest in funds held by the Defendant or his Companies.  [Doc. 398].  Petitioner Sloan does not address this Petition in his Motion for Summary Judgment, nor does he address it in his Response to the Government's Motion.  Having failed to move for relief on this Petition, and in light of his lack of opposition to the Government's Motion, the Petitioner is deemed to have abandoned his Petition. Accordingly, the Government's Motion will be granted and this Petition [Doc. 120] will be dismissed.

funds and assets based on absurd contortions of the forfeiture statute. To the extent that such illogical arguments may be allowed under § 853(o) where they serve to *punish the defendant*, they are without any merit whatsoever when they are employed to punish and dispossess innocent parties.

This matter has now been litigated for months, and the parties have expended countless hours (and countless pages) asserting their arguments. The Court has dutifully read the cases cited by the Government and has come to the ultimate conclusion that the Government's position is simply misguided. The Government has repeatedly cited to cases that do not support the Government's position, all in the interest of making more of the Defendant's clients "share the pain" resulting from his massive fraud. This is the sort of behavior that diminishes the public trust in government, as well as the justice system in general. After all, it is the *Department of Justice* that seeks to dispossess these innocent owners and make them victims, ostensibly in the name of "fairness." As such, if the Government were successful, these Petitioners would only be victims of the Government, not of the Defendant.

Accordingly, **IT IS, THEREFORE, ORDERED** as follows:

(1)     The Motion for Summary Judgment filed by William Stephen Aldridge [Doc. 441] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 373] is **DENIED**; Petitioner Aldridge's Petition [Doc. 85] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(a) therein;

(2)     The Motion for Summary Judgment filed by the Combest Petitioners [Doc. 435] is **GRANTED**; the Government's Motion for Summary Judgment [Doc. 375] is **DENIED**; the Combest Petitioners' Petitions [Doc. 79 and 104] are **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the asset described in Paragraph 1(VI)(zz) therein;

(3)     The Motion for Summary Judgment filed by the Contrastano Petitioners [Doc. 413] is **GRANTED**; the Government's Motion for Summary Judgment [Doc. 376] is **DENIED**; and the Contrastano Petitioners' Petition [Doc. 89] is **GRANTED** to the extent that the

Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(c) therein. To the extent that the Contrastano Petitioners challenge the forfeiture of the membership interest in the Peter L. Contrastano Real Estate IRA, LLC, the Petition [Doc. 89] is **DENIED AS MOOT**;

(4)    The Motion for Summary Judgment filed by the Beverly Daggett Petitioners [Doc. 418] is **GRANTED**; the Government's Motion for Summary Judgment [Doc. 377] is **DENIED**; the Beverly Daggett Petitioners' Petition [Doc. 94] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the asset described in Paragraph 1(VI)(d) therein. To the extent that the Beverly Daggett Petitioners challenge the forfeiture of the membership interest in the Beverly J. Daggett Real Estate IRA, LLC, the Petition [Doc. 94] is **DENIED AS MOOT**;

(5)    The Motion for Summary Judgment filed by the Russell Daggett Petitioners [Doc. 422] is **GRANTED**; the Government's Motion for Summary Judgment [Doc. 378] is **DENIED**; the Russell Daggett

Petitioners' Petition [Doc. 98] is **GRANTED** to the extent that and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the asset described in Paragraph 1(VI)(d) therein.  To the extent that the Russell Daggett Petitioners challenge the forfeiture of the membership interest in the Russell L. Daggett Real Estate IRA, LLC, the Petition [Doc. 98] is **DENIED AS MOOT**;

(6)    The Motion for Summary Judgment filed by the Eddy Petitioners [Doc. 367] is **GRANTED** with respect to the 60% interest in the subject property asserted by James R. Eddy and the James R. Eddy Real Estate IRA, LLC; the Motion [Doc. 367] is **DENIED AS MOOT** with respect to the 40% interest claimed by the Susann Eddy Petitioners; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 380] is **DENIED**; the Petitioners' Claim for Return of Seized Property [Doc. 42] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(e) therein;

(7)     The Motion for Summary Judgment filed by the Efird Petitioners [Doc. 371] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 381] is **DENIED**; and the Efird Petitioners' Petition [Doc. 46] is **GRANTED**, subject to any and all valid secured interest held by HomeTrust Bank, as identified in the Consent Order entered August 25, 2011 [Doc. 270].  The Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraphs 1(VI)(f), 1(VI)(g), 1(VI)(h), and 1(VI)(i) therein.  The Efird Petitioners' Motion for a hearing on their petition [Doc. 46] is **DENIED AS MOOT**;

(8)     The Motion for Summary Judgment by James R. Fatland Real Estate IRA, LLC [Doc. 365] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 382] is **DENIED**; and the Petitioner's Petition [Doc. 294-1] is **GRANTED**, subject to any and all valid secured interest held by Macon Bank, as identified in the Consent Order entered January 30, 2013 [Doc. 590].  The Consent Order and Judgment of Forfeiture entered February 16,

2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(j) therein;

(9)  The Motion for Summary Judgment filed by the Fox Petitioners [Doc. 520] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 383] is **DENIED**; and the Petitioners' Petition [Doc. 296] is **GRANTED**, subject to any and all valid secured interest held by HomeTrust Bank, as identified in the Consent Order entered August 25, 2011 [Doc. 270].  The Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(l) therein.

(10)  The Motion for Summary Judgment filed by the Ghormley Petitioners [Doc. 424] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 384] is **DENIED**; the Petitioners' Amended and Revised Petition [Doc. 174] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(m) therein;

(11)  The Motion for Summary Judgment filed by the Harold Petitioners [Doc. 404] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 385] is **DENIED**; the Petitioner's Claim [Doc. 40] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(bb) therein;

(12)  The Motion for Summary Judgment filed by the Howard Petitioners [Doc. 402] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 386] is **DENIED**; the Petitioners' Petition [Doc. 200] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(r) therein.  To the extent that the Howard Petitioners challenge the forfeiture of the membership interest in the Victor D. Howard Real Estate IRA, LLC, the Petition [Doc. 200] is **DENIED AS MOOT**;

(13)  The Motion for Summary Judgment filed by the Johnstone Petitioners [Doc. 436] is **GRANTED**; the Government's Motion to Dismiss or, in

the Alternative, for Summary Judgment [Doc. 387] is **DENIED**; the Petitioners' Claim [Doc. 92] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(s) therein;

(14)   The Motion for Summary Judgment filed by Harold K. Ledford IRA, LLC  [Doc. 369] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 388] is **DENIED**; the Petitioner's Claim for Return of Seized Property [Doc. 43] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(u) therein;

(15)   The Motion for Summary Judgment filed by the Lessow Petitioners [Doc. 453] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 389] is **DENIED**; the Lessow Petitioners' Petition [Doc. 111] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(t) therein;

(16) The Motion for Summary Judgment filed by the Lucas Petitioners [Doc. 427] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 390] is **DENIED**; and the Petitioners' Petition [Doc. 88] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraphs 1(VI)(w), (x), and (y) therein. To the extent that the Lucas Petitioners challenge the forfeiture of the membership interest in the James H. Lucas, Jr., Real Estate IRA, LLC, the Petition [Doc. 88] is **DENIED AS MOOT**;

(17) The Motion for Summary Judgment filed by the McCartney Petitioners [Doc. 448] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 391] is **DENIED**; and the McCartney Petitioners' Petition [Doc. 110] is **GRANTED**, subject to any and all valid secured interest held by HomeTrust Bank, as identified in the Consent Order entered August 25, 2011 [Doc. 270]. The Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(aa) therein. To the extent

that the McCartney Petitioners challenge the forfeiture of the membership interest in the David R. McCartney Real Estate IRA, LLC, the Petition [Doc. 110] is **DENIED AS MOOT**;

(18) The Motion for Summary Judgment filed by the Mehaffey Petitioners [Doc. 433] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 432] is **DENIED**; and Petitioners' Petition [Doc. 183] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(cc) therein. To the extent that the Mehaffey Petitioners challenge the forfeiture of the membership interest in the Michael James Mehaffey Real Estate IRA, LLC, the Petition [Doc. 183] is **DENIED AS MOOT**;

(19) The Motion for Summary Judgment filed by the Miller Petitioners [Doc. 439] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 392] is **DENIED**; the Petitioners' Petition [Doc. 101] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is

hereby **AMENDED** to remove the property described in Paragraph 1(VI)(gg) therein;

(20) The Motion for Summary Judgment filed by the Myers Petitioners [Doc. 275] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 393] is **DENIED**; and the Myers Petitioners' Petition [Doc. 83] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(ii) therein.  To the extent that the Myers Petitioners challenges the forfeiture of the membership interest in the John C. Myers Real Estate IRA, LLC, the Petition [Doc. 83] is **DENIED AS MOOT**;

(21) The Motion for Summary Judgment filed by the Peacock Petitioners [Doc. 407] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 394] is **DENIED**; and the Peacock Petitioners' Petition [Doc. 121] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(jj) therein.  To the extent that

the Peacock Petitioners challenge the forfeiture of the membership interest in the William Ellis Peacock Real Estate IRA, LLC, the Petition [Doc. 121] is **DENIED AS MOOT**;

(22)  The Joint Motions for Summary Judgment filed by Becky Pope and the Keith Pope Petitioners [Doc. 416, 420] are **GRANTED**; the Government's Motion for Summary Judgment [Doc. 395] and Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 396] are **DENIED**; the Petition of Becky Pope [Doc. 99] is **GRANTED**; the Petition of the Keith Pope Petitioners [Doc. 100] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the properties described in Paragraph 1(VI)(kk) and Paragraph 1(VI)(ll) therein.  To the extent that the Keith Pope Petitioners challenge the forfeiture of the membership interest in the Keith Pope Real Estate IRA, LLC, the Petition [Doc. 100] is **DENIED AS MOOT**;

(23)  The Motion for Summary Judgment filed by the Price Petitioners [Doc. 452] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 397] is **DENIED**; the Price Petitioners' Amended Petition Asserting Interest in Forfeited

Property [Doc. 80] is **GRANTED**; and the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(mm) therein;

(24) The Motion for Summary Judgment filed by the Sloan Petitioners [Doc. 450] is **DENIED AS MOOT** regarding the forfeiture of the membership interest in Terry R. Sloan Real Estate IRA, LLC a North Carolina Limited Liability Company; in all other respects, the Petitioners' Motion [Doc. 450] is **GRANTED**. The Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 398] is **DENIED** with respect to the Sloan Petitioners' Petition [Doc. 119] and **GRANTED** with respect to Petitioner Terry R. Sloan's Second Petition [Doc. 120]. The Sloan Petitioners' Petition [Doc. 119] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraphs 1(VI)(pp) and (qq) therein. To the extent that the Sloan Petitioners challenge the forfeiture of the membership interest in the Terry R. Sloan Real Estate IRA, LLC, the Petition [Doc. 119] is **DENIED AS MOOT**.

Petitioner Terry Sloan's Second Petition [Doc. 120] is hereby **DISMISSED**;

(25) The Motion for Summary Judgment filed by the Talley Petitioners [Doc. 401] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 399] is **DENIED**; and the Talley Petitioners' Petition [Doc. 87] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(vv) therein. To the extent that the Talley Petitioners challenge the forfeiture of the membership interest in the Kenneth L. Talley Real Estate IRA, LLC, the Petition [Doc. 87] is **DENIED AS MOOT**; and

(26) The Motion for Summary Judgment filed by the Warren Petitioners [Doc. 409] is **GRANTED**; the Government's Motion to Dismiss or, in the Alternative, for Summary Judgment [Doc. 400] is **DENIED**; and the Warren Petitioners' Petition [Doc. 103] is **GRANTED** to the extent that the Consent Order and Judgment of Forfeiture entered February 16, 2011 [Doc. 16] is hereby **AMENDED** to remove the property described in Paragraph 1(VI)(xx) therein. To the extent that the

Warren Petitioners challenge the forfeiture of the membership interest in the Glenn A. Warren Real Estate IRA, LLC, the Petition [Doc. 103] is **DENIED AS MOOT**.  The Warren Petitioners' Preliminary Motion to Determine the Existence of Any Interest of the Defendant in the Subject Property and Request for Expedited Hearing [Doc. 60] is also **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the Government's Motion to Correct Clerical Errors [Doc. 285] is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Signed: February 25, 2013

Martin Reidinger
United States District Judge