| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| **JAMES W. "BILL" BAILEY, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |
| | ) | |
| **IN RE: EAJA PETITIONS** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Petitioners' motions for awards of attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) ("EAJA") [Docs. 622, 623, 631, 632, 649, 650, 653, 655, 656, 657, 658, 659, 660, 661, 662, 663, 664, 665, 666, 667, 668, 669, 670, 671, 672, 674, 675, 677, 683, 712].

## I.    INTRODUCTION

The Defendant James W. "Bill" Bailey, Jr. ("Bailey" or simply, "the Defendant"), was a financial advisor who admitted to engaging in a massive Ponzi scheme to defraud investors of millions of dollars over the course of a

decade.  Petitioners herein were among Bailey's clients.  They were not, however, victims of his fraud.  They forwarded funds from their individual retirement accounts (IRAs) to the Defendant's company for the purpose of purchasing real estate or other property with their IRA funds.  Unlike so many of the Defendant's other clients, whose funds were stolen and never invested as promised, these IRA clients (Petitioners) received the assets they had instructed the Defendant to purchase within the time promised.[1]

The Government sought the forfeiture of the assets purchased in whole or in part on behalf of Bailey's IRA clients on the theory that such assets constitute the proceeds of the Defendant's fraud.  The present Petitioners objected to the forfeiture, claiming that they are the sole, rightful owners of the properties.  While the Government eventually agreed to dismiss some of these properties from the preliminary order of forfeiture, it continued to seek forfeiture of the other properties.  The Court ultimately rejected the Government's position and ordered all of the Petitioners' properties to be removed from the preliminary order of forfeiture.  The Petitioners now seek

---

[1] The Petitioners addressed in this Order were either: (1) clients of Bailey who sought the establishment of self-directed IRAs with Southern Financial for the purpose of purchasing real estate or other asserts with their IRA funds or (2) purchased property jointly with such clients.  All of the Petitioners herein shall be referred to as the "IRA Petitioners" so as to distinguish from the other petitioners who filed ancillary claims in this case.

awards of attorneys' fees and costs under EAJA as prevailing parties.  For the reasons that follow, those motions are granted.

## II.    PROCEDURAL BACKGROUND

On February 1, 2011, the Defendant was charged in a Bill of Information with filing false tax returns, in violation of 26 U.S.C. § 7206(l); committing mail fraud, in violation of 18 U.S.C. § 1341; and committing securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  [Doc. 1].  The Bill of Information contained a Notice of Forfeiture, which stated the Government's intent to pursue the forfeiture of the Defendant's interest in various properties pursuant to 18 U.S.C. § 982 and 28 U.S.C. § 2461(c).  [Id. at 3].

The Defendant entered a plea of guilty to the Bill of Information on February 16, 2011.  [Doc. 15].  Following the Defendant's plea of guilty, the Government and the Defendant presented the Court with a proposed Consent Order and Judgment of Forfeiture ("Preliminary Order of Forfeiture" or "Preliminary Order"), pursuant to which the Defendant agreed to forfeit, among other things, his interest in the properties identified in the Notice of Forfeiture in the Bill of Information.  [Doc. 16 at 8].  As originally entered, the Preliminary Order authorized the preliminary forfeiture of "[a]ny and all interest in any LLCs, including LLCs in the name of Southern Financial

Services clients, established by Defendant and/or Southern Financial Services for the purpose of managing and/or purchasing assets ...." [Doc. 16 at 3]. It further authorized the preliminary forfeiture of "any and all assets titled in the name of LLCs established by Defendant and/or Southern Financial Services for the purpose of managing and/or purchasing assets ...." [Id.]. Beyond the Defendant's consent to the proposed forfeiture and his stipulation as set forth in the Plea Agreement that he "has or had a possessory interest or other legal interest in each item or property" identified in the Bill of Information [Doc. 3 at ¶8(b)], the Government presented no evidence supporting the forfeiture of these properties. The Preliminary Order of Forfeiture was entered by the Magistrate Judge on February 16, 2011.

On March 11, 2011, several petitioners (collectively, "the Sage Petitioners") filed verified claims, seeking to adjudicate the validity of their interest in the certificated securities of Sage Automotive Interiors, Inc. ("Sage Certificates" or "Certificates") that were identified as forfeitable assets in the Preliminary Order. [Docs. 23-38]. Other verified claims asserting interests in various real properties and LLCs identified in the Preliminary Order quickly followed. [See Docs. 40, 41, 42, 43, 46, 47, 62, 71, 72, 73, 74, 76, 79, 80, 82, 83, 85, 86, 87, 88, 89, 92, 93, 94, 96, 97, 98, 99, 100, 101, 103, 104, 110, 111, 113, 114, 115, 119, 120, 121, 122, 131, 168, 171, 174, 183, 186, 187,

200, 292]. The majority of these Petitioners were Bailey's former clients, who had forwarded IRA funds to Bailey, a purportedly qualified IRA custodian[2], for the purpose of establishing self-directed IRA limited liability companies and purchasing properties to be held in the names of such companies.[3] The remaining Petitioners had never been clients of Bailey and had used their own personal funds to buy interest in certain properties, but owned these properties jointly with a limited liability company established by Bailey on behalf of an IRA client.

In each Petition, the Petitioners took the position that the Defendant had no interest in the identified properties; that the Petitioners had a superior interest in the properties such that they would prevail under § 853(n)(6)(A); and that the Petitioners would also qualify as bona fide purchasers of the properties under § 853(n)(6)(B). In support of their verified claims, the

---

[2] Bailey, in fact, was *not* a qualified IRA custodian. Thus, although Bailey established limited liability companies on behalf of his various clients, and these limited liability companies had "IRA" in their names, Bailey did not effectively establish valid self-directed IRAs on behalf of the Petitioners. As is discussed in greater detail below, as a result of Bailey's failure to handle the Petitioners' IRA funds in the manner required by law, the Petitioners were unknowingly exposed to certain tax penalties.

[3] Because of unresolved issues regarding the continued viability of the individual retirement accounts and the limited liability companies established by Bailey to hold property purchased with funds from such accounts, several of Bailey's clients filed petitions on behalf of themselves individually, as well as on behalf of their respective individual retirement accounts and limited liability companies.

Petitioners presented documentary evidence, including closing documents and account statements, to show that the properties were in fact owned by the Petitioners and that the Defendant had no ownership interest therein. Despite this evidence, the Government took the position that the Defendant nevertheless had an ownership interest in the properties because some or all of the funds used to purchase such properties flowed through the Defendant's bank accounts and thus, in the Government's view, constituted proceeds of his fraud.

On March 22, 2011, the Sage Petitioners moved for an expedited hearing on their claims. [Doc. 48]. The Court granted the Sage Petitioners' motion and held an expedited hearing on April 5, 2011. Following the expedited hearing, on April 8, 2011, the Court entered an Order ("the First Sage Order"), directing the return of the Certificates to the Sage Petitioners subject to certain requirements. [Doc. 164]. Particularly, the Court concluded that because the Defendant had obtained money from the Sage Petitioners through fraudulent means, a constructive trust arose in those funds at the time that they were conveyed to the Defendant. [Id. at 7]. Having determined that the Sage Petitioners had a valid legal interest in the funds under state law and that such interest was superior to any interest the Defendant may have had, the Court then conducted a tracing analysis.

Using the bank record summaries that were prepared by the Government and introduced at the hearing without objection by the Sage Petitioners ("the Bank Summaries"), the Court applied the lowest intermediate balance rule to trace the Sage Petitioners' funds and determine the amount of the Certificates' value that should be returned to them. The Court recognized a constructive trust on the entirety of the Certificates issued on behalf of some of the Sage Petitioners. [Id. at 8-9]. With respect to other Sage Petitioners, for whom Certificates were purchased in whole or in part with commingled funds, the Court awarded only a percentage of the Certificates' value. [Id. at 9-10].

In this Order, the Court noted as follows:

> The [Sage] Petitioners are in a relatively unique position. Unlike many other victims who "invested" money with Defendant and received some payouts in return (thereby reducing their total losses), the Petitioners have lost 100% of the funds they provided to the Defendant for the purchase of the Sage Certificates. Other victims are being allowed to keep the proceeds that the Defendant paid to them, despite the fact that such payouts may be technically forfeitable as proceeds of the Defendant's crimes, because the Government as a practical matter does not intend to pursue forfeiture of these assets. Unfortunately for the Petitioners, their "payout," i.e., the Certificates that were issued on their behalf, happened to be in the physical possession of the Defendant at the time that the Government physically

seized the Defendant's assets. It is only because of this fortuitous (or rather, unfortuitous) occurrence that the Government now seeks forfeiture of the Certificates. Had the Certificates been delivered to the Petitioners, the Government concedes that it would not have sought the forfeiture of this property. But because the Certificates were in the possession of the Defendant, and thus are, in the words of the Government, "low hanging fruit," forfeiture of this property is being pursued. It is the Government's decision to pursue forfeiture of these Certificates, however, that truly renders the Petitioners victims in this case.

[Doc. 164 at 11-12].

In June 2011, several of those Sage Petitioners who received only a percentage of the Certificates' value filed a motion to clarify the Court's Order regarding the calculation of their percentage ownership of the Certificates. [Doc. 226]. While that motion was pending, the Court granted the motions of various other Petitioners to conduct discovery for a period of sixty (60) days. [Docs. 152, 153, 154, 155, 156, 158, 159, 160, 164, 175, 179, 184; <u>see also</u> Order, Doc. 230]. In that 60-day period, these Petitioners conducted extensive joint discovery consisting of interrogatories, requests for production, requests for admission, and several depositions, including a multi-day deposition of Bailey, as well as the review of several thousands of pages of documents seized from Bailey, which were held in the custody of the Government.

On June 2, 2011, the Government moved to dismiss "any and all interest in any LLCs" from the Preliminary Order.  [Doc. 206].  In its motion, the Government argued that inclusion of the LLCs was initially proper so as to prevent the Defendant, who had not yet had an opportunity to exhibit compliance with his bond conditions, from undertaking "any further illegal activity via the IRA LLCs."  [Id.].  The Government conceded, however, that continued inclusion of the LLCs in the forfeiture "needlessly complicate[d]" the action.  [Id.].  The Court granted the Government's motion on June 10, 2011, and all of the IRA LLCs established on behalf of Bailey's clients were removed from the Preliminary Order.  [See Doc. 229].

In July 2011, the Court referred the remaining claims to the Magistrate Judge for the purpose of conducting such ancillary proceedings as may be required to adjudicate these claims. [Doc. 239].  The Magistrate Judge proceeded to schedule hearings on the Petitioners' claims for the end of September 2011.  [Doc. 241].

On September 7, 2011, this Court entered an Order staying all proceedings pending resolution of the Sage Petitioners' Motion to Clarify. [Doc. 286].  In ordering the stay, the Court noted that reconsideration of the First Sage Order "may have a significant impact on the manner in which the other pending ancillary claims are addressed by the parties and resolved by

this Court." [Id.]. Subsequently, on November 10, 2011, the Court granted the Sage Petitioners' Motion to Clarify and vacated the First Sage Order with respect to these Petitioners ("the Sage Reconsideration Order"). [Doc. 306]. In this Order, the Court stated that the filings in the ancillary proceedings had caused it to question the basis for the preliminary order of forfeiture obtained by the Government:

> The Court determines that rehearing of this matter is necessary for another, more fundamental reason as well. Review of the Motion for Reconsideration, as well as the myriad of filing[s] by other claimants since the original Sage Hearing, has led the Court to question whether the Government satisfied its initial burden of proving the requisite nexus between the Defendant's crimes and the property sought to be seized pursuant to the preliminary order of forfeiture.

[Doc. 306 at 12]. Accordingly, the Court determined that the Government would be required to show the requisite nexus between each property subject to forfeiture pursuant to the Preliminary Order and the offenses to which the Defendant pled guilty before the Petitioners would be required to go forward with their claims. [Id.]. In reaching this conclusion, the Court noted that the Government took the position that "every asset purchased by the Defendant on behalf of his clients over the course of a decade – including the Sage Certificates – constitutes proceeds of his fraud and is therefore forfeitable, regardless of whether those clients actually suffered a loss as a

result of Defendant's fraud." [Doc. 306 at 6]. The Court contrasted the Government's position with the contention of the Petitioners that "they received exactly what they expect to receive from the Defendant, in the manner they expected to receive it, and when they expected to receive it." [Id. at 17]. The Court agreed with the Sage Petitioners' contention, noting that "by all accounts, it appears that they suffered no loss as a result of these transactions, and the Defendant himself received no ill-gotten gain." [Id.]. The Court further noted: "Indeed, it appears that it is only by the actions of the Government, in pursuing forfeiture of these assets that these claimants stand to suffer any loss as a result of their dealings with the Defendant." [Id. at 18 n.3].

The hearing on the Sage Petitioners' Motion to Clarify was held on December 12, 2011. During the hearing, the Government presented the testimony of five witnesses and offered into evidence voluminous documents as exhibits. Included among these witnesses were former clients of the Defendant, who had established Investment Management Accounts or Asset Management Accounts[4] with Southern Financial. These witnesses testified that the Defendant never purchased any of the stocks, bonds, or securities

---

[4] These accounts are discussed in greater detail *infra*.

that he had been instructed to purchase, and that he had provided them false account statements to hide his fraud. At the conclusion of the Government's nexus presentation, the Sage Petitioners submitted nine exhibits consisting of documents concerning their interests in the Sage Certificates. [Doc. 318]. The parties were given the opportunity to file post-hearing briefs, as well as proposed findings of fact and conclusions of law for the Court's consideration. [Docs. 319, 320, 321, 322, 323, 324].

On February 22, 2012, the Court entered an Order ("the Gardza Order") granting the Petitions of those Sage Petitioners who challenged the First Sage Order, and the Preliminary Order of Forfeiture was amended to reflect their superior rights in the Sage Certificates. [Doc. 331]. In this Order, the Court concluded that the Sage Petitioners had established a legal interest superior to any claim that Bailey had in the seized property. [Id. at 26-45]. The Court further determined that the Sage Petitioners "possess superior interests under 21 U.S.C. § 853(n)(6)(A) and are entitled to the full value of the sale of their Certificates." [Id. at 46]. The Court further opined as follows:

> The Court views the Government's position in this matter as entirely misguided. There is no indication that forfeiting assets from the Defendant's *victims*, rather than from the Defendant or his proxies, was ever contemplated under § 853. For this reason, as

well as all of the reasons cited above, the Court
questions whether the Government's action and
position with regarding to these Petitioners is not
substantially justified, thus potentially entitling the
Petitioners to recover their reasonable attorney's
fees under the Equal Access to Justice Act, 28
U.S.C. § 2412(d).

[Doc. 331 at 45-46].

In light of the <u>Gardza</u> Order, a status conference was held with counsel on March 8, 2012 to address the remaining ancillary claims. Despite the Court's stated concerns regarding nexus, the Government advised the Court that it did not intend to offer any additional evidence regarding the nexus between the Petitioners' property that had been seized and the Defendant's crimes. As a consequence of this status conference, the Court set a schedule for the filing of motions to dismiss and/or summary judgment. [<u>See</u> Text-Only Order entered March 8, 2012]. Pursuant to the Court's Order, the remaining Petitioners filed motions for summary judgment. [Docs. 275, 365, 367, 369, 371, 401, 402, 404, 413, 407, 409, 416, 418, 420, 422, 424, 427, 433, 435, 436, 439, 441, 448, 450, 452, 453, 520]. The Government, in turn, sought dismissal of the Petitioners' claims. [Docs. 286, 373, 375, 376, 377, 378, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 432].

On February 25, 2013, the Court entered Orders granting the Petitioners' claims and amending the Preliminary Order of Forfeiture accordingly. [Docs. 598, 599, 602]. In these Orders, the Court determined that there was no nexus between Bailey's crimes and the properties which were seized. The Court further determined that, even assuming a nexus existed, the Petitioners held a valid, superior legal interest in the properties and were bona fide purchasers for value. In the Order disposing of the IRA Petitioners' claims [Doc. 598], the Court expressed significant skepticism regarding the Government's legal position throughout the ancillary proceeding:

> Taking the Government's argument to its logical conclusion, any expenditure by the Defendant -- for salaries of employees who were oblivious to his fraud, for mortgage or rental payments for office space, even for payment of the electric bill -- would constitute funds which would now be subject to forfeiture from the innocent third parties who received them. Such a result is nonsensical and is completely contrary to the underlying remedial purposes of the criminal forfeiture laws.

[Id. at 61]. Ultimately, the Court concluded as follows:

> In its arguments, the Government has completely lost sight of the purpose of this proceeding and the purpose of the forfeiture statute. Section 853(o) expressly states that the statute should be construed liberally to effectuate the purpose of the statute. That purpose is the punishment of the wrong-doer, the

Defendant…. Forfeiting the properties at issue herein does absolutely nothing to punish the Defendant…The ones who are being punished by the Government's actions are the Petitioners, who are completely innocent in every regard. The Government seeks to deprive them of their hard-earned retirement funds and assets based on absurd contortions of the forfeiture statute.

\* \* \*

This is the sort of behavior that diminishes the public trust in government, as well as the justice system in general. After all, it is the Department of Justice that seeks to dispossess these innocent owners and make them victims, ostensibly in the name of "fairness." As such, if the Government were successful, these Petitioners would only be victims of the Government, not of the Defendant.

[Id. at 82].

Following the entry of these final Orders, the Petitioners filed the present motions for attorneys' fees under the EAJA, which the Government opposes.

## III. FACTUAL BACKGROUND

From approximately January 2000 and continuing through December 2010, Defendant Bailey operated a number of companies, including Southern Financial Services Inc. ("Southern Financial"), 1031 Exchange Services, LLC ("1031 Exchange"), and AVL Properties, LLC ("AVL Properties") (collectively, "the Companies") in Asheville, North Carolina.

Bailey originally started Southern Financial as an estate planning and insurance business. He later expanded the scope of Southern Financial's services to include various investment vehicles, which will be described in greater detail *infra*. Bailey founded AVL Properties as a real estate holding company. In 2004, Bailey created 1031 Exchange to act as a qualified intermediary for 1031 exchanges.[5]

Throughout the relevant time period, the Defendant's Companies purported to operate as separate entities with separate bank accounts. If one of the Companies had a shortage of money, however, Bailey would transfer funds from the other businesses to the business that was short. For example, Bailey occasionally funded real estate purchases by AVL Properties with funds provided by Southern Financial clients. Further, Bailey occasionally used funds from the 1031 Exchange bank accounts to fund purchases on behalf of Southern Financial clients.

Through Southern Financial, Defendant Bailey offered four basic types of services to clients: (1) trust and estate administration[6]; (2) asset

---

[5] For an explanation of the 1031 exchange as well as the role of the qualified intermediary in such exchanges, see <u>United States v. Okun</u>, 453 F. App'x 364, 367 n.1 (4th Cir. 2011).

[6] It was not alleged that Bailey engaged in any type of fraud with respect to his trust and estate clients.

management accounts ("AMAs"); (3) investment management accounts ("IMAs"); and (4) self-directed real estate individual retirement accounts ("self-directed IRAs").  Clients who established AMAs with Southern Financial either instructed Bailey to purchase specific assets, such as bonds, foreign currencies or gold, or simply deposited funds with Southern Financial and entrusted Bailey to manage the money.  Unbeknownst to these clients, however, when their funds were forwarded to Southern Financial, either for the purchase of a specific asset or for the management of an investment fund, Bailey did not utilize the funds as directed but rather deposited these funds in Southern Financial's bank accounts for use as he saw fit.  The AMA clients were then provided fictitious account statements falsely stating that their money was invested as directed.  Similarly, clients who established IMAs with Bailey would deposit funds with Southern Financial for investment. Essentially, an IMA was supposed to function like a private certificate of deposit with a guaranteed rate of return for a specific period of time.  Like the AMA clients, IMA clients received fictitious account statements purporting to show their investments growing at the promised rate of return when in fact Bailey had deposited the clients' funds in Southern Financial accounts for general use by himself and his Companies.  In short, Bailey's

treatment of the funds from his AMA and IMA clients was a Madoff-type Ponzi scheme.

The final type of service Bailey purportedly offered to provide through Southern Financial was related to the establishment and operation of self-directed IRAs. In order to maintain the protected status of these IRA funds under Section 408 of the Internal Revenue Code, 26 U.S.C. § 408, real estate IRAs require a qualified custodian who can provide custodial services similar to those services provided for traditional IRA accounts by financial institutions. A qualified custodian's primary responsibility is to manage the account so that it does not engage in prohibited transactions as defined by § 408. Such prohibited transactions may result in a loss of tax-deferred status, as the assets may be deemed "distributed" by virtue of the prohibited transaction. Any distribution of IRA funds to a third party who is not a qualified custodian under § 408 also results in a loss of tax-deferred status, and the owner of those funds incurs substantial taxes and penalties for this distribution. The real estate IRA investment vehicle offered by Bailey and Southern Financial purportedly allowed clients to use their existing IRA funds to purchase real estate or other assets while protecting the tax-deferred status of such funds.

For each of the IRA Petitioners, unless otherwise noted below, Southern Financial provided the following services. Southern Financial, through Bailey, entered into a standard management agreement with each client for the establishment of a self-directed real estate IRA. Pursuant to that agreement, Bailey established a North Carolina limited liability company (LLC) for the client's real estate IRA, usually using the client's name within the name of the LLC (e.g., "the John Q. Smith Real Estate IRA, LLC"). Bailey utilized a standard form operating agreement, pursuant to which the LLC was designated as a manager-managed LLC, with Southern Financial or Bailey designated as the manager and the client (or the client's IRA) designated as the sole member of the LLC. It was therefore undisputed that Defendant Bailey had no membership interest or ownership interest in any of the LLCs created on behalf of the IRA Petitioners.

The standard operating agreement utilized by Defendant Bailey with regard to all of the LLCs that were established describes the control reserved by the client and the limitations which applied to the Defendant. Pursuant to this agreement, the client could replace Defendant Bailey as manager and could dissolve the LLC at the client's option. In both the articles of organization filed for each LLC and in subsequent filings with the Secretary of State, Bailey or Southern Financial was identified as a manager,

custodian, or registered agent of the Petitioners' LLCs, as opposed to a member or owner of it. As set forth in the standard operating agreement, Bailey acted as an agent of the Petitioners, with fiduciary obligations and with the authorization to perform only administrative tasks to accomplish the purchase and maintenance of assets funded by the IRAs.

Neither Bailey nor Southern Financial participated in any way in selecting the assets to be purchased with the IRA Petitioners' funds. The IRA Petitioners performed all of the due diligence in identifying and purchasing their investments. The only service performed by Bailey and Southern Financial with respect to the purchase of the real properties was to accept the IRA proceeds, set up the IRA LLCs, and transfer the IRA funds to complete the purchases of the properties for the benefit of the IRA LLCs. When the purchase of the property selected by the client closed, the title to the property was held by the client's self-directed IRA LLC.[7] At all times since the closing, the properties were held and titled in the name of the Petitioners, or their respective LLCs.

---

[7] In the case of Petitioner William Ghormley, his property was not titled in the name of an LLC, but rather in the name of "Southern Financial Services, Inc. as Trustee FBO William R. Ghormley IRA." [Doc. 426-17]. At no time during the ancillary proceeding, however, did the Government contend that Southern Financial acquired any ownership interest in the real property by virtue of its designation as trustee for Ghormley's IRA.

Following these purchases, each IRA Petitioner received quarterly statements which listed the purchased property as an asset of the Petitioner's self-directed IRA LLC. Some Petitioners directed the Defendant to expend funds they had deposited with Southern Financial to pay certain expenses, such as property taxes and association fees, and the Defendant performed those tasks as instructed. These expenditures never exceeded the amount that the IRA Petitioners initially deposited. In the case of those Petitioners who funded mortgages or engaged in the leasing of their properties, Southern Financial collected payments and retained such funds on behalf of the LLCs.[8] The Petitioners paid Southern Financial annual custodial fees, and Southern Financial paid the necessary property taxes and filed the required annual reports with the North Carolina Secretary of State for each LLC that was created.

Unbeknownst to the Petitioners, Defendant Bailey was not in fact a qualified custodian under § 408. Bailey failed to manage the self-directed IRAs appropriately, thus in many cases causing his clients to engage (unknowingly) in prohibited transactions and thereby compromise the tax-

_____

[8] Those funds were not recovered and were presumably lost. They were not at issue in any of these proceedings. In such instances, the Petitioners sought only the return of the underlying property or asset (and the future income stream therefrom) and not the funds previously paid to Southern Financial.

deferred status of their funds. When Southern Financial received a wire transfer of funds from a client's IRA, the money was wired into Southern Financial bank accounts and not into an account designated solely for the client. As a result, the Petitioners' IRA funds were, at least for a brief time, held in the same account as funds provided by other clients of Southern Financial. While the Petitioners' funds may have been temporarily co-mingled with the funds of other Southern Financial clients, it was undisputed that all of the transactions for which the Petitioners forwarded funds to Bailey were completed as directed and within the time contemplated by Petitioners.

None of the Petitioners had notice of any irregularities concerning the operations of Southern Financial or the criminal conduct of the Defendant regarding the AMAs and IMAs. Until learning of the Defendant's guilty plea and the entry of the Preliminary Order of Forfeiture in February 2011, none of the Petitioners had any notice or reason to believe that the Defendant had engaged in any criminal wrongdoing or that the assets they had purchased could be subject to forfeiture.

## IV. THE IRA PETITIONERS

The following IRA Petitioners have filed petitions for an award of attorneys' fees under the EAJA:

## William Aldridge

Petitioner William Stephen Aldridge ("Aldridge") filed a petition [Doc. 85] asserting an interest in the real property at 130 NW 5th Street, Oak Island, North Carolina ("Oak Island Property"), which was identified in Paragraph 1(VI)(a) of the Preliminary Order of Forfeiture. The Court granted Aldridge's Petition on February 25, 2013 and removed the Oak Island Property from the Preliminary Order. [Doc. 598].

Aldridge was represented by attorney James Cunningham throughout these proceedings. Aldridge was charged for 93.75 hours of attorney time at $275 per hour and .75 hour of paralegal time at $100 per hour. He incurred expenses in the amount of $226.49 in pursuing this litigation. [Doc. 649-2].

## The Carters, the Peacocks, and the Peacock LLC

Petitioners James W. Carter and Marilyn F. Carter ("the Carters") and William Ellis Peacock and Penny Peacock ("the Peacocks") filed petitions [Docs. 113, 115] seeking to adjudicate the validity of their legal interests in the real property located at 261 3rd Street, Key Colony Beach, Florida ("the Key Colony Beach Property"), which was identified in Paragraph 1(VI)(jj) of the Preliminary Order of Forfeiture. William Ellis Peacock, the William Ellis Peacock Retirement Account, and the William Ellis Peacock IRA, LLC (collectively, "Peacock LLC") also asserted [Doc. 121] a legal interest in the

Key Colony Beach Property, as well as the William Ellis Peacock Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court granted the Government's motion to dismiss the William Ellis Peacock IRA, LLC from the Preliminary Order. [Doc. 229]. On August 4, 2011, the Government filed a Response to the petitions filed by the Carters and the Peacocks, indicating that the Government did not intend to contest their legal interests in the property and conceding that these interests should not be subject to a final order of forfeiture.[9] [Doc. 246]. Accordingly, on August 10, 2011, the Court entered an Order granting the Carters' and the Peacocks' Petitions and amending the Preliminary Order of Forfeiture to reflect their interests. [Doc. 252].

On February 25, 2013, the Court entered an Order granting the Peacock LLC's motion for summary judgment and ordering that the Key

---

[9] The Warranty Deed for the Key Colony Beach Property indicates that the Carters own a 50.0% undivided interest; the Peacocks own a 14.1% undivided interest; and the Peacock LLC owns a 35.9% undivided interest in the property. [Doc. 660-1]. While the funds used by the Peacock LLC to purchase its 35.9% interest in the property were transferred from the William Ellis Peacock IRA to the Defendant Bailey, the funds used by the Carters and the Peacocks to purchase their respective interests in the property were never within possession or control of the Defendant Bailey, but were transferred directly from the Carters and the Peacocks to the closing agent for the purchase of the property.

Colony Beach property be removed from the Preliminary Order of Forfeiture in its entirety. [Doc. 598].

The Carters, the Peacocks, and the Peacock LLC were all represented by attorneys James W. Kilbourne, Jr. and Robert Dungan of Dungan, Kilbourne & Stahl, P.A. ("the Dungan Law Firm") throughout these proceedings. Subsequent to the entry of the Preliminary Order of Forfeiture and prior to entry of the Order granting the Peacock LLC Petition, the Dungan Law Firm charged fees in the amount of $23,915.87 and costs in the amount of $1,355.18 in pursuing this action with respect to the Key Colony Beach Property. [Docs. 671-4 and 671-5]. These fees were calculated based on 80.35 hours of attorney time at rates between $225 and $325 per hour and 24.95 hours of paralegal work at rates between $85 and $125 per hour. Approximately 42% of these fees and costs were incurred jointly and severally among the Peacocks, the Carters, and the Peacock LLC. [See Doc. 660-4]. The remainder was incurred by the Peacock LLC alone. Accordingly, the Carters seek an award of 50% of the jointly and severally incurred fees; the Peacocks seek an award of 14.1% of the jointly and severally incurred fees; and the Peacock LLC seeks an award of 35.9% of the jointly and severally incurred fees, as well as the remainder of fees and costs incurred.

**James Combest**

Petitioners James F. Combest, the James F. Combest Self Directed IRA, LLC, and the James F. Combest Individual Retirement Account (collectively "Combest") filed petitions [Docs. 79, 104] asserting a legal interest in the James F. Combest Self Directed IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and all shares or percentile ownership in Griffin Stafford Lodging One, LLC ("Griffin Stafford"), which was identified in Paragraph 1(VI)(1)(zz) of the Preliminary Order of Forfeiture.

On June 10, 2011, upon motion of the Government, the Court removed the James F. Combest Self Directed IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Combest's motion for summary judgment and removed Griffin Stafford from the Preliminary Order of Forfeiture. [Doc. 598].

Combest was represented by James Baley and Stephen Grabenstein of the Van Winkle Law Firm throughout these proceedings. Van Winkle attorneys and staff performed 83.90 hours of legal work, resulting in Combest

incurring attorneys' fees in the amount of $17,433.00[10] and costs of $112.02. [Id.].

### Peter Contrastano

Petitioners Peter L. Contrastano, the Peter L. Contrastano Individual Retirement Account, and the Peter L. Contrastano Real Estate IRA, LLC (collectively, "Contrastano") filed a petition [Doc. 89] seeking to adjudicate the validity of their legal interest in the Peter L. Contrastano Real Estate IRA, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 1525 NW 57th St., Unit 626, Seattle, Washington ("the 57th St. Property"), which was identified in Paragraph 1(VI)(c) of the Preliminary Order of Forfeiture.

On June 10, 2011, upon the Government's motion, the Court dismissed the Peter L. Contrastano Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Contrastano's Motion for Summary Judgment and removed the 57th St. Property from the Preliminary Order. [Doc. 598].

Contrastano was represented by the Dungan Law Firm throughout these proceedings. Contrastano incurred attorneys' fees for 106.08 hours of

---

[10] Van Winkle discounted the amount actually charged to Combest by $5,347.50 to $12,085.50.

legal work in pursuing this action, resulting in fees in the amount of $21,949.22 and costs in the amount of $1,748.53. [Docs. 663-4 and 663-5].

### **Beverly Daggett and Russell Daggett**

Petitioners Beverly J. Daggett, Beverly J. Daggett Individual Retirement Account, and Beverly J. Daggett Real Estate IRA, LLC (collectively, "Beverly Daggett") and Russell L. Daggett, Russell L. Daggett Individual Retirement Account, and Russell L. Daggett Real Estate IRA, LLC (collectively, "Russell Daggett") filed petitions [Docs. 94, 98] asserting their respective legal interests in the Beverly J. Daggett Real Estate IRA, LLC and the Russell L. Daggett Real Estate IRA, LLC, which were identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and their respective legal interests in one or more promissory notes secured by deeds of trust on the real property known as the "Louise B Buckner Property" ("Louise Buckner Property Notes"), which were identified in Paragraph 1(VI)(d) of the Preliminary Order of Forfeiture.

On June 10, 2011, upon motion of the Government, the Court dismissed the Beverly J. Daggett Real Estate IRA, LLC and the Russell L. Daggett Real Estate IRA, LLC from this action. [Doc. 229]. On February 25, 2013, the Court granted the Petitioners' motions for summary judgment and

removed the Louise Buckner Property Notes from the Preliminary Order of Forfeiture. [Doc. 598].

Both Beverly Daggett and Russell Daggett were represented by the Dungan Law Firm throughout these proceedings. Beverly Daggett and Russell Daggett jointly and severally incurred attorneys' fees for 104.95 hours of legal work in pursuing this action, resulting in fees in the amount of $21,807.33 and costs in the amount of $1,312.05. [Docs. 668-3 and 668-4; Docs. 669-3 and 669-4].

### James Eddy

Petitioners James R. Eddy Real Estate IRA, LLC, James R. Eddy Real Estate IRA, and James R. Eddy, individually and in his capacity as owner of the James R. Eddy Real Estate IRA, LLC (collectively, "James Eddy") and Susann M. Eddy and the Susann M. Eddy Revocable Living Trust (collectively, "Susann Eddy") filed a petition [Doc. 42] asserting their legal interest in the real property at 156 Allegra Lane, Silverthorne, Colorado ("Allegra Lane Property"), which was identified in Paragraph 1(VI)(e) of the Preliminary Order of Forfeiture. In this petition, James Eddy also asserted an interest in the James R. Eddy Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, dismissed the James R. Eddy Real Estate IRA, LLC from this action. [Doc. 229]. On July 31, 2012, the Court entered a Consent Order, by which the Government and Susann Eddy stipulated that the Susann M. Eddy Revocable Living Trust owned a 40% interest in the Allegra Lane Property and therefore that the Petition should be granted as to that 40% interest. The Consent Order did not adjudicate the contested claim by James Eddy for the remaining 60% interest in the Property. [Doc. 572].

On February 25, 2013, the Court granted summary judgment in favor of James Eddy and removed the Allegra Lane Property in its entirety from the Preliminary Order. [Doc. 598].

James Eddy was represented by attorney William Christy of Stone & Christy, P.A. throughout these proceedings. James Eddy incurred attorneys' fees for 62.33 hours of legal work in pursuing this action, resulting in fees in the amount of $10,259.48 and costs in the amount of $38.49. [Doc. 672-2]. Of these amounts, all but one hour of work were incurred jointly and severally with Susann Eddy for common work which benefitted both parties. [Id.].[11]

---

[11] The Eddys had filed a joint motion for summary judgment. [Doc. 367]. While that motion was pending, however, the Consent Order was entered resolving Susann Eddy's interest in the property. Thus, only James Eddy's claim remained for adjudication. Susann Eddy does not seek a separate award of attorney's fees under the EAJA.

## Jeffrey Efird and Melissa Efird

Petitioners Jeffrey E. Efird and Melissa P. Efird (collectively, "the Efirds") filed a petition [Doc. 46] seeking to adjudicate the validity of their legal interest in four residential properties located in Greenville, South Carolina: 23 Sequoia Drive, 1608 E. North Street, 409 Morris Street, and 121 Henderson Avenue (collectively, "the Greenville Properties"), which were identified in Paragraph 1(VI)(f), (g), (h), and (i) of the Preliminary Order of Forfeiture.  On February 25, 2013, the Court granted the Efirds' Motion for Summary Judgment and removed the Greenville Properties from the Preliminary Order.  [Doc. 598].

When the Efirds purchased the Greenville Properties, they had obtained title insurance on the Properties with Fidelity National Title Insurance Company ("Fidelity").  Upon learning that the Government sought to dispossess them of title to the Properties, they filed a claim with Fidelity.

In August 2011, without admitting or denying liability, Fidelity agreed to defend the Efirds in the action.  Fidelity retained the firm of Ward and Smith, PA to represent its interests in this action.  Prior to Fidelity's involvement, the Efirds had retained attorneys Guy F. Clerici and George W. Saenger to defend their interest against the Government.

The Efirds incurred attorneys' fees from Mr. Clerici in the amount of $12,041.25 [Doc. 631-2] and from Mr. Saenger in the amount of $14,932.00 [Doc. 631-3]. Additionally, the Efirds incurred attorneys' fees paid by Fidelity to Ward and Smith, PA in the amount of $26,988.00 and costs in the amount of $171.78. [Doc. 631-4]. Accordingly, the Efirds seek to recover a total amount of $54,133.03 for fees and costs incurred in filing this action. [Doc. 631].[12]

### James R. Fatland

Petitioner James R. Fatland filed a petition [Doc. 294-1] seeking to adjudicate the validity of his legal interest in the real property at 602 Highlands Mountain Club, Highlands NC ("the Highlands Property"), which was identified in Paragraph 1(VI)(j) of the Preliminary Order of Forfeiture. On February 25, 2013, the Court granted Fatland's Motion for Summary Judgment and removed the Highlands Property from the Preliminary Order. [Doc. 598].

Fatland was represented by attorney George Saenger and the law firm of Adams, Hendon, Carson, Crowe & Saenger, P.A. throughout these

---

[12] While the Government generally objects to the various hourly rates claimed by Efirds' counsel, it makes no specific objection to the Efirds' recovery of fees paid by Fidelity to Ward and Smith.

proceedings.  Fatland incurred attorneys' fees for 25.40 hours of legal work in pursuing this action, resulting in fees in the amount of $6,350.00 and costs in the amount of $0.64.  [Doc. 632-1].

### William Ghormley

Petitioners William R. Ghormley, the William R. Ghormley Individual Retirement Account, and the William R. Ghormley Real Estate Individual Retirement Account (collectively, "Ghormley") filed a petition [Doc. 62] seeking to adjudicate the validity of their legal interest in the real property identified as 100 acres more or less Big Hickory Bear Pen Branch ("Big Hickory Property"), which was identified in Paragraph 1(VI)(m) of the Preliminary Order of Forfeiture.  On February 25, 2013, the Court granted Ghormley's Motion for Summary Judgment and removed the Big Hickory Property from the Preliminary Order.  [Doc. 598].

Ghormley was represented by the Dungan Law Firm throughout these proceedings.  Ghormley incurred attorneys' fees for 87.61 hours of legal work in pursuing this action, resulting in incurred attorneys' fees in the amount of $17,500.48 and costs in the amount of $1,480.52.  [Docs. 670-3 and 663-4].

### Victor Howard

Petitioners Victor D. Howard, Victor D. Howard Individual Retirement Account, and Victor D. Howard Real Estate IRA, LLC (collectively, "Howard")

filed a petition [Doc. 200] seeking to adjudicate the validity of their legal interest in the Victor D. Howard Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 2622 Dayton Street, Knoxville, Tennessee ("the Dayton Street Property"), which was identified in Paragraph 1(VI)(r) of the Preliminary Order of Forfeiture.  On February 25, 2013, the Court granted Howard's Motion for Summary Judgment and removed the Dayton Street Property from the Preliminary Order.  [Doc. 598].

Howard was represented by the Dungan Law Firm throughout these proceedings.[13]  Howard incurred attorneys' fees for 88.82 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $19,199.38 and costs in the amount of $1,454.29.  [Docs. 662-3 and 662-4].

### Joan Johnstone

Petitioners Joan T. Johnstone, Joan T. Johnstone Individual Retirement Account, and the Joan T. Johnstone Real Estate IRA, LLC (collectively, "Johnstone") filed a petition [Doc. 92] seeking to adjudicate the

---

[13] While the present EAJA petitions were pending, counsel moved to withdraw from representing Petitioners Howard, McElroy, and Mehaffey.  Because EAJA fees are directly payable to the claimant, Stephens ex rel. R.E. v. Astrue, 565 F.3d 131, 137 (4th Cir. 2009), the withdrawal of counsel has no effect on these Petitioners' ability to recover for legal fees incurred in pursuing this action.

validity of their legal interest in the Joan T. Johnstone Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at Flowery Branch Road, Buford, Georgia ("Flowery Branch Property"), which was identified in Paragraph 1(VI)(s) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the Joan T. Johnstone Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Johnstone's Motion for Summary Judgment and removed the Flowery Branch Property from the Preliminary Order. [Doc. 598].

Johnstone was represented by J. Wayne Pierce, P.A. d/b/a Pierce & Dunkelberger throughout these proceedings. Johnstone incurred attorneys' fees in the amount of $19,595.50 and costs in the amount of $450.16 in pursuing this action. [Docs. 665-2].

### Harold K. Ledford

Petitioner Harold K. Ledford ("Ledford") filed a petition [Doc. 43] seeking to adjudicate the validity of his legal interest in the Harold K. Ledford Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property located at 8590 Highway 25-70, Marshall, NC 28753 ("Highway 25-70 Property"), which was

identified in Paragraph 1(VI)(u) of the Preliminary Order of Forfeiture as Parcel 1-1 Township, Parcel B, Madison County, North Carolina.

On June 10, 2011, the Court, upon the Government's motion, removed the Harold K. Ledford Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Ledford's Motion for Summary Judgment and removed the Highway 25-70 Property from the Preliminary Order. [Doc. 598].

Ledford was represented by James Ellis of Stone & Christy, P.A. throughout these proceedings. Ledford incurred attorneys' fees for 116.05 hours of legal work in pursuing this action, resulting in in the amount of $17,775.72 and costs in the amount of $442.49.[14] [Docs. 712-1].

**James Lucas**

Petitioners James H. Lucas, Jr., the James H. Lucas, Jr. Individual Retirement Account, and the James H. Lucas, Jr. Real Estate IRA, LLC (collectively, "Lucas") filed a petition [Doc. 88] seeking to adjudicate the validity of their legal interest in the James H. Lucas, Jr. Real Estate IRA, LLC,

---

[14] Although Ledford was represented by Stone and Christy throughout these proceedings, Ledford's EAJA Petition was filed by the Dungan Law Firm. The Government objects to the award of any fees that may be attributable to the Dungan Law Firm on behalf of Ledford. [Doc. 725]. This objection appears to be moot, however, as Ledford does not seek an award of EAJA fees for any work performed by the Dungan Law Firm.

which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 22 Harris Lane, 78 Harris Lane, and 122 Harris Lane, Maylene, Alabama ("the Harris Lane Properties"), which were identified in Paragraphs 1(VI)(w), (x), and (y) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the James H. Lucas, Jr. Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Lucas's Motion for Summary Judgment and removed the Harris Lane Properties from the Preliminary Order. [Doc. 598].

Lucas was represented by the Dungan Law Firm throughout these proceedings. Lucas incurred attorneys' fees for 105.33 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $22,335.54 and costs in the amount of $1,338.59. [Doc. 667-1].

### **David McCartney**

Petitioners David R. McCartney, the David R. McCartney Individual Retirement Account, and the David R. McCartney Real Estate IRA, LLC (collectively, "McCartney") filed a petition [Doc. 110] seeking to adjudicate the validity of their legal interest in the David R. McCartney Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 2896 Treadwell Street, Mt. Pleasant,

South Carolina ("Treadwell Street Property"), which was identified in Paragraph 1(VI)(aa) of the Preliminary Order.

On June 10, 2011, the Court, upon the Government's motion, removed the David R. McCartney Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted McCartney's Motion for Summary Judgment and removed the Treadwell Street Property from the Preliminary Order. [Doc. 598].

McCartney was represented by attorneys T. Douglas Wilson, Jr. and Starling B. Underwood III of McGuire Wood & Bissette, P.A. throughout these proceedings. McCartney incurred attorneys' fees for 201.48 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $35,158.75 and costs in the amount of $252.00.[15] [Doc. 675].

### Jonathan McElroy

Petitioner Jonathan McElroy, trustee of The Monroe Real Estate Revocable Trust, on behalf of himself as Trustee, the Trust, its settlor, and its beneficiaries (collectively, "McElroy") filed a petition [Doc. 187] seeking to

---

[15] The Government objects to McCartney's fee petition to the extent that the Affidavit of Starling Underwood, which was submitted in support of his fee petition, erroneously refers to a fee billed for Petitioner Terry Sloan, and not Petitioner McCartney. [See Affidavit of Starling B. Underwood, Doc. 675-2 at ¶ 5]. A review of McCartney's fee petition reveals, however, that the correct billing statement for McCartney was attached to Mr. Underwood's affidavit, and the reference to Terry Sloan therein was simply a typographical error.

adjudicate the validity of his legal interest in The Monroe Real Estate Revocable Trust ("the Trust"), which was identified in Paragraph 1(VI)(ee) of the Preliminary Order of Forfeiture.

On August 4, 2011, the Government moved to remove the Trust from the Preliminary Order.  [Doc. 247].  For grounds, the Government stated that it had included the Trust because Southern Financial Services account statements for the Michael J. Mehaffey Real Estate IRA identified a "25% Interest in the Monroe Circle Real Estate Revocable Trust" as an asset purchased via funds forwarded from Southern Financial Services.  The Government subsequently learned, through statements of the Defendant, that there was an error in the Defendant's account statements and that "fraud proceeds were not forwarded from Southern Financial Services in order to purchase the Trust."  [Id. at 2].  The Court granted the Government's motion on August 10, 2011.  [Doc. 251].

McElroy was represented by the Dungan Law Firm throughout these proceedings.  McElroy incurred attorneys' fees for 53.04 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $10,530.38 and costs in the amount of $502.95.  [Docs. 658-3 and 658-4].

## Michael James Mehaffey

Petitioners Michael James Mehaffey, the Michael James Mehaffey Individual Retirement Account, and the Michael James Mehaffey Real Estate IRA, LLC (collectively, "Mehaffey") filed a petition [Doc. 183] seeking to adjudicate the validity of their legal interest in the Michael James Mehaffey Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at Richland Creek Road, Clyde, North Carolina ("Richland Creek Property"), which is identified in Paragraph 1(VI)(bb) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the Michael James Mehaffey Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Mehaffey's Motion for Summary Judgment and removed the Richland Creek Property from the Preliminary Order. [Doc. 598].

Mehaffey was represented by the Dungan Law Firm throughout these proceedings. Mehaffey incurred attorneys' fees for 109.06 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $23,645.11 and costs in the amount of $1,342.36. [Docs. 659-3 and 659-4].

**Paul Miller**

Petitioners Paul L. Miller and the Paul L. Miller Real Estate IRA, LLC (collectively, "Miller") filed a petition [Doc. 101] seeking to adjudicate the validity of their legal interest in the Paul L. Miller Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 420 Hells Hollow Lane, Blue Ridge, Georgia ("Hells Hollow Property"), which was identified in Paragraph 1(VI)(gg) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the Paul L. Miller Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Miller's Motion for Summary Judgment and removed the Hells Hollow Property from the Preliminary Order. [Doc. 598].

Miller was represented by attorneys Gary Freed of Robbins Freed and Katherine Langley of The Hart Law Group, P.C. throughout these proceedings. Miller incurred attorneys' fees for 65.80 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $16,327.00 and costs in the amount of $981.01.[16] [Doc. 622-1].

---

[16] In the event that the EAJA statutory rate (adjusted for inflation for the year 2011) is applied, Miller seeks an award of attorneys' fees in the amount of $11,844.00. [Doc. 622].

**John Myers**

Petitioners John C. Myers, the John C. Myers Individual Retirement Account, and the John C. Myers Real Estate IRA, LLC (collectively, "Myers") filed a petition [Doc. 83] seeking to adjudicate the validity of their legal interest in the John C. Myers Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at Lot 2, at Sweetwater Hills, Ridgeview, Henderson County, North Carolina ("Sweetwater Hills Property"), which was identified in Paragraph 1(VI)(ii) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the John C. Myers Real Estate IRA, LLC from the Preliminary Order.  [Doc. 229].  On February 25, 2013, the Court granted Myers's Motion for Summary Judgment and removed the Sweetwater Hills Property from the Preliminary Order.  [Doc. 598].

Myers was represented by the Dungan Law Firm throughout these proceedings.  Myers incurred attorneys' fees for 93.92 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $23,645.11 and costs in the amount of $1,342.36.  [Docs. 659-3 and 659-4].

**Becky Pope and Keith Pope**

Petitioner Becky Pope filed a petition [Doc. 99] seeking to adjudicate the validity of her legal interest in the real property at Lot 1, The Gorges at Lake Toxaway ("the Lake Toxaway Property"), which was identified in Paragraph 1(VI)(ll) of the Preliminary Order of Forfeiture. Petitioners Keith Pope, the Keith Pope Individual Retirement Account, and the Keith Pope Real Estate IRA, LLC (collectively, "Keith Pope") also filed a petition [Doc. 100] seeking to adjudicate the validity of their legal interest in the Lake Toxaway Property. Additionally, Keith Pope sought to adjudicate the validity of his interest in the Keith Pope Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at Bayside Lot #58, Grainger County, Tennessee ("Bayside Lot #58"), which was identified in Paragraph 1(VI)(kk) of the Preliminary Order of Forfeiture. The Court shall refer to Becky Pope and Keith Pope collectively as "the Popes."

The evidence presented by the Popes showed that Becky Pope and the Keith Pope Real Estate IRA, LLC closed on the purchase of the Lake Toxaway Property on January 23, 2009. The Keith Pope Real Estate IRA, LLC acquired an undivided 25% interest in the property. Becky Pope acquired a 75% undivided interest in the Property, using funds directly from

her own personal account. Becky Pope's funds were never in the possession or control of Defendant Bailey.

On June 10, 2011, the Court, upon the Government's motion, removed the Keith Pope Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted the Popes' Motions for Summary Judgment and removed both the Lake Toxaway Property and Bayside Lot #58 from the Preliminary Order. [Doc. 598].

The Popes were represented by the Dungan Law Firm throughout these proceedings. The Popes jointly and severally incurred attorneys' fees for 112.96 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $25,645.55 and costs in the amount of $1,306.92 in pursuing this action. [Docs. 656-3 and 656-4; Docs. 657-3 and 657-4].

### Terry Price

Petitioner Terry Price, individually and as manager of Terry L. Price Real Estate IRA, LLC (collectively, "Price"), filed a petition [Doc. 76] seeking to adjudicate the validity of his legal interest in the real property at Bayside Lot #57, Grainger County, Tennessee ("Bayside Lot #57"), which was identified in Paragraph 1(VI)(mm) of the Preliminary Order of Forfeiture.

On February 25, 2013, the Court granted Price's Motion for Summary Judgment and removed Bayside Lot #57 from the Preliminary Order. [Doc. 598].

Price was represented by Steven J. Allen and Strauss & Associates, P.A. throughout these proceedings. Price incurred attorneys' fees for 86.60 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $26,190.00. [Doc. 623].

### Sage Petitioners

Petitioners David E. Gable, Brian T. McSharry, Douglas W. Morris, Lorri K. Morris, Brian D. Gardze, Carlton Lee Matthews, Sidney S. Locke, Stephen M. Todd, Michael J. Mikina, Wendy Hammond, Daniel F. Russian, Bruce H. Keel, Gregory M. McCarthy, Mark A. Brezenski, and Timothy E. Batson (collectively, "the Sage Petitioners") each filed a petition [Docs. 23-38] seeking to adjudicate the validity of their interest in 110,000 shares of Sage Automotive ("the Certificates"), which were identified in Paragraph 1(VI)(zz) of the Preliminary Order of Forfeiture.

Over the course of two hearings and three Orders entered by the Court [Docs. 164, 331, and 602], the Sage Petitioners received the return of all of the Certificates.

The Sage Petitioners jointly incurred attorneys' fees for 834.40 hours of legal work in pursuing this action, resulting in attorneys' fees of $259,474.10 and jointly incurred expenses of $3,865.92.  [Docs. 683, 727-1].[17]

**Terry Sloan**

Petitioners Terry R. Sloan, the Terry R. Sloan Individual Retirement Account, and the Terry R. Sloan Real Estate IRA, LLC (collectively, "Sloan") filed a petition [Doc. 119] seeking to adjudicate the validity of their legal interest in the Terry R. Sloan Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture; the real property at 141 Wexford Drive, Unit 200, Anderson, South Carolina ("Wexford Drive Property"), which was identified in Paragraph 1(VI)(pp) of the Preliminary Order of Forfeiture; and the real property at 107 and 108 High Field Court, Anderson, South Carolina ("High Field Court Property"), which was identified in Paragraph 1(VI)(qq) of the Preliminary Order of Forfeiture.[18]

---

[17] The Sage Petitioners do not seek an award of fees for work done solely for the benefit of Sage Petitioner Dirk Pieper, as he does not meet the net worth requirement for eligibility for an award of fees under 28 U.S.C. § 2412(d)(2)(B).

[18] Terry R. Sloan, individually, filed a petition to claim an interest in certain IRA funds deposited with Southern Financial Services.  [Doc. 120].  The Government moved to dismiss this petition, which Sloan did not oppose.  Accordingly, the Government's motion to dismiss was granted and this petition was dismissed on February 25, 2013.  [Doc. 598 at 80-81 n.24].

On June 10, 2011, the Court, upon the Government's motion, removed the Terry R. Sloan Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Sloan's Motion for Summary Judgment and removed the Wexford Drive Property and the High Field Court Property from the Preliminary Order. [Doc. 598].

Sloan was represented by attorneys T. Douglas Wilson, Jr. and Starling B. Underwood III of McGuire Wood & Bissette, P.A. throughout these proceedings. Sloan incurred attorneys' fees for 201.48 hours of legal work in pursuing this action, resulting in attorneys' fees in the amount of $35,158.75 and costs in the amount of $252.00. [Doc. 677].

### **Kenneth Talley**

Petitioners Kenneth L. Talley, the Kenneth L. Talley Individual Retirement Account, and the Kenneth L. Talley Real Estate IRA, LLC (collectively, "Talley") filed a petition [Doc. 119] seeking to adjudicate the validity of their legal interest in the Kenneth L. Talley Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 301-305 West Oaklane Avenue, Johnson City, Tennessee ("West Oaklane Property"), which was identified in Paragraph 1(VI)(vv) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the Kenneth L. Talley Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Talley's Motion for Summary Judgment and removed the West Oaklane Property from the Preliminary Order. [Doc. 598].

Talley was represented by the Dungan Law Firm as well as the firm of McGuire Woods, LLP throughout these proceedings. Talley incurred attorneys' fees from the Dungan Law Firm for 113.41 hours of legal work in pursuing this action, resulting in in the amount of $23,366.47 and costs in the amount of $1,319.86. Talley incurred attorneys' fees from McGuire Woods, LLP for 43.50 hours of legal work in pursuing this action, resulting in in the amount of $14,675.70 and costs in the amount of $704.09. [Doc. 650]. At all times relevant to this action, Petitioner Kenneth L. Talley had an individual net worth in excess of $2,000,000.00. The Kenneth L. Talley Real Estate IRA, LLC, however, which in fact owned the property at issue, had a net worth of less than $7,000,000 and had fewer than 500 employees. [Doc. 650]. Accordingly, only the Kenneth L. Talley Real Estate IRA, LLC seeks the recovery of fees in this case.

**Robert Tuck**

Petitioners Robert E. Tuck, the Robert E. Tuck Individual Retirement Account, and the Robert E. Tuck Real Estate IRA, LLC (collectively, "Tuck") filed a petition [Doc. 122] seeking to adjudicate the validity of their legal interest in the Robert E. Tuck Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and the real property at 229 Bowling Park Road, Asheville, North Carolina ("Bowling Park Property"), which was identified in Paragraph 1(VI)(ww) of the Preliminary Order of Forfeiture. [Doc. 93]. Additionally, HomeTrust Bank filed a petition asserting a secured interest in, among other properties, the Bowling Park Property.

On June 10, 2011, the Court, upon the Government's motion, removed the Robert E. Tuck Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On August 25, 2011, the Court entered a Consent Order, agreed upon by Home Trust and the Government, releasing the Bowling Park Property and others from the Preliminary Order, thereby rendering Tuck's petition moot. [Doc. 269].

Tuck was represented by the Dungan Law Firm throughout these proceedings. Tuck incurred attorneys' fees for 42.28 hours of legal work in

pursuing this action, resulting in attorneys' fees in the amount of $8,693.50 and costs in the amount of $695.46. [Docs. 653-3 and 653-4].

**Glenn Warren**

Petitioners Glenn A. Warren, the Glenn A. Warren Individual Retirement Account, and the Glenn A. Warren Real Estate IRA, LLC (collectively, "Warren") filed a petition [Doc. 103] seeking to adjudicate the validity of their legal interest in the Glenn A. Warren Real Estate IRA, LLC, which was identified in Paragraph 1(VI) of the Preliminary Order of Forfeiture, and real property located in Rich Square Township, Northampton County, North Carolina ("Rich Square Property"), which was identified in Paragraph 1(VI)(xx) of the Preliminary Order of Forfeiture.

On June 10, 2011, the Court, upon the Government's motion, removed the Glenn A. Warren Real Estate IRA, LLC from the Preliminary Order. [Doc. 229]. On February 25, 2013, the Court granted Warren's Motion for Summary Judgment and removed the Rich Square Property from the Preliminary Order. [Doc. 598].

Warren was represented by the Dungan Law Firm as well as the firm of McGuire Woods, LLP throughout these proceedings. Warren incurred attorneys' fees for 86.46 hours of legal work in pursuing this action, resulting

in attorneys' fees in the amount of $17,627.50 and costs in the amount of $1,308.51.  [Docs. 666-3 and 666-4].

## V.    DISCUSSION

The Equal Access to Justice Act ("EAJA" or simply, "the Act") provides, in pertinent part, as follows:

> [A] court shall award to a prevailing party[,] other than the United States[,] fees and other expenses . . . incurred by that party in any civil action . . . brought by or against the United States . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).  Although the EAJA is directed to "civil actions," the Fourth Circuit has applied the statute in the context of a criminal forfeiture ancillary proceeding.  See United States v. Cox, 575 F.3d 352, 355 (4th Cir. 2009).

As the Supreme Court has recognized, "the specific purpose of the EAJA is to eliminate for the average person the financial disincentive to challenge unreasonable governmental actions."  Astrue v. Ratliff, 560 U.S. 586, 599 (2010) (Sotomayor, J., concurring) (citation omitted).  By expressly authorizing the award of attorneys' fees, Congress sought "to eliminate the barriers that prohibit small businesses and individuals from securing vindication of their rights in civil actions and administrative proceedings

brought by or against the Federal Government." Scarborough v. Principi, 541 U.S. 401, 406 (2004) (quoting H.R. Rep. No. 96-1005, at 9 (1979)); see also Sullivan v. Hudson, 490 U.S. 877, 883 (1989) (noting that the EAJA was enacted to address the fact that "[f]or many citizens, the costs of securing vindication of their rights and the inability to recover attorney fees preclude resort to the adjudicatory process")(quoting S. Rep. No. 96–253, at 5 (1979)).

In the present case, the Government contends that some of the Petitioners are not "prevailing parties" within the meaning of the EAJA. Further, it contends that, with respect to all of the Petitioners' claims, EAJA awards are not warranted because the Government's litigation position was substantially justified. Finally, the Government takes issue with the amount of fees sought. The Court will address each of these issues in turn.

## A. Prevailing Party

In order to receive an award of attorneys' fees under the EAJA, a litigant first must establish itself as a "prevailing party." See 28 U.S.C. § 2412(d)(1)(A). The Act defines a "party" to include individuals whose net worth did not exceed $2,000,000.00 at the time the civil action was filed, and any partnership, corporation, association, unit of local government or organization, the net worth of which does not exceed $7,000,000.00 and which did not have more than 500 employees at the time the action is filed.

See 28 U.S.C. § 2412(d)(2)(B).  It is undisputed that at all times relevant to this litigation, each of the individual Petitioners, with the exception of Petitioner Kenneth L. Talley, had a net worth of less than $2,000,000.00, and each of the LLC Petitioners had a net worth of less than $7,000,000.00 and less than 500 employees.[19]

Having determined that the present Petitioners qualify as "parties," the Court next considers whether all of these Petitioners should be considered to have "prevailed" in this proceeding.  To be a "prevailing party" for the purpose of awarding attorney's fees, a litigant need only "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) (citation omitted).  "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties."  Farrar v. Hobby, 506 U.S. 103, 111 (1992) (quoting Texas State Teachers Ass'n v. Garland Ind. School. Dist., 489 U.S. 782, 792-93 (1989)).  Thus, "[t]he focus when determining whether a petitioner is a prevailing party is aimed at the degree

---

[19] As noted previously, because Kenneth L. Talley does not personally qualify for an award of EAJA fees, only the Kenneth L. Talley Real Estate IRA, LLC seeks fees in connection with the Talley Petition.

of success obtained by the petitioner." <u>Roanoke River Basin Ass'n v.</u> <u>Hudson</u>, 991 F.2d 132, 139 (4th Cir. 1993).

Clearly, the IRA Petitioners prevailed in this action as the cloud on their titles was cleared and their properties were returned to them. The Government contends, however, that those Petitioners who were not clients of Bailey, namely, James W. Carter, Marilyn F. Carter, William Ellis Peacock, Penny Peacock, Jonathan McElroy, and Becky Pope. are not "prevailing parties" because the interests claimed by these Petitioners were titled to them individually and not to an LLC created by the Defendant. As such, the Government argues, these Petitioners' interests were not even forfeited in the Preliminary Order. In any event, the Government contends that it never contested these Petitioners' claims, and that it never proposed that the Court should enter an order forfeiting any portion of these properties. Accordingly, the Government argues that it should not be held liable under the EAJA to pay for the attorneys' fees of these Petitioners. [Doc. 693].

### 1. The Carters and the Peacocks

The Carters and the Peacocks filed claims asserting interests in the Key Colony Beach Property. The Warranty Deed for the Key Colony Beach Property indicates that the Carters own a 50.0% undivided interest; the Peacocks own a 14.1% undivided interest; and the Peacock LLC owns a

35.9% undivided interest in the property. [Doc. 660-1]. While the funds used by the Peacock LLC to purchase its 35.9% interest in the property were transferred from the William Ellis Peacock IRA to the Defendant Bailey, the funds used by the Carters and the Peacocks to purchase their respective interests in the property were never within possession or control of the Defendant Bailey, but were transferred directly from the Carters and the Peacocks to the closing agent for the purchase of the property.

The Government is correct that the Preliminary Order sought forfeiture of properties only to the extent that such properties were "titled in the name of LLCs." [Doc. 16 at ¶1(VI)]. The Preliminary Order fails to identify, however, that only a percentage of the Key Colony Beach Property is titled in the name of an LLC. Moreover, following the entry of the Preliminary Order, the Government filed a Notice of *Lis Pendens* in the Official Records of Monroe County, Florida, which provided, in pertinent part, as follows:

> [T]hat on February 1, 2011, an Information was filed in the Western District of North Carolina, Asheville Division . . . most particularly charging in the forfeiture allegation that the below described real property, together with all appurtenances thereto, improvements thereon, furnishings and fixtures, is subject to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981 and 982 and the provisions outlined at 21 U.S.C. § 853 and 28 U.S.C. § 2461. The real property which is subject to criminal forfeiture is located at 261 3rd Street, Key Colony

Beach, Florida, including all improvements, fixtures, and equipment found therein or thereon, and more particularly described as [full legal description follows].

[Doc. 718-1]. Significantly, this Notice of *Lis Pendens* addresses *the entire property*, not just that portion of the property titled in the name of the LLC. The filing of a general Notice of *Lis Pendens*, affecting the entire property, undoubtedly clouds the title of all of the owners of record and materially affects their property interests.

In light of the wording of the Preliminary Order, and the filing of the *Lis Pendens*, the Carters and Peacocks filed petitions on April 1, 2011, asserting that their interest in the Key Colony Beach Property was not subject to seizure. These petitions, and the supporting documentation filed therewith, clearly demonstrate that the Carters and the Peacocks have valid legal interests in the property, and that the funds used by the Carters and the Peacocks to purchase their respective interests were never within the possession or control of the Defendant. Nevertheless, nearly four months passed before the Preliminary Order was amended to properly reflect the Petitioners' interests. During that time, counsel engaged in numerous discussions with the Government in an effort to resolve the Petitioners' claims. At no time during this process did the Government take the position

with the Petitioners that their petitions were unnecessary as their interests were not subject to the Preliminary Order. By the end of May 2011, the Governments' attorneys had advised the Petitioners only that they were still reviewing the matter. [See Doc. 713-3]. With their petitions still unresolved, in June 2011, the Carters and the Peacocks joined other Petitioners in the cause in engaging significant discovery, including deposing the Defendant, in an effort to present further evidence of their lack of involvement with the Defendant and Southern Financial Services. Finally, in August 2011, the Government agreed to amend the Preliminary Order in favor of the Carters and the Peacocks.

In short, the Government's filing of a Notice of *Lis Pendens* clouded the Carters' and the Peacocks' title, forcing them to commence an ancillary proceeding in order to protect their interests. All of the information necessary for the Government to determine that the Carters and the Peacocks' interests in the property were not subject to forfeiture under 21 U.S.C. § 853 was at the Government's disposal upon the filing of the Petitions in April 2011. Yet, it took the Government more than four months to acquiesce and agree to the amendment of the Preliminary Order. The release of the Petitioners' interest was the sought-after relief on a substantial issue in the litigation. The Court's Order amending the Preliminary Order effectively overruled the *Lis Pendens*,

thereby materially altering the legal relationship of the parties. For these reasons, the Court concludes that the Carters and the Peacocks are "prevailing parties" within the meaning of the EAJA.

### 2. Becky Pope

The Government takes the position that Becky Pope's petition was also unnecessary as the 75% undivided interest she claimed in the Lake Toxaway Property was not titled to an LLC and thus, in the Government's view, was not subject to forfeiture under the Preliminary Order.

As was the case with the Carters' and the Peacocks' petitions, however, the Preliminary Order fails to identify that only a percentage of the Lake Toxaway Property is titled in the name of an LLC and thus potentially subject to forfeiture. Moreover, the Notice of *Lis Pendens* filed by the Government in the Transylvania County Registry (Deed Book 569, Page 509) does not limit its reach to that portion of the property titled in the name of an LLC, but rather identifies the real property in its entirety. [Doc. 717-1]. The filing of this general Notice of *Lis Pendens*, undoubtedly clouded Becky Pope's title and materially affected her property interests.

In her Petition filed on April 1, 2011, Becky Pope argued that neither Bailey nor Southern Financial ever had any ownership interest in the Lake Toxaway Property and that she alone holds an undivided 75% interest in the

Property.  [Doc. 99].  During the 13 months that followed, counsel engaged in numerous discussions with the Government in an effort to resolve her claim.  At no time during this process did the Government take the position with Becky Pope that her petition was unnecessary.  In fact, the opposite is true: the record suggests that the Government clearly contested Becky Pope's claim and asserted that the entirety of the Lake Toxaway Property was subject to forfeiture.

In early July 2011, counsel for the Government requested that Becky Pope's counsel provide additional documentation evidencing her interest in the property, stating, "If you can provide such documentation and Ms. Pope is amenable to settlement discussions, then I would consider the documentation."  [Doc. 717-2].  If the Government understood that the Preliminary Order did not forfeit "any portion of the Lake Toxaway property that was not titled to a LLC," there would have been no cause for any such "settlement discussions."  The Government could have asked the Court to release her interest immediately.

The Government continued to contest the release of Becky Pope's 75% undivided interest in its responses to Petitioner's written discovery.

[Doc. 717-3].[20]   Then, in April 2012, the Government filed a Motion for Summary Judgment seeking the dismissal of Becky Pope's Petition.  [Doc. 395].  In this Motion, the Government argued that "applying the 'but for' test to the totality of the circumstances, the Property is proceeds of the fraud scheme," [Id. at 5]; that "Petitioner Cannot Satisfy Section 853(n)(2) or Section 853(n)(6)," [Id. at 9]; and that "Petitioner Does Not Have Any Interest, Much Less a Preexisting or Superior Interest, in Fraud Proceeds and Is Not A Bona Fide Purchaser for Value."  [Id.].   While the Government now contends that the Preliminary Order never forfeited Becky Pope's interest, it is clear that the Government fervently argued during the litigation of her claim that the Petitioner had failed to demonstrate that she had any interest in the Property.  Thus, contrary to its recent claims that it "never took the position in Court that the 75% interest was subject to forfeiture," [Doc. 689 at 2 n.2], the Government consistently argued during the course of the ancillary

---

[20] Counsel's email correspondence makes clear that the Government questioned the origin of the funds which Becky Pope used to purchase her 75% undivided interest and requested documentation – beyond the deed clearly establishing her ownership – to establish not her ownership interest (which is clearly established by the deed itself), but rather the source of the funds with which she procured that interest.  The Government's actions exemplify precisely what was wrong with the Government's conduct throughout this litigation.  Rather than carefully investigate these transactions, and the Defendant's involvement therein, the Government sought wholesale forfeiture of virtually anything that the Defendant had touched, leaving innocent owners like Becky Pope with the burden of undertaking the considerable expense of proving the Government wrong and establishing their rightful ownership.

proceeding that Becky Pope had no interest in the property after forfeiture under the Preliminary Order, and it actively sought the forfeiture of the entire Lake Toxaway Property. It was not until May 10, 2012, after nearly a year of litigation and after placing a cloud on the title of Becky Pope's interest in the property with the Notice and Lis Pendens, that the Government reversed course and finally acknowledged that her interest in the Property was not subject to criminal forfeiture. [Doc. 492].

As in the case of the Carters and the Peacocks, the Government's filing of a Notice of *Lis Pendens* clouded Becky Pope's title, leading her to commence an ancillary proceeding to protect her interests. The Petitioner received the relief she sought upon the granting of her motion for summary judgment and the release of the Lake Toxaway from the Preliminary Order, thereby materially altering the legal relationship of the parties. For these reasons, the Court concludes that Becky Pope is also a "prevailing party" within the meaning of the EAJA.

### 3. Jonathan McElroy

In the case of McElroy, the Preliminary Order identified for forfeiture "[a]ny and all interest in The Monroe Circle Real Estate Revocable Trust." [Doc. 16 at ¶ 1(VI)(ee)]. On March 21, 2011, the Government filed a Notice

and *Lis Pendens* in the official records of Haywood County, North Carolina,

giving notice of forfeiture of the following:

> Any and all interest in The Monroe Circle Real Estate
> Revocable Trust, more particularly described in Book
> RB 785, Page 784 in the Haywood County Register
> of Deeds . . . .

[Doc. 722-1]. This Notice does not mention property "titled in the name of an

LLC"; rather, it identifies a certain real property described in Book RB 785,

Page 784 of the Haywood County Register of Deeds. This real property,

however, does not appear anywhere within the text of the Preliminary Order.

On April 29, 2011, McElroy asserted in his Petition that his interest in

the Monroe Circle Real Estate Revocable Trust was not subject to seizure:

> At all times, the Trust has been handled by Jonathan
> S. McElroy for the benefit of Alivia Jewel Mehaffey
> and Jorge Cure. The funds were transferred from the
> personal account of the settlors into the Attorney
> Christopher B. Waldera's trust account to purchase
> the real property discussed above for the legal and
> equitable ownership of the Trust. Neither Defendant
> Bailey nor Southern Financial Services has ever had
> any legal, equitable or beneficial ownership interest
> in the Trust as described above.

[Doc. 187 at 4]. The Petitioner supported his argument with sworn affidavits

and documentary evidence.

The Government contends that it moved to remove the Trust from the

Preliminary Order on August 4, 2011, after "[r]ecognizing that the property

was not titled to a LLC or funded by fraud proceeds and that Southern Financial account documents mistakenly referred to a portion of the trust as purchased with fraud proceeds." [Doc. 691 at 1]. The Government, however, provides no explanation or documentary evidence to support its claim that Southern Financial account documents "mistakenly" referred to the Michael J. Mehaffey Real Estate IRA owning a 25% interest in the Monroe Circle Real Estate Revocable Trust. Even assuming that such documents exist, however, the Government's reasoning reflects a basic misunderstanding of trust law. While one could be a settlor of a trust providing 25% of the assets, or one could be a 25% beneficiary of a trust, one could never be a "purchaser" of an interest in a trust. Even assuming for the sake of argument that one *could* purchase a partial interest in a trust, the Government's position was that the Mehaffey Real Estate IRA LLC only had a claim to "a 25% interest in the Trust." Thus, at the very least, seizing "any and all interest in the . . . Trust" and filing a *Lis Pendens* against the entire interest of a parcel of property unnamed in the Preliminary Order was not justified. It was incumbent upon the Government to review these matters further before forfeiting innocent property.

It appears that the Government failed to perform even the most basic due diligence before deciding to seek forfeiture of any and all interest in The

Monroe Circle Real Estate Revocable Trust.  Even a cursory inspection of the documents seized from Southern Financial Services reveals that the Michael J. Mehaffey Real Estate IRA purchased an undivided 25% interest in *a parcel of real property theretofore owned by the Trust*.  [See Doc. 722-3].  Purchasing an interest in real property from a trust is not the same as purchasing an interest in the Trust.  It would have been obvious upon review of all of the settling documents that Bailey made an obvious mistake in his documentation, and that forfeiture of the *Trust* itself was not warranted and not proper.

Despite the abundant documentary evidence suggesting that the Trust was improperly included within the Preliminary Order, the Government still took more than three months to address McElroy's claim.  In the meantime, there were numerous discussions between counsel in an effort to resolve the matter.  On May 27, 2011, counsel for McElroy sent an email to Benjamin Bain-Creed, counsel for the Government, reiterating the assertion made in McElroy's petition that neither Bailey nor Southern Financial was involved in the Trust in any way.  [Doc. 722-4].  Bain-Creed responded that he was reviewing the matter with other Assistant United States Attorneys.  [Id.].

Having received no relief from the Government, McElroy joined other Petitioners in conducting extensive discovery, including the deposition of the

Defendant. During that deposition, Bailey testified that he did not know anything about the Trust [Bailey Dep. at 9-10, 59], and that neither he nor Southern Financial Services had "any specific connection to this trust agreement." [Id. at 172-73].

On June 3, 2011, the Government requested the payoff on the Eugenie Monroe loan on the real property addressed in the McElroy petition. [Doc. 722-4]. In response to this email, counsel provided the payoff for 30 Monroe Lane and explained to the Government that this property was owned by the Monroe Circle Real Estate Trust from February 5, 2006 to July 27, 2007, and that the current owner was the Michael James Mehaffey Real Estate IRA, LLC.[21] Counsel again requested that the Government remove the Trust from the Preliminary Order, but received no immediate response. [Id.]. Six weeks later, the Government moved to dismiss the Trust from the action. [Doc. 247].

All of the information necessary for the Government to determine that The Monroe Circle Real Estate Revocable Trust was not subject to forfeiture under 21 U.S.C. § 853 was at the Government's disposal upon the filing of the Petition in April 2011. Yet, it took the Government nearly four months to

---

[21] The 30 Monroe Lane Property was not listed as a forfeited property in the Preliminary Order.

acquiesce and agree to the amendment of the Preliminary Order. The release of the Trust was the sought-after relief on a substantial issue in the litigation, and the Court's Order amending the Preliminary Order materially altered the legal relationship of the parties. For these reasons, the Court concludes that McElroy also is a "prevailing party" within the meaning of the EAJA.

### 4.    Individual Petitioners

The Government questions the propriety of the individual Petitioners joining their respective IRA LLCs in asserting interests in the various properties. Specifically, the Government contends that because the properties were titled in the names of the LLCs, there was no basis for the individual Petitioners to assert any state law interests in the respective properties. At best, the Government argues, the individual Petitioners had personal property interests in the LLCs, but not an interest in the real property itself.

The Government's argument on this point is misguided for several reasons. First, the Government ignores the fact that the Preliminary Order, as originally drafted by the Government and entered by the Magistrate Judge, sought forfeiture *of the LLCs* created by Bailey and/or Southern Financial, in addition to the properties owned by those entities. Thus, the

individual Petitioners were entirely justified in asserting their interests in this action with respect to the forfeited LLCs. Even after the dismissal of the LLCs, these individual Petitioners were justified in remaining in the case, as many had concerns regarding the continued viability of both their IRA accounts and the LLCs created to hold assets purchased with their IRA funds. As the sole members of their respective limited liability companies, the individual Petitioners were entitled to allocations of income, gain, loss, deduction and credit upon distribution or dissolution. See N.C. Gen. Stat. §§ 57D-4-03 and 57D-6-08(2). Thus, each of the individual Petitioners had an interest not only in the limited liability company of which he or she was a member, but also in the assets of that company. The inclusion of the individual Petitioners in these ancillary proceedings was not only prudent, but entirely proper.[22] For all of these reasons, the individual Petitioners, along with the LLC Petitioners, will be considered prevailing parties and will be allowed to seek the fees and expenses incurred by them in this action.

---

[22] In any event, the inclusion of the individual Petitioners did not result in any unnecessary or duplicative work being performed by counsel, as the individual and corporate Petitioners were represented jointly.

## B. Whether Government's Position Was "Substantially Justified"

Having determined that the Petitioners are "prevailing parties," the Court must award them their fees and expenses unless a finding is made that "the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d). Here, the Government does not contend that that any "special circumstances" exist that would make an award of fees and expenses unjust. Instead, the Government argues that an award of fees is unwarranted because its position on forfeiture of the property owned by the LLCs was substantially justified.

In so arguing, the Government contends that the burden of showing that its position was not substantially justified is on the Petitioners, and it argues that the Petitioners have failed to carry this burden. The Government is mistaken. The case law is clear: the burden is on the *Government* to show that its position was substantially justified. See Scarborough, 541 U.S. at 403 ("the Government is aware, from the moment a fee application is filed, that to defeat the application on the merits, it will have to prove its position 'substantially justified'"); United States v. 515 Granby, LLC, 736 F.3d 309,

315 (4th Cir. 2013) ("The United States has the burden of showing that its position was substantially justified.").

The Supreme Court has defined "substantially justified" to mean "justified to a degree that could satisfy a reasonable person" and as "more than merely undeserving of sanctions for frivolousness." Pierce v. Underwood, 487 U.S. 552, 565-66 (1988). The Fourth Circuit has held that a position is "substantially justified" where such position has a "reasonable basis in law and fact." 515 Granby, LLC, 736 F.3d at 315 (quoting Cody v. Caterisano, 631 F.3d 136, 141 (4th Cir. 2011)). In considering the "position" of the United States, the Court may look to both pre-litigation and litigation conduct. 515 Granby, LLC, 736 F.3d at 315 (noting that "courts must undertake 'a single evaluation of past conduct' that examines the 'case as an inclusive whole, rather than as atomized line-items") (quoting Comm'r, INS v. Jean, 496 U.S. 154, 159 n.7 (1990)); see also Roanoke River Basin Ass'n, 991 F.2d at 138 (4th Cir. 1993) ("[I]t is clear that [through EAJA,] Congress intended to address governmental misconduct whether that conduct preceded litigation, compelling a private party to take legal action, or occurred in the context of an ongoing case through prosecution or defense of unreasonable positions.").

Applying these standards to the instant case, the Court concludes that the positions taken by the Government throughout this ancillary proceeding were not substantially justified.

First, the Government has not proved that it was sufficiently justified in asserting a nexus between the Petitioners' properties and the Defendant's crimes. As the Government correctly notes, a preliminary order of forfeiture requires a finding of a nexus between a particular property and the crime. See Fed. R. Crim. P. 32.2(b). As the Court previously determined, however, the Government failed to establish a nexus between the IRA Petitioners' properties and the Defendant's crimes in this case. [See Doc. 598 at 45-62].

The lack of merit in the Government's position was apparent to the Petitioners even before the Preliminary Order was entered. While the Government contends that in bringing this forfeiture action, it "reasonably relied on undisputed facts about the use of fraud proceeds to purchase the forfeited properties," [See, e.g., Gov't Response, Doc. 687 at 14], a review of the record demonstrates that such evidence was far from "undisputed" and thus that the Government's reliance on these facts was anything but "reasonable." The documents and files seized by the Government from Southern Financial Services unequivocally show that the Petitioners deposited money from their own individual retirement accounts equal to or

greater than those funds used for the purchase of the properties. The deeds for each of the properties identify the owner as a limited liability company and the documents in Bailey's files demonstrate that Bailey had no ownership interest in these LLCs.[23] Based on this evidence, the Government should have known prior to initiating these proceedings that Bailey had no ownership interest in the properties, and therefore, that these properties were not subject to forfeiture.[24]

In pursuing forfeiture of the Petitioners' properties, the Government relied on a "but for" test, arguing that without Bailey's crimes, Southern Financial would not have existed. As the Court has previously explained, however, this reasoning is profoundly flawed:

> If the Government is correct in its nexus argument, then any funds which Defendant Bailey received from clients over the course of a decade and legitimately expended for such clients' benefit constitute the indirect proceeds of the Defendant's crimes and would therefore be forfeitable. Taking the Government's argument to its logical conclusion, any

---

[23] The one exception to this was the deed for "The real property known as 100 acres More or less Big Hickory Bear Pen Branch," which identified "Southern Financial Services, Inc., as Trustee FBO William Ghormley IRA" as the grantee, as Bailey had failed to establish an LLC on behalf of Ghormley. Southern Financial, however, gained no ownership interested in this real property by virtue of its designation as trustee for Ghormley's IRA.

[24] The Government had more than sufficient time prior to requesting the Preliminary Order of Forfeiture to determine the absence of Bailey's interests in the Petitioners' properties. Southern Financial's documents were seized in mid-January 2011, and the Preliminary Order of Forfeiture was not presented to the Court until February 16, 2011.

expenditure by the Defendant – for salaries of employees who were oblivious to his fraud, for mortgage or rental payments for office space, even for payment of the electric bill – would constitute funds which would now be subject to forfeiture from innocent third parties which received them. Such a result is nonsensical and is completely contrary to the underlying remedial purpose of the criminal forfeiture laws.

[Doc. 598 at 60-61]. Such an expansive and unsupported reading of the statute and case law did not provide a reasonable basis in law or in fact for the Government's actions in pursuing forfeiture of the Petitioners' properties.[25]

Compounding its inadequate investigation, the Government repeatedly and continually failed to provide any direct evidence to the Court regarding the existence of this nexus. Without evidence of this nexus, the Government had no authority to request seizure of the properties. The Government has

---

[25] The Government continues to take an unreasonable position and act without substantial justification in its responses to the Petitioners' fee applications. In its responses, the Government suggests that "funds used to purchase the property constituted proceeds of the fraud because the funds were 'within the sole possession, dominion, and control of [Defendant], at least for a brief period of time'" and cites to <u>United States v. Farkas</u>, No. 1:10cv200 (LMB), 2011 WL 5101752 (E.D. Va. Oct. 26, 2011) to support this proposition. [<u>See, e.g.</u>, Gov't's Response, Doc. 687 at 6-7]. As the Court previously explained in its Order granting summary judgment to the Petitioners, however, "[t]he Government's reliance on <u>Farkas</u> is entirely misplaced" as "[t]he facts of <u>Farkas</u> are clearly distinguishable from the present case." [Doc. 598 at 60].

not shown that it ever had a reasonable basis to believe that there was a nexus between the crimes and the properties seized.

The Government argues that Bailey's fraud scheme presented the Court with a "novel issue of law," arguing:

> No party in this matter has identified a scheme in which a defendant deposited many victims' funds into an account, commingling funds that would never be returned with funds that were intended to be used to purchase properties and ultimately were used as directed. Under the case law cited above and the novelty of Defendant's scheme to defraud, the Government was substantially justified in arguing that a nexus existed because Defendant's business through which he solicited Petitioners' funds would not have existed but for his scheme to defraud, together with the facts regarding commingled funds.

[Doc. 688 at 9]. The Government is correct on at least one point: no party, *including the Government*, has presented the Court with another criminal forfeiture proceeding remotely like this one, where unwitting clients of a fraudster had property seized from them, despite having paid for such property with legitimate funds, on the theory that the Defendant somehow gained an interest in their property by serving as an intermediary for the transaction. This is not a novel issue of law; it is, as the IRA Petitioners correctly note, a nonsensical proposition.

In addition to a lack of substantial justification for its position on nexus, the Government has failed to demonstrate that it was sufficiently justified in arguing that the Petitioners did not have a superior legal interest in the property. A petitioner will prevail in an ancillary proceeding where the petitioner can show that "right, title or interest was vested in the petitioner rather than the defendant or was superior to any right, title or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture." 21 U.S.C. § 853(n)(6)(A). In the present case, the Defendant never had a vested interest in the forfeited property; all interest was legally vested in the Petitioners. The Government maintained that Bailey obtained a superior legal interest in the funds deposited by the Petitioners, arguing that these funds became "fraud proceeds" and therefore the properties, although purchased at the explicit direction of the Petitioners, were subject to forfeiture. Ultimately, however, the Government failed to present any evidence to the Court that the properties were actually purchased with funds provided by Bailey's other victims. [Doc. 598 at 57 n.16].[26]

---

[26] While the Government did not appeal the Court's Order granting the Petitioners' ancillary claims, the Government continues to maintain that the Court's decision is not supported by existing precedent. [See, e.g., Gov't Response, Doc. 687 at 10-11].

To be substantially justified in pursuing forfeiture of the Petitioners' properties, the Government had to reasonably believe that the Defendant had a vested right, title or interest to the property being seized or that he had a right, title or interest superior to the Petitioners' interest. Upon review of the documents in their possession, it should have been clear to the Government that the IRA Petitioners were in a position different from those clients who were defrauded by Bailey. These documents demonstrate that Bailey had no ownership interest in the properties and that he had completed his delegated responsibilities exactly as instructed by the Petitioners.

Shortly after the Preliminary Order of Forfeiture was entered, the Court identified the lack of legal precedents for this forfeiture action and began to identify the errors in the Government's position. During a hearing regarding claims by the Sage Petitioners, which occurred a little more than one month after the Preliminary Order of Forfeiture was entered, the Court asked, "How is it that property held in the name of an LLC, when there is nothing before this Court to indicate that the defendant has any interest in that LLC, comes anywhere within the purview of [the Preliminary Forfeiture O]rder of February 16, 2011?" [Hrg. Tr. (Mar. 23, 2011), Doc. 70 at 18-19]. At a subsequent hearing on April 5, 2011, regarding the Sage Certificates, the Government again stated its theory that all funds that passed through Southern Financial's

accounts were "proceeds" of Bailey's fraud. According to the Government, because all of Bailey's activities were part of "one overarching scheme" it was immaterial that the Petitioners had suffered no loss:

> Q [by the Court]. So you're saying that by virtue of these claimants having paid money to Mr. Bailey for a specific purpose and him having discharged that specific purpose, that nonetheless that money constitutes property constituting or derived from any proceeds Mr. Bailey obtained as a result of the violation. That's your position.
>
> A. That's our position.

[Hrg. Tr. (Apr. 5, 2011), doc. 172 at 26]. The Court pointed out to the Government that its position contradicted the established common law principle that there can be no fraud without loss. [Id. at 28-29]. The Court also noted that the Petitioners would suffer loss only if the Government succeeded in forfeiting their property. [Id.]. The Court also questioned whether the Government as to whether it intended to pursue forfeiture of money paid, purportedly as investment returns, to some of Bailey's other clients on the grounds that such payments also constituted proceeds of the Defendant's fraud:

> THE COURT: Are you seeking forfeiture of any of these amounts that have been paid to the investors who invested cash? In other words, the investor who invested $200,000 with Mr. Bailey and at the end of

the game got back $190,000, are you seeking that $190,000 from those investors?

MR. BRAFFORD: We have never done that to the best of my knowledge. I think it's extremely unlikely that we would do that in this case or any other case, simply --

THE COURT: Why?

MR. BRAFFORD: Because it's almost impossible to win. I mean, it's hard enough making the arguments I'm making here to the Court and to a jury in forfeiture on what you might call the low hanging fruit. If we're trying to call back money -- I mean, there may be a logical inconsistency, but in terms of the jury appeal factor, it's really hard to get money back from people who were victims and already had a loss. The Madoff trustee[27] is doing it, doing it successfully. He's got billions of dollars to work with. We don't. We can't litigate every single case with bad facts like that that we might choose to. So there may be a logical inconsistency. But we theoretically could. As a practical matter, we never have.

THE COURT: So you theoretically could, but you're not doing it here. However, you are doing that with regard to persons who got their investment back in the form of stock certificates.

MR. BRAFFORD: I think it's a pragmatic fact that we had it, you know, we were able to seize it . . . .

[Id. at 53-54].

---

[27] The Court notes that counsel appeared to be referring to the "clawback" procedures utilized by the bankruptcy trustee in the Bernie Madoff matter, which was *not* a criminal forfeiture proceeding.

Despite the Court's repeatedly expressed concerns and skepticism regarding the legal basis for the Government's actions, the Government continued to argue for the next two years that Bailey's interests in the properties were superior to those of the Petitioners. In fact, the Government continues to persist in its reasoning in opposing the Petitioners' fee applications, despite the fact that the Government never appealed the Court's forfeiture determinations. The Government has not proved that it had a reasonable basis to believe that the Petitioners would not prevail under 21 U.S.C. § 853(n)(6)(A).

Finally, the Government has not proved that it was sufficiently justified in arguing that the Petitioners were not bona fide purchasers for value. Because the Petitioners had a right to return of property under Section 853(n)(6)(B), the Government's actions would only be substantially justified if it had a reasonable basis in law and fact to believe that the Petitioners were not bona fide purchasers for value of the right, title, or interest in the property. The Government claimed that the Petitioners were not bona fide purchasers for value because the property was purchased with proceeds of fraud obtained from numerous individuals and entities. The records provided by the Petitioners, however, as exhibits to both their original Petitions and their Motions for Summary Judgment, provide a full and thorough accounting of

the funds used for the purchase of these properties. Moreover, the Court has determined that the lack of segregation of funds, without more, is insufficient to establish that "these properties *must* have been purchased with funds provided by Bailey's other victims." [Doc. 598 at 57 n.16]. Indeed, in failing to submit any evidence on the issue, the Government constrained the Court "to find that the Government has failed to show by the preponderance of the evidence that any of these properties were purchased with funds other than those deposited precisely for that purpose." [Id.]. The Government has not proved that it had a reasonable basis to believe that the Petitioners would not prevail as bona fide purchasers for value under 21 U.S.C. § 853(n)(6)(B).

In sum, the conduct of the Government throughout this action was not substantially justified. While counsel for the Government suggested as early as March 2012 that they were interested in reducing the Petitioners' attorneys' fees and in expediting the proceedings, they took no action to alter their unreasonable position or to ameliorate the effects of their prior unreasonable actions. Instead of immediately conceding in the face of a clear directive from the Court in the Gardza Order, the Government continued to press forward with its position, a course of action which was not substantially justified by the facts or existing law. Following months of

litigation, the Government filed Motions to Dismiss against each of the Petitioners, claiming for the first time they did not have standing to bring their ancillary claims, as well as alternative Motions for Summary Judgment, arguing that the Petitioners had no cognizable legal interest under § 853. Ultimately, the Petitioners prevailed in this case.  In order to prevail, however, the Petitioners had to undergo the considerable expense of filing petitions, engaging in discovery, attending hearings, responding to the Government's Motions to Dismiss, responding to the Government's alternative Motions for Summary Judgment, and prosecuting their own Motions for Summary Judgment.  The Court concludes that, as prevailing parties, the Petitioners are entitled to receive an award of reasonable fees and expenses under the EAJA for these efforts.

## C.    Amount of Fees, Expenses, and Costs Claimed

Having determined that the Government's position was not substantially justified, the Court will proceed to determine the amount of fees, expenses, and costs to be awarded in this case.

The EAJA requires that any award of "fees and other expenses" made to a prevailing party must be "reasonable."  28 U.S.C. § 2412(d)(2)(A). Determining the overall reasonableness of the fee award requires the Court to determine the appropriate hourly rate as well as the reasonableness of

the amount of hours claimed.  The Court will address each of these issues in turn.

### 1.    The Hourly Rate

Section 2412(d)(2)(A) provides a maximum hourly rate that can be awarded under EAJA:

> The amount of fees awarded . . . shall be based upon prevailing market rates for the kind and quality of the services furnished, *except* that . . . attorney fees shall not be awarded in excess of $125 per hour *unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.*

28 U.S.C. § 2412(d)(2)(A)(ii) (emphasis added).

In the present case, all of the Petitioners request that fees be awarded at a rate in excess of $125 per hour.  Two of the Petitioners – Paul Miller and Terry Price -- limit their request to $180.60 per hour, an hourly rate based on the increase in the cost of living between the time that the EAJA was last amended in 1996 and 2011, when this litigation commenced.  The other Petitioners, however, argue for a further increase of the hourly rate based upon the application of certain "special factors," which are discussed in greater detail *infra*.  The Petitioners argue that these "special factors" warrant

a calculation of fees based on counsel's customary hourly rates, which generally range from $225 to $325 per hour.[28]

In response to nearly every EAJA petition, the Government cursorily objects – in a footnote – to *any* fee award based on an hourly rate in excess of $125 per hour. In support of this objection, the Government cites 28 U.S.C. § 2412(d)(2)(A)(ii), simply noting that the statute provides for an hourly rate with $125 with only "limited exceptions." [See, e.g., Gov't's Response, Doc. 687 at 3 n.1]. The Government does not specifically address the propriety of awarding fees at a rate that reflects the increase in the cost of living – other than an off-hand objection to the rate of $180.60 sought by Miller and Price as being "an unexplained inflationary adjustment." [Doc. 626 at 2 n.1; Doc. 627 at 2 n.1]. In response to the Sage Petitioners' petition, however, the Government appears to concede that an inflationary adjustment would be appropriate. [See Doc. 724 at 17 n.7].

The Government's objections in this regard, presented in footnotes without any meaningful discussion of the rates claimed or the applicable law, are so conclusory as to warrant summary treatment. Nevertheless, the

---

[28] While the majority of the fees claimed are based on this range of hourly rates, some attorneys charged even higher rates, with one attorney even charging as much as $550 per hour for his services. [See Sage Petitioners' Application, Doc. 683].

statute requires that the Court make specific findings to justify the award of a fee in excess of $125 per hour.  See 28 U.S.C. § 2412(d)(2)(A)(ii) ("attorney fees shall not be awarded in excess of $125 per hour *unless the court determines* that an increase in the cost of living or a special factor . . . justifies a higher fee") (emphasis added).  It is because of this statutory requirement, and not the Government's cursory objections, that the Court will proceed to analyze the Petitioners' claims and determine whether a higher hourly rate is justified under the circumstances.

The Court finds that the increase in the cost of living which occurred since the EAJA was last amended in 1996 warrants an adjustment of the statutory hourly rate.  "[A]lmost every court that has applied [§ 2412(d)(2)(A)] has held . . . that 'cost of living' has th[e] ordinary meaning [of costs of food, shelter, clothing and other basic goods and services] and is properly measured by the Consumer Price Index."  Harris v. Sullivan, 968 F.2d 263, 265 (2[d] Cir. 1992) (collecting cases); Sullivan v. Sullivan, 958 F.2d 574, 574 n.1 (4th Cir. 1992) (noting that a general cost of living index such as the United States Department of Labor's Consumer Price Index for all urban consumers is the appropriate measure by which to calculate a cost of living enhancement to a statutory fee).

The hourly rate pursuant to EAJA "should only be increased by the corresponding Consumer Price Index for each year in which the legal work was performed." Kerin v. U.S. Postal Service, 218 F.3d 185, 194 (2[d] Cir. 2000). "If a cost of living adjustment is applied, it must be calculated with regard to when the services were performed, not on the basis of when the award is made. Thus, fees incurred in a particular year must be indexed using the cost of living multiplier applicable to that year, and so on for each year in which fees were incurred." Marcus v. Shalala, 17 F.3d 1033, 1040 (7th Cir. 1994); Kerin, 218 F.3d at 194 ("Using a single cap reflecting the cost of living in [one year] for all nine years [of litigation] to calculate the amount of attorney's fees would result in a *de facto* award of prejudgment interest, which would constitute an abuse of discretion.").

In the present case, the Preliminary Order of Forfeiture was entered in February 2011 and the Final Order adjudicating the IRA Petitioners' claims was entered in February 2013. The majority of the litigation occurred in 2011 and 2012. The Consumer Price Index data published by the Bureau of Labor Statistics reflects that the cost of living increased from 155.7 in March 1996, the date that the statutory rate of $125 per hour was established, to an average rate of 224.939 for the year 2011, 229.594 for the year 2012, and 232.957 for the year 2013. See www.bls.gov/ro3/fax_9125.pdf (last visited

March 23, 2015).[29]  These increases in the Consumer Price Index result in an adjusted hourly rate of $180.59 for the year 2011, $184.32 for the year 2012, and $187.02 for the year 2013.

Some Petitioners contend, however, that the statutory rate should be further increased in light of certain "special factors," including the limited availability of qualified attorneys for the proceedings involved, as well as the efficiencies achieved by counsel's joint representation of multiple petitioners and the Government's bad faith in pursuing this litigation.[30]  The Court finds that none of these factors warrant the application of a higher statutory rate here.

First, these Petitioners argue that there was a limited number of qualified attorneys available who could have litigated their claims. Specifically, they contend that this was a complicated criminal forfeiture case, which required a thorough and expert understanding of state property law, complex business concepts, and federal criminal law.  The Petitioners

---

[29] A copy of this document is attached hereto as Exhibit 1.

[30] The Government again offers only conclusory objections to the application of these "special factors," containing its objections primarily to footnotes in its opposition briefs, accompanied with little or no factual or legal support.  Accordingly, the Government's objections in this regard will be summarily disregarded.

argue that it would have been impossible for them to have obtained attorneys with similar knowledge and skills at the statutory rate.

The Court is not persuaded that there was a limited number of qualified attorneys available to litigate the Petitioners' claims. As the Supreme Court has explained:

> If "the limited availability of qualified attorneys for the proceedings involved" meant merely that lawyers skilled and experienced enough to try the case are in short supply, it would effectively eliminate the [$125] cap -- since the "prevailing market rates for the kind and quality of the services furnished" are obviously *determined* by the relative supply of that kind and quality of services. "Limited availability" so interpreted would not be a "special factor," but a factor virtually always present when services with a market rate of more than [$125] have been provided. We do not think Congress meant that if the rates for all lawyers in the relevant city -- or even in the entire country -- come to exceed [$125] per hour (adjusted for inflation), then that market-minimum rate will govern instead of the statutory cap. To the contrary, the "special factor" formulation suggests Congress thought that [$125] an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be. If that is to be so, the exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question -- as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation.

> Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are necessary and can be obtained only at rates in excess of the [$125] cap, reimbursement above that limit is allowed.

Pierce v. Underwood, 487 U.S. 552, 571-572 (1988).

> We think that the directive of the Supreme Court in Pierce makes clear that the special skill requirement of the statute can be defined in terms of *either* an identifiable practice specialty not easily acquired by a reasonably competent attorney *or* special non-legal skills such as knowledge of a foreign language.... Pierce directs the courts to recognize that certain practice areas require more advanced and specialized legal skills than those possessed or easily acquired by most members of the bar. In our view, Pierce acknowledges that there will be cases in which such specialized training will be necessary. Nevertheless, we believe that such cases will be the exceptional situation and that, by providing for the "specialized case," Congress did indeed contemplate such a situation.

Hyatt v. Barnhart, 315 F.3d 239, 250 (4th Cir. 2002) (quoting Raines v. Shalala, 44 F.3d 1355, 1361 (7th Cir. 1995)) (emphasis in Hyatt).

In the present case, more than twenty attorneys, most of whom practice regularly in this District, made appearances to represent the Petitioners throughout the ancillary proceeding. While the claims at issue required a degree of familiarity and competence in state property law as well as federal forfeiture law, there was nothing that required "some distinctive

knowledge or specialized skill needful for the litigation in question" as the same is defined in <u>Pierce</u>. Therefore, the Court concludes that the skills and expertise of the Petitioners' attorneys brought to this case are not sufficient to warrant an increase of the statutory rate.

Next, several of the Petitioners contend that the hourly rate should be increased to reflect the efficiencies that resulted from counsel's joint representation of multiple Petitioners in these proceedings.[31]  These Petitioners argue that this joint representation resulted in extremely cost-effective representation, thereby justifying the award of fees at the attorneys' customary hourly rate.

While the joint representation of the Petitioners undoubtedly resulted in a more reasonable number of hours being expended in each Petitioners' case, the Court does not find that counsel's efficiency in this regard constitutes a "special circumstance" warranting a deviation from the statutory rate.  As the Sage Petitioners themselves note, "the question of *how much*

---

[31] The Government does not address all of the Petitioners' arguments regarding joint representation.  Rather, the Government takes issue (albeit only in a footnote) with the Sage Petitioners' contentions that their joint representation created efficiencies and that the early resolution of their claims materially advanced the interests of all of the ancillary claimants.  [Doc. 724 at 17 n.7].  Beyond a cursory citation to a hearing transcript and one brief filed by the Petitioners, however, the Government does not present any further argument on this point.

of an attorney's time should be compensated is a different question than the *rate* at which compensation should be awarded." [Doc. 727 at 8]. Thus, while counsel's efficient representation is commendable and certainly provides compelling justification for the number of hours claimed for each Petitioner, it does not justify increasing the statutory rate of $125 to the customary hourly rates charged by counsel in this case.

Several Petitioners also argue that the Government's bad faith in pursuing the forfeiture of the Petitioners' properties justifies the award of attorneys' fees at prevailing market rates. Section 2412(b) authorizes an award of "reasonable" attorney fees against the Government where a private party in the Government's position "would be liable under the common law." 28 U.S.C. § 2412(b). For example, where the Government has litigated in bad faith, it may be subject under common law to an award of fees based upon prevailing market rates. Sullivan v. Sullivan, 958 F.2d 574, 577 n.8 (4th Cir. 1992); Baker v. Bowen, 839 F.d 1075, 1080, n.3 (5th Cir. 1988).

"The common law allows awards of attorneys' fees in only a few exceptional cases, such as when the losing party has wilfully disobeyed a court order or has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Hyatt v. Shalala, 6 F.3d 250, 254 (4th Cir. 1993). "In order to fall within the exceedingly narrow bad faith exception to the general rule, there

must be clear evidence that the challenged claim 'is entirely without color *and* has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.'" F.T.C. v. Kuykendall, 466 F.3d 1149, 1152 (10th Cir. 2006) (quoting in part F.T.C. v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1201 (10th Cir. 2005)). "Because a fee award under § 2412(b) is punitive, it 'requires more than a showing of a weak or legally inadequate case,' and is only appropriate 'in exceptional cases and for dominating reasons of justice.'" Kuykendall, 466 F.3d at 1152 (quoting United States v. 2,116 Boxes of Boned Beef, 726 F.2d 1481, 1488 (10th Cir. 1984)).; see also Hyatt v. Shalala, 6 F.3d 250, 254 (4th Cir. 1993).

While the Court has concluded that the Government's actions were misguided and its position in this litigation was not substantially justified, the Court cannot find on this record that the Government acted wantonly, for purposes of harassment or delay, or for other improper reasons in pursuing this forfeiture action. Accordingly, the Court declines to award fees pursuant to § 2412(b).

In sum, the Court finds that the increase in the cost of living justifies a corresponding increase in the hourly rate in this case. There are no special factors in this case which warrant a further increase of the hourly rate beyond the standard inflationary adjustment, nor does the record warrant a finding

that the Government litigated this action in bad faith.  The Court further finds that the inflationary adjusted rate is consistent with the prevailing market rates for services charged by lawyers of similar talents and experience in this District.  Accordingly, the Court will grant the Petitioners' EAJA petitions and award fees based on an hourly rate of $180.59 for work performed by attorneys in the year 2011, 184.32 per hour for work performed by attorneys in the year 2012, and $187.02 per hour for work performed by attorneys in the year 2013.

The Petitioners also seek fees incurred by paralegals.  Prevailing parties may recover paralegal fees at prevailing market rates.  See Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 577 (2008).  Having reviewed the Petitioners' billing statements, and based upon the Court's familiarity with the rates charged by paralegals in this District, the Court finds that an hourly rate of $100.00 is reasonable and reflects the prevailing market rate.  Accordingly, the Petitioners will be awarded fees based on an hourly rate of $100.00 for work performed by paralegals.

## 2. Amount of Hours Claimed

Next, the Court turns to the reasonableness of the number of hours claimed by Petitioners' counsel.  See Comm'r, INS v. Jean, 496 U.S. 154, 161 (1990); see also Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  "A

request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." Hensley, 461 U.S. at 437. When the parties cannot agree on a fee amount, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended." Hensley, 461 U.S. at 437. In submitting a fee application, counsel should submit evidence supporting the number of hours worked, and exercise "billing judgment" with respect to those hours. Id. at 433, 437. "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." Id. at 434 (citation omitted).

As the Fourth Circuit has instructed:

> The district court is accorded substantial discretion in fixing the amount of an EAJA award, but is charged with the duty to ensure that the final award is reasonable. The extent of a plaintiff's success is an important factor to consider when determining the reasonableness of the fees requested. Unsuccessful claims that are distinct in all respects from the claims upon which the plaintiff has prevailed should be excluded in considering the amount of a reasonable fee. In sum, the EAJA provides that attorneys for a prevailing party should be paid for all time reasonably expended on a matter, but the EAJA should not produce windfalls to attorneys.

Hyatt v. Barnhart, 315 F.3d 239, 253-54 (4th Cir. 2002) (citations and internal quotation marks omitted).

While the Government does not specifically challenge the number of hours claimed, it makes a series of cursory objections -- again primarily in footnotes -- to certain work performed by the Petitioners' attorneys.[32]  For example, in opposing the fee petitions of Paul Miller and Terry Price, the Government objects "to the extent that . . . Petitioners seek fees for preparation of a victim impact statement that would normally be prepared by the victim him or herself, and Petitioners seek fees for expenses incurred when the multiple attorneys that chose to represent multiple clients in this matter had to expend time and money de-conflicting their representation." [Doc. 626 at 2 n.1; Doc. 627 at 2 n.1].  The Government does not cite to any specific billing statement in making these arguments, nor does it cite to any legal authority to support its objections.  The Government also does not explain which hours it considers to have been spent on "de-conflicting" the attorneys' representation of multiple Petitioners.  The Government's objections in this regard are conclusory and are presented without any

---

[32] The Court also notes that the EAJA provides the Court with discretion to reduce or even deny an award of fees and expenses upon a finding that the prevailing party "during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy."  28 U.S.C. § 2412(d)(1)(C); United States v. 515 Granby, LLC, 736 F.3d 309, 318 (4th Cir. 2013).  The Government does not contend that any of the Petitioners unduly and unreasonably protracted the resolution of this matter, and the Court specifically finds that none of the Petitioners engaged in such conduct.  Accordingly, none of the Petitioners' awards will not be reduced or denied on this basis.

factual or legal support.  Accordingly, such objections will be denied.  Lucas

v. White, 63 F. Supp.2d 1046, 1057-58 (N.D. Cal. 1999) ("Conclusory and

unsubstantiated objections are not sufficient to warrant a reduction in fees.").

The Government also objects, without citation to any authority, to the

Petitioners being awarded any fees incurred for the preparation of the fee

applications themselves.  [See Doc. 704 at 2 n.1].  The Supreme Court has

explicitly authorized, however, the award of fees incurred in preparing EAJA

fee applications.  See Jean, 496 U.S. at 162-63; see also Nken v. Holder,

385 F. App'x 299, 303 (4th Cir. 2010) (awarding fees incurred in preparing

application for fees).  The Government's objection in this regard is entirely

without merit.

Finally, the EAJA defines "fees and expenses" to include the

reasonable expenses of expert witnesses and the reasonable cost of any

study, analysis, engineering report, test or project necessary to the party's

case.  28 U.S.C. § 2412(d)(1)(D)(2)(A).  The EAJA also provides for an

award of costs, as enumerated in 28 U.S.C. § 1920, to the prevailing party.

28 U.S.C. § 2412(a)(1).  Upon careful review of each of the Petitioners' fee

applications, the Court finds that the expenses and costs claimed by the

Petitioners were reasonable and necessarily incurred as a result of this litigation.[33]

Accordingly, the Court will award the Petitioners fees based on the full number of hours requested, at the adjusted rates set forth above. The Petitioners further shall be awarded the full amount of their requested expenses and costs.

On the current record, however, the Court is unable to calculate the specific amount of fees to be awarded with regard to each of these Petitioners. The hourly rate to be allowed for work during each calendar year is different, and not all of the Petitioners have provided a breakdown of the number of hours expended each year. For this reason, the Court needs information regarding the number of hours expended during each year, and not just the totals provided. Accordingly, the Court will allow the Petitioners thirty (30) days to submit such a breakdown of the hours worked, with a calculation of the fees to be awarded in accord with this Order.

---

[33] The Government makes no objection to any of the expenses and costs claimed by the Petitioners.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Petitioners' motions for an award of attorneys' fees and costs pursuant to the Equal Access to Justice Act [Docs. 622, 623, 631, 632, 649, 650, 653, 655, 656, 657, 658, 659, 660, 661, 662, 663, 664, 665, 666, 667, 668, 669, 670, 671, 672, 674, 675, 677, 683, 712] are **GRANTED.**  The Petitioners have thirty (30) days from the entry of this Order to submit a calculation of their fees and expenses using the hourly rates identified in this Order.

**IT IS SO ORDERED.**

Signed: April 27, 2015

Martin Reidinger
United States District Judge